**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |
|---|---|
| **In re** | ) |
|  | ) |
|  | ) |
|  | ) |
| **COLONIAL BANCGROUP, INC.** | ) |
| **SECURITIES LITIGATION** | )    **CIVIL ACTION NO.** |
|  | )    **2:09-CV-104-MHT** |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

The Underwriter Defendants, listed in paragraphs 385 and 440 of the Consolidated Class Action Complaint ("Consolidated Complaint"), hereby move to dismiss the four claims against them, two of which are brought under Section 11 of the 1933 Securities Act and two of which are brought under Section 12(2) of the same Act.

## ARGUMENT

"Sections 11 and 12(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996). Under Section 11, an "underwriter may be held liable to purchasers of registered securities if the registration statement contains 'an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . .'" In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005) (quoting 15 U.S.C. § 77k(a)). Similarly, under Section 12(2), a prospectus that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the

statements, in light of the circumstances in which they were made, not misleading" may subject an underwriter to liability.  15 U.S.C. § 77*l*(a)(2).  Plaintiffs have attempted to assert claims against the Underwriter Defendants, and others, under both Sections 11 and 12 that stem from two securities offerings by Colonial BancGroup.  Consolidated Complaint ¶¶ 413, 424, 452, 461.  Because Plaintiffs do not have standing to pursue the claims under Sections 11 and 12, this Court should dismiss the action against the Underwriter Defendants for lack of jurisdiction.  Even if the Court retained jurisdiction over the claims, the allegations are insufficiently pleaded, indecipherable, fail to state a violation of Section 11 or 12, and warrant dismissal of the Consolidated Complaint.

I.    **The Lead Plaintiffs Lack Standing to Pursue Their Claims Related to the April 2008 Stock Offering Under Sections 11 and 12(a) Against the Underwriter Defendants.**

The standing requirement stems from the case-or-controversy requirement of Article III of the Constitution and is essential for the Court to exercise jurisdiction.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992).  "[S]tanding is a threshold jurisdictional question that should be addressed prior to and independent of the merits of a party's claims." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir.2005).  The party asserting federal jurisdiction bears the burden of establishing standing.  Amnesty Intern., USA v. Battle, 559 F.3d 1170, 1177 (11th Cir. 2009).

A.    Section 11 Claims

Although Section 11 imposes a high level of liability, "its standing provisions limit putative plaintiffs to the 'narrow class of persons' consisting of 'those who purchase securities that are the direct subject of the prospectus and registration statements.'"  Krim v. PCOrder.com, Inc., 402 F.3d 489, 495 (5th Cir. 2005); 15 U.S.C. § 77(a) ("In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or

omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security" has a cause of action under Section 11). A party may have standing if it either bought the security directly from the issuer or underwriter in the offering or acquired the security in the aftermarket.[1] Krim, 402 F.3d at 495-96; Grand Lodge of Pa. v. Peters, 550 F. Supp. 2d 1363, 1373-74 (M.D. Fla. 2008); Congregation of Ezra Sholom v. Blockbuster, Inc., 504 F. Supp. 2d 151, 159 (N.D. Tex. 2007). However, aftermarket purchasers must plead and prove that the security they own was issued pursuant to the allegedly-actionable prospectus or registration statement, as opposed to being part of another offering. APA Excelsior III L.P. v. Premiere Tech., Inc., 476 F.3d 1261, 1276 (11th Cir. 2007) ("In order to have standing and prevail on a claim under Section 11[, an aftermarket purchaser] must be able to trace his stock to the defective registration statement."); Grand Lodge, 550 F. Supp. 2d at 1374 ("An aftermarket purchaser . . . may have standing 'so long as he can prove the securities he bought were those sold in an offering covered by the false registration statement.'").

In a shelf registration, "each new issuance requires amending the 'registration statement' . . ., thereby creating a new 'registration statement' for purposes of giving rise to § 11 liability." In re Countrywide Financial Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1164 (C.D. Cal. 2008); 17 C.F.R. §§ 229.512(a)(2), (a)(5)(i)(B). Because any misrepresentations in the amended statement create a claim only for those who can trace their security purchase to the amended statement, "buyers that can trace their purchase to the second effective date have a claim while those who can only trace their purchase to the first do not." In re Countrywide, 588 F. Supp. 2d at 1165. Similarly, the liability of the underwriter is limited to the offerings in which they were involved:

---

[1] An aftermarket transaction is one other than a direct purchase from an underwriter, e.g., a purchase on the New York Stock Exchange.

"Plaintiffs may only sue the underwriter of the offering to which they trace their shares." In re Friedman's, Inc. Sec. Litig., 385 F. Supp. 2d 1345, 1371 (N.D. Ga. 2005).

Plaintiffs face two hurdles in the standing arena. First, they have not pleaded that the Lead Plaintiffs purchased stock traceable to the April 23, 2008, stock offering; instead, they have pleaded only that "members of the class" – which, by definition, may not include Lead Plaintiffs – bought stock traceable to that offering. And second, the allegation about putative class members owning stock traceable to the April 2008 offering is so conclusory that it fails of its own accord.

The Lead Plaintiffs, who are the only named plaintiffs, do not have standing under Section 11 and cannot bring the current action. See Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[T]he threshold question is whether the named plaintiffs have individual standing, in the constitutional sense, to raise certain issues."); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). The Consolidated Complaint identifies each Lead Plaintiff and states that each "purchased common stock of Colonial," Consolidated Complaint ¶¶ 14-17, but does not state that this stock is traceable to the April 2008 offering. The Consolidated Complaint includes exhibits that list each Lead Plaintiff's purchases and sales of Colonial stock, but none of these exhibits indicates that the stocks are traceable to the April 2008 offering. The purchased securities listed in the exhibits could easily be shares already in the market that are traceable to a prior offering, such as the 2004 offering.[2] The only mention of traceability refers to the class members, not the named or Lead Plaintiffs specifically. See id. ¶ 458 ("Members of the class purchased Colonial stock . . traceable" to the April 2008 offering); see also id. ¶¶ 436, 439, 450, 452, 456, 459. This reference is insufficient to confer standing on the Lead Plaintiffs: "[A] plaintiff who lacks standing to sue a defendant may not acquire such status through class

---

[2] In fact, some of the Lead Plaintiffs' shares were purchased prior to April 2008 and, thus, were necessarily issued under a prior prospectus.

representation." Matte v. Sunshine Mobile Homes, Inc., 270 F. Supp. 2d 805, 826 (W.D. La. 2003); Brown v. Sibley, 650 F.2d 760, 771 (5th Cir. 1981). Because there is no "specific allegation that the Lead Plaintiff[s] purchased traceable shares[,] . . . the Lead Plaintiff[s] lack[] standing to bring a Section 11 claim." In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, 864 (N.D. Tex. 2005) (finding a lack of standing because no "paragraph [in the complaint] specifically pleads that the Lead Plaintiff purchased traceable shares").

At most, Plaintiffs allege that "[m]embers of the Class purchased Colonial common stock pursuant to or traceable to the Stock Offering Materials," Consolidated Complaint ¶ 458, but this vague allegation is insufficient to establish standing even as to those unnamed plaintiffs.[3] Plaintiffs must put meat on the bone; in a non-conclusory manner, they "'must show that the security was issued under, and was the direct subject of, the prospectus and registration statement being challenged.'" Grand Lodge, 550 F. Supp. 2d at 1376 (quoting APA Exclesior, 476 F.3d at 1271); see also Krim, 402 F.3d at 495-96 ("[A]ftermarket purchasers seeking standing must demonstrate the ability to 'trace' their shares to the faulty registration."). The "Plaintiffs have not suggested what evidence they intend to use to show that the particular shares purchased by [members of the class] can be traced to the stocks issued in the" April 2008 stock offering. Grand Lodge, 550 F. Supp. 2d at 1376. The "wholly conclusory statement[s]," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561, 127 S.Ct. 1955, 1968 (2007), that the purchased stock is traceable to the April 2008 offering, without more, is insufficient to allege standing. Grand Lodge, 550 F. Supp. 2d at 1376; see Krim, 402 F.3d at 502.

In sum, because Plaintiffs do not have standing, the Court must dismiss the Section 11 action for lack of jurisdiction.

---

[3] Of course, it is not enough for unnamed putative class members to have standing; the named plaintiffs in an action must have standing. See Griffin, 823 F.2d 1476 at 1482.

B.    Section 12 Claims

Plaintiffs also lack standing to pursue their claims against the Underwriter Defendants under Section 12.  Standing to assert claims under Section 12 is "more narrow than section 11 standing."  Blockbuster, Inc., 504 F. Supp. 2d at 159.  Unlike Section 11, Section 12 limits standing "to the person purchasing such security from" a seller.  15 U.S.C. § 77l(a).  The Eleventh Circuit has squarely held "that section 12(2) of the 1933 Act does not apply to aftermarket transactions."  First Union Discount Brokerage Serv., Inc. v. Milos, 997 F.2d 835, 843-44 (11th Cir. 1993); AAL High Yield Bond Fund v. Ruttenberg, 229 F.R.D. 676 (N.D. Ala. 2005) ("[O]ur Circuit has squarely held that Section 12(a)(2) [formerly Section 12(2)] does not apply to after-market transactions."); In re Friedman's, Inc., 385 F. Supp. 2d at 1367 ("Only purchasers of stock in initial distributions to the public have standing to bring suit under Section 12(a)(2)."); see also Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 693 (3d Cir. 1991) ("[S]ection 12(2) applies only to initial offerings and not to aftermarket trading.").

Plaintiffs have failed to allege that they or other members of the class purchased Colonial stock in the initial distribution in April 2008.  The Consolidated Complaint contains no allegations that the Lead, or named, Plaintiffs purchased their shares as part of the initial offering, see Consolidated Complaint ¶¶ 14-17, or that the class members' shares were purchased in the initial offering and not in aftermarket trading.  See id. ¶¶ 439, 450, 461.  At most, Plaintiffs allege that members of the class are "purchasers of Colonial common stock pursuant to, or traceable to, the Prospectus" in the April 2008 offering, id. ¶ 461, but "it is not sufficient to allege that the shares can be 'traced back' to the offering" under Section 12(a)(2).  See Blockbuster, Inc., 504 F. Supp. 2d at 159.  Because Plaintiffs have failed to sufficiently allege that they were "purchasers of stock in the initial distribution," In re Friedman's, Inc., 385 F. Supp. 2d at 1367, they lack standing to pursue a claim under Section 12(a)(2), and the

Consolidated Complaint should be dismissed for lack of jurisdiction. See First Union, 997 F.2d at 843-44.

## II. The Consolidated Complaint Fails to State a Cause of Action Because the Statements in the 2007 Form 10-K Identified by Plaintiffs Are Not Materially Misleading.

To state an actionable claim under Sections 11 and 12 of the Securities Act, Plaintiffs "must allege the misstatement or omission of a material fact" contained in the Prospectus and Registration Statement. In re BellSouth Corp. Sec. Litig., 355 F. Supp. 2d 1350, 1365 (N.D. Ga. 2005). Truthful statements that would not mislead a reasonable investor do not give rise to violations of the Securities Act:

> A court, in reviewing a statement alleged to [be] an actionable misstatement or omission, must scrutinize the nature of the statement or omission to determine whether the statement was false when it was made. If a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a misrepresentation was somehow misleading, dismissal of the plaintiff's claims is appropriate.

Id. When assessing whether a statement is truthful, and thus not misleading, the Court must consider the prospectus as a whole and judge the truthfulness of the statements based on facts that existed when the registration statement became effective. In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004). The Eleventh Circuit has recognized that a "complaint [that] fail[s] to plead facts that, if true, would constitute a misrepresentation . . . and does nothing more than offer the legal conclusion that the representation in the prospectus was somehow misleading" should be dismissed. Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1194 (11th Cir. 2002). The standard is clear: "'[I]f no reasonable investor could conclude [that the] statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law.'" In re BellSouth, 355 F. Supp. 2d at 1365 (quoting In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002)).

It is not sufficient for Plaintiffs merely to allege that a particular statement or omission was false or misleading; they must also establish that the statement or omission is material. In re Cosi, 379 F. Supp. 2d at 586 ("Materiality is thus a required element for claims under both § 11 and § 12(a)(2)."). The Eleventh Circuit has stated the "well known" test of materiality: "'[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available,'" Oxford, 297 F.3d at 1189 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 983 (1988)) (two sets of internal quotation marks omitted), which includes "information already available to the market," Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997).

The determination of materiality is ordinarily reserved for the trier of fact, but "if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout . . . it is proper for the court to pronounce the omission immaterial as a matter of law." Oxford, 297 F.3d at 1189; see also In re AMDOCS Ltd. Sec. Litig., 390 F.3d 542, 547 (8th Cir. 2004) ("A complaint that alleges only immaterial misrepresentations presents an 'insuperable bar to relief' and is properly dismissed."). An alleged misrepresentation may be immaterial as a matter of law if (1) it is "of such common knowledge that a reasonable investor can be presumed to understand" it; (2) it "present[s] or conceal[s] such insignificant data that, in the total mix of information, it simply would not matter"; (3) it is "so vague and of such obvious hyperbole that no reasonable investor would rely upon" it; or (4) it is "accompanied by sufficient cautionary statements." In re AMDOCS Ltd., 390 F.3d at 548.

Here, there is no allegation – **none** – that the Underwriter Defendants directly made a false or misleading statement. The claims against them are based **entirely** on their incorporation by reference of Colonial's 2007 Form 10-K annual report. See Consolidated Complaint ¶¶ 368,

370, 420, 426, 436, 448, 453, 463.    Plaintiffs assert that the Form 10-K contained four misrepresentations:

> (a) the goodwill impairment analysis for 2007 indicated that no impairment write-offs were required; (b) Colonial maintained "conservative underwriting" standards; (c) Colonial was "committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses"; and (d) Colonial had collateral guidelines that required Loan-To-Value ("LTV") ratios of a certain minimum percentage in each loan sector.

Id. ¶ 368.

Plaintiffs have failed to allege sufficiently that any of the four statements were "actually false" or materially misleading, particularly in the light of the included cautionary language. See Grossman, 120 F.3d at 1119. This is most glaringly true with respect to the third statement: that Colonial was "committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses[.]" Id. Other than a couple of passing references, Plaintiffs have failed even to identify the offending language regarding loan losses in the Form 10-K. Id. ¶ 368, 409. Nor have they offered any factual basis to support their implied claim that Colonial did not have "an adequate level of allowance to cover inherent losses." Id. ¶ 368. Only when plaintiffs have identified the statements or omissions that are "specifically named in the complaint" and identified "the manner in which . . . the [statements are] false and misleading" have they properly stated a claim, In re Consumers Power Co. Sec. Litig., 105 F.R.D. 583, 599 (E.D. Mich. 1985), and the cursory reference to loan levels does not satisfy even the minimal requirements of notice pleading, does not permit a proper response, and cannot form the basis of Plaintiffs' cause of action. FED. R. CIV. P. 8.

The remaining three statements that Plaintiffs actually identified and purported to support with factual allegations also fail to state a violation of Sections 11 and 12. The statements about goodwill impairment, underwriting standards, and collateral guidelines are neither misleading nor material as a matter of law.

A.    None of the Individual Statements Is Sufficient to Sustain a Violation of Section 11 or 12.

1.    *Goodwill Impairment*

The first passage in the 2007 Form 10-K that Plaintiffs identify as "[f]alse and [m]isleading" discusses Colonial's calculation of goodwill. The Form 10-K states:

> BancGroup records goodwill in an amount equal to the excess of the cost of an acquisition over the fair value of the net assets acquired. BancGroup tests goodwill for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment. The Company has elected to perform its annual testing as of September 30 each year. The goodwill impairment test is a two-step process, which requires management to make judgments in determining the assumptions used in the calculations. The first step involves estimating the fair value of each reporting unit and comparing it to the reporting unit's carrying value, which includes the allocated goodwill. If the estimated fair value is less than the carrying value, then a second step is performed to measure the actual amount of goodwill impairment. The second step initially involves determining the implied fair value of goodwill. This requires the Company to allocate the estimated fair value to all the assets and liabilities of the reporting unit. Any unallocated fair value represents the implied fair value of goodwill which is compared to its corresponding carrying value. If the implied fair value is less than the carrying value, an impairment loss is recognized in an amount equal to that deficit.
>
> Fair values of reporting units are estimated using discounted cash flow models derived from internal earnings forecasts. The key assumptions used to estimate the fair value of each reporting unit include earnings forecasts for five years, terminal values based on future growth rates and discount rates based on the Company's weighted average cost of capital adjusted for the risks associated with the operations of each reporting unit.
>
> The goodwill impairment analysis for 2007 indicated that no impairment write-offs were required.

Colonial 2007 Form 10-K at 21-22. Plaintiffs conclusorily challenge the accounting procedures described in the Form 10-K and assert that "Colonial failed to properly account for its goodwill impairment," Consolidated Complaint ¶ 394, but the only support they cite for this bare allegation actually confirms the truthfulness of Colonial's statements.

01856189.2

As confirmed by the assertions in the Consolidated Complaint, the Form 10-K accurately states that Colonial tests goodwill for impairment annually unless circumstances require an interim assessment and that in 2007 the annual assessment was conducted on September 30. Colonial 2007 Form 10-K at 21. Plaintiffs agree that "GAAP requires that goodwill be assessed for potential impairment at least annually, and more frequently where certain triggering conditions are present," Consolidated Complaint ¶ 129, and that "Colonial elected to conduct its annual impairment testing as of September 30 each year," id. ¶ 135. Far from supporting an inference that "Colonial failed to properly account for its goodwill impairment," these allegations confirm Colonial's statements in the Form 10-K that it conducted the annual assessments of goodwill impairment required by GAAP. While an institution may test goodwill impairment on an interim basis if events or circumstances suggest an impairment might exist, Plaintiffs have failed to allege any circumstances that should have prompted Colonial to conduct an interim assessment in 2007.

Plaintiffs also agree that the two-step process identified by Colonial in the Form 10-K is the proper procedure for assessing goodwill impairment, id. ¶ 393-94, 129-32. Plaintiffs' description of the proper procedure, as outlined in the Statement of Financial Accounting Standards No. 142, id. ¶ 130, is identical to the procedure Colonial disclosed in the Form 10-K. Id. ¶ 393. Plaintiffs have failed even to suggest that Colonial used a procedure other than the one identified in the Form 10-K when performing its calculations of goodwill impairment. Again, the facts alleged by Plaintiffs actually establish the truthfulness of Colonial's statements about its procedure for calculating goodwill impairment.

Plaintiffs then assert that Colonial's statement about the outcome of its testing in 2007 was misleading, but again their unsupported allegations fall short. The 2007 Form 10-K reported

01856189.2

that "[t]he goodwill impairment analysis for 2007 indicated that no impairment write-offs were required." Id. ¶ 393. Plaintiffs allege that this statement was false and misleading because Colonial recognized a goodwill impairment in the fourth quarter of 2008, "the vast majority related to assets in Florida." Id. ¶ 394.

"A court evaluates whether the statement or omission was misleading at the time it was made," Zucker v. Quasha, 891 F. Supp. 1010, 1014 (D.N.J. 1995), and the presence of an impairment in goodwill at the end of 2008 fails to show that an impairment existed in 2007 or that the statement in the Form 10-K that no write-off for goodwill impairment was required was false or misleading. "The mere fact that the [company] requested more information in fiscal year [2008] and that a writeoff occurred in the last quarter, standing alone, provides no evidence that there was an accounting problem in [2007]." In re Airgate PCS, Inc. Sec. Litig., 389 F. Supp. 2d 1360, 1377 (N.D. Ga. 2005). Because Plaintiffs cannot "show that the omitted information [about a goodwill impairment] in fact existed at the time that the allegedly misleading statement was made," Zucker, 891 F. Supp. at 1017, the statements in the 2007 Form 10-K are not misleading as a matter of law and should not be considered by this Court as support for the Plaintiff's claims under Sections 11 and 12. See Oxford, 297 F.3d at 1193 ("The fatal flaw in Oxford's position is the complaint's failure to allege facts that support the conclusion that the 32% claim is false.").

### 2.    Conservative Underwriting Standards

The second set of statements identified by Plaintiffs as misrepresentations in the 2007 Form 10-K address the credit risk management policies employed by Colonial. Consolidated Complaint ¶ 395; 2007 Form 10-K at 43. The 2007 Form 10-K described Colonial's procedures to monitor risk associated with its lending practices:

> Colonial has some measure of credit risk in most of its primary banking activities, but the majority of this risk is associated with lending. Colonial's Credit Risk

Management philosophy has historically been, and continues to be, focused on establishing and administering policies and procedures such that Colonial's credit quality has outperformed Colonial's peers in most economic environments. Consistent with this philosophy, Colonial has maintained conservative underwriting and credit product standards and has generally avoided nontraditional credit products. The Company's credit risk management process is centered on comprehensive credit and underwriting policies and procedures, a strong and effective loan approval process, continual audit and review functions and experienced credit professionals at the regional, business-line and BancGroup levels. In addition, Colonial has a credit risk reporting and analysis group which falls under the supervision of the Chief Credit Officer. This group continually evaluates changes in credit risk, monitors large concentrations and exposures of all types and locations and implements Colonial Bank's allowance methodology. Colonial also has a special assets/collections group which is charged with minimizing losses, maximizing recoveries and implementing strategies to reduce problem asset levels. In addition, the internal auditors and regulatory examiners review and perform detailed tests of the Company's credit risk management activities, such as credit underwriting, loan administration and the allowance process. The overall goals of Colonial's credit risk management activities include providing a sound basis for new credit extensions and early recognition of problems/risks so that Colonial can maintain a high quality loan portfolio and achieve long-term earnings growth.

Colonial 2007 Form 10-K at 43; Consolidated Complaint ¶ 395. Plaintiffs erroneously allege that this statement is misleading because "in reality, Colonial's underwriting standards had suffered a severe deterioration." Consolidated Complaint ¶ 396. Plaintiffs attempt to support this vague accusation with conclusory allegations and unrelated facts, but these efforts are unsuccessful.

From the lengthy description of the risk management policies contained in the Form 10-K, Plaintiffs selectively excerpt the statement that "Colonial has maintained conservative underwriting . . . standards" and seek to discredit this assertion with the accounts of confidential witnesses that are former employees of Colonial. Id. ¶¶ 396-406. The recollections of these employees do not render the select statement in the Form 10-K about the underwriting practices false or misleading, much less even suggest that the statements about risk management, when taken together, would have misled a reasonable investor.

13

Plaintiffs rely on the statement of a former "Loan Document Review Specialist" (CW1) that a team of loan operations personnel "acted as a safeguard" and "in the second half of 2006, the loan operations team's ability to perform this safeguarding function was severely compromised." Id. ¶ 397. The only support offered for this bald assertion is that in 2006 Colonial changed its policy to allow loan officers and their assistants, in addition to the loan operations team, to "clear exceptions" that had been flagged on pending loans and that loan officers were motivated to clear exceptions and process the loans. Id. ¶¶ 398-400. One of the disgruntled former employees complained "that this completely defeated the purpose of the loan operations department reviewing loan files and noting exceptions, in effect, allowing loan officers to bypass the loan operations department." Id. ¶ 399.

Even if this allegation is true and loan officers and their assistants were authorized to clear exceptions on loans, it does not follow that such a change in policy resulted in unsound underwriting practices or poor risk management procedures. The 2007 Form 10-K does not mention the loan operations team or designate which personnel within the bank are responsible for the underwriting of loans; it simply states that "the credit risk management process is centered on comprehensive credit and underwriting policies and procedures, a strong and effective loan approval process, continual audit and review functions and experienced credit professionals at the regional, business-line and BancGroup levels." Colonial 2007 Form 10-K at 43. Based on this statement, a reasonable investor would conclude that professionals within the bank were reviewing and approving loans based on sound underwriting procedures, and the simple fact that loan officers, who are "experienced credit professionals," were some of the individuals tasked with reviewing loans and clearing exceptions does not render the statement false or misleading. Plaintiffs' assertion that the description of Colonial's policies in the Form 10-K was misleading because "loan officers were motivated to clear exceptions" meets a similar

fate. Consolidated Complaint ¶ 400. Efficiency in clearing loans does not equate to unsound or loose underwriting standards or risk management strategies.

Plaintiffs also rely on a statement by a former employee that the criteria for reviewing a loan had changed over a ten year span to support their allegation that Colonial was not using conservative underwriting standards as stated in the Form 10-K, but this alleged factual support collapses under the load Plaintiffs force it to bear. See Computervision Corp., 90 F.3d at 624 ("The district court held that the Prospectus would not bear the characterizations plaintiffs sought to place on it, and that the allegedly actionable 'representations' were no more than unreasonable inferences drawn by plaintiffs and unsupported by the surrounding language."). The former employee recounted that when he or she started working at Colonial, ten years earlier, the bank employed "approximately 30 criteria" to judge the soundness of a loan, but that by mid-2007, "only three criteria" were used by loan officers. Consolidated Complaint ¶ 405. Plaintiffs fail to allege when this change took place or that the policy change resulted in unsound lending practices.

First, simply altering the number of criteria used to review a loan does not translate to unsound underwriting standards. The 2007 Form 10-K does not describe the exact procedure used to evaluate a loan and does not assert that certain criteria are utilized when determining the soundness of a loan. Colonial 2007 Form 10-K at 43. The use of fewer criteria over a ten-year period does not give rise to the inference that Colonial's statement about its conservative underwriting practices was misleading to a reasonable investor when made in February 2008, when the Form 10-K was filed.

Second, the Consolidated Complaint alleges that the loan operations team "confined their review to just three items," Consolidated Complaint ¶ 405, but it does not allege that the team was the only division at Colonial to review loans or that other personnel were also reviewing

15

loans on the same three criteria. In fact, the Form 10-K states that multiple divisions within the company are involved in risk management: "Colonial has a credit risk reporting and analysis group which falls under the supervision of the Chief Credit Officer" that "continually evaluates changes in credit risk," "a special assets/collections group which is charged with minimizing losses, maximizing recoveries and implementing strategies to reduce problem asset levels," and "internal auditors and regulatory examiners" that "review and perform detailed tests of the Company's credit risk management activities, such as credit underwriting, loan administration and the allowance process." Colonial 2007 Form 10-K at 43. Plaintiffs have not alleged that these statements are false or misleading. At most, the allegations in the Consolidated Complaint suggest that Colonial had moved its risk management and underwriting practices away from the loan operations team and toward other divisions and personnel at the company. The 2007 Form 10-K states that Colonial used a variety of methods to ensure sound underwriting and credit risk management, and Plaintiffs have alleged no facts that would lead a reasonable investor to conclude that this assertion is false or misleading.

Plaintiffs also include statements by former employees about the origination procedures for loans in the secondary market, Consolidated Complaint ¶ 401-02, but these statements actually confirm that Colonial employed conservative practices that reduced its credit risk. According to a mortgage loan officer and an administrative assistant, the loans that potentially carried greater risk, including subprime loans, were part of Colonial's "secondary loan business" and were "sold to other lending institutions." Id. This practice of selling higher risk loans to other institutions reduces Colonial's risk and, by extension, its investors' risk because the loans are no longer part of Colonial's permanent loan portfolio.

The remainder of the Plaintiffs' allegations are impermissibly vague, such as "CW5 said Colonial's lending guidelines were 'loosey-goosey,'" id. ¶ 403, and do not render the statements

in the 2007 Form 10-K false or misleading. Plaintiffs cite the statement of a former employee that "a substantial component of Colonial's mortgage loan portfolio consisted of loans made to the 'foreign national market,' [whose customers] . . . could not provide credit scores or other standard documentation and proofs of creditworthiness." Id. Even if this allegation is true, the inability of customers to provide "standard" documentation does not mean that Colonial failed to properly document and underwrite those loans.

Based on the vague and conclusory statements alleged in the Consolidated Complaint, no reasonable investor could conclude that the statements in the 2007 Form 10-K about Colonial's risk management were misleading. See In re BellSouth, 355 F. Supp. 2d at 1365. This conclusion is especially true when one examines the passage in its entirety. Plaintiffs have only attacked a few, select words from the lengthy statement and have failed to discredit even those cherry-picked assertions. Taken as a whole, the statement would have led a reasonable investor to conclude that Colonial employed sound policies at multiple levels of the company to fulfill its commitment to comprehensive credit risk management policies and that multiple areas of the company played an active role in monitoring and reducing risk. Because Plaintiffs have failed to offer evidence that refutes this understanding or that would lead a reasonable investor to conclude that the statements in the Form 10-K were false or misleading, the statements are not misleading as a matter of law and cannot sustain the current action.

Even if Plaintiffs had sufficiently alleged that the statements were misleading, the misrepresentations are immaterial. "Mere misinformation or misrepresentation is not sufficient to constitute a violation of the Securities Act." SEC v. Carriba Air, Inc., 681 F.2d 1318, 1323 (11th Cir. 1982). To be actionable, the misrepresentation must be one that a reasonable man would attach importance to in determining his course of action. Id. The materiality or importance of the statement is assessed in the "total mix" of information available to the

01856189.2

investor. In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 658 (S.D.N.Y. 2004); In re

Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993) ("[A] court must appraise a

misrepresentation or omission in the complete context in which the author conveys it."). 

Although accurate statements of present or past performance or historical fact can be considered

in the "total mix" of facts, they "cannot form the basis of a securities fraud action." In re

Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002).

    The statement in the 2007 Form 10-K that Colonial "maintained conservative

underwriting . . . standards" is a statement of historical fact and is so vague that it is immaterial

as a matter of law. In re AMDOCS Ltd., 390 F.3d at 548; see In re Scientific-Atlanta, 239 F.

Supp. 2d at 1360 ("A statement can be dismissed as puffery as a matter of law only if it is

immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on

it in considering the 'total mix' of facts available."). The statement does not define

"conservative" or describe the exact underwriting standards employed by the company. The

passing reference is couched in statements about Colonial's general "philosophy" and its past

operations. Colonial 2007 Form 10-K at 43. The few words appear in a portion of a sentence in

a 120-page document that was incorporated by reference into prospectuses that were each

approximately 50 pages in length. In the total mix of information available, a fleeting reference

to "conservative underwriting . . . standards" would have assumed no "significance in the

deliberations of a reasonable shareholder." Carriba Air, 681 F.2d at 1323; Miller v. Lazard, Ltd.,

473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007).

    Additionally, there is not a "**substantial** likelihood" that disclosure of the "facts"

Plaintiffs allege were omitted would "have been viewed by the reasonable investor as having

**significantly** altered the total mix of information available." Oxford, 297 F.3d at 1189

(emphasis added). As the Eleventh Circuit has recognized, companies do not have a duty to

01856189.2

disclose every material fact in a prospectus. Id. at 1190. "[T]he duty question is properly stated as 'whether the defendants had a specific obligation to disclose information of the type that the plaintiffs complain was omitted from the registration statement and prospectus.'" Id. A duty arises when the omitted information is "required to be stated in the prospectus or is necessary to make the statements in the prospectus not misleading." Id. (emphasis omitted); see 15 U.S.C. § 77k(a); id. § 77l(a)(2).

Colonial did not have a duty to disclose its routine business decisions that allowed loan officers, in addition to other company personnel, to clear exceptions and approve loans and that altered the number of criteria used to assess a loan over a ten year span. See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud."). The Form 10-K described the general standards for managing Colonial's risk, and the disclosure of each officer or division tasked with a role in reducing risk was not necessary to prevent misleading a reasonable investor. Nor would this deluge of trivial information have been significant to a reasonable investor. The Supreme Court has recognized that imposing a standard of materiality that is unnecessarily low could result in companies "bury[ing] shareholders in an avalanche of trivial information [-] a result that is hardly conducive to informed decisionmaking." TSC Indus. v. Northway, Inc., 426 U.S. 438, 448-49, 96 S. Ct. 2126, 2132 (1976); see Oxford, 297 F.3d at 1190. Requiring Colonial to disclose every minute detail of its loan review and underwriting processes, along with details about every other aspect of the company, would turn a 120-page document into a multi-volume treatise and would prevent investors from locating information that is pertinent to their decision. "The average prudent investor is not concerned with minor inaccuracies or with errors as to matters which are of no interest to him. The facts which tend to deter him from purchasing a security are facts which have an important bearing upon the nature

19

or condition of the issuing corporation or its business." Escott v. BarChris Constr. Corp., 283 F. Supp. 643, 681 (S.D.N.Y. 1968). The exact department or individual responsible for monitoring and managing credit risk and the specific criteria used by one division within a company to assess a loan do not "have an important bearing upon" the company and there is not a substantial likelihood that such a disclosure would be important to a reasonable investor.

Disclosing the additional information about the loans originated for sale on the secondary market also would not have been significant to a reasonable investor. The Form 10-K already disclosed that Colonial originated and sold loans on the secondary market and "d[id] not retain any servicing rights related to these loans." Colonial 2007 Form 10-K at 31. Because the sale of these potentially higher risk loans actually reduced Colonial's risk and the loans did not remain part of Colonial's permanent loan portfolio, further disclosure about the secondary market would have been insignificant to a reasonable investor and was unnecessary. See Oxford, 297 F.3d at 1190.

Even accepting the allegations in the Consolidated Complaint as true, the pertinent information about Colonial's credit risk management was either "effectively disclosed" or did not require additional disclosure. Computervision Corp., 90 F.3d at 621. No reasonable investor could conclude that the statements about Colonial's credit risk management were misleading or that additional facts would have assumed significance in the deliberations about whether to invest in the offerings. The statement that Colonial "maintained conservative underwriting . . . standards," taken in context, is not misleading, is immaterial as a matter of law, and "presents an 'insuperable bar to relief.'" See In re AMDOCS Ltd., 390 F.3d at 547.

### 3.    Collateral Guidelines

The third set of alleged misrepresentations in the 2007 Form 10-K concerns Colonial's "Loan Approval and Underwriting," specifically the "collateral guidelines." Colonial 2007 Form

01856189.2

10-K at 43; Consolidated Complaint ¶ 407. The Form 10-K outlined Colonial's policies for evaluating and monitoring loans:

> BancGroup has standard policies and procedures for the evaluation and underwriting of new credits, including debt service evaluations and collateral guidelines. Collateral guidelines vary with the creditworthiness of the borrower, but generally require loan-to-value ratios not to exceed 85% for commercial real estate, 80% for construction, 75% for development, 65% for raw land and 90% for residential real estate. Commercial non-real estate, financial and agricultural loans are generally collateralized by business inventory, accounts receivables or business equipment and are financed at 50%, 80% and 90% of estimated value, respectively. Where required, collateral for installment and consumer loans is based on 90% or lower loan-to-value ratios. Collateral values referenced above are monitored and estimated by loan officers and the senior credit administration function through inspections, independent appraisals, reference to broad measures of market values and current experience with similar properties or collateral. Loans with relatively high loan-to-value ratios may have potentially higher risks which are offset by other factors including the borrowers' or guarantors' creditworthiness, deposits and other aspects of the overall relationship, the customer's history with Colonial and other potential sources of repayment.

Colonial 2007 Form 10-K at 43.

Instead of specifying which particular statements were misleading in the above passage, as they are required to do, In re Consumers Power Co., 105 F.R.D. at 599, Plaintiffs reference the entire passage and summarily assert that "Colonial's loan officers were consistently disregarding LTV ratios entirely" when reviewing the soundness of a loan. Consolidated Complaint ¶¶ 408, 405. As support for this conclusory statement, Plaintiffs cite the recollection of a former employee who stated that, at some undefined point in time, "loan operations personnel ignored . . . loan-to-value ratio[s]." Id. ¶405. There is no assertion in the Consolidated Complaint that the loan officers or loan operations team were not considering loan-to-value ratios in February 2008, when the Form 10-K was filed, or in March or April 2008, when the offerings were made. See Zucker, 891 F. Supp. at 1014. Even if this statement is true and the loan operations team was not considering loan-to-value ratios at the pertinent time, it does not follow that no one within the company was monitoring the ratios. The Form 10-K states that the Chief Credit Officer

21

"provides company-wide credit oversight," that "a senior credit administration function . . . reviews larger credits," that both "regional loan committees" and "state loan committees" oversee loans, and that the "collateral values . . . are monitored and estimated by loan officers and the senior credit administration function through inspections, independent appraisals, reference to broad measures of market values and current experience with similar properties or collateral." Colonial 2007 Form 10-K at 43. Plaintiffs have offered no evidence that these procedures were abandoned, that other divisions or personnel at Colonial were not observing the loan-to-value ratios, or that loans were issued that did not "generally" reflect the ratios stated in the Form 10-K. Plaintiffs have offered only "conclusory allegations, unwarranted deductions of facts [and] legal conclusions masquerading as facts" that do not support their claim that the statements were false and misleading and should "not prevent dismissal" of the Consolidated Complaint. See Oxford, 297 F.3d at 1188.

Additionally, the facts cited by Plaintiffs that were allegedly omitted from Colonial's statement about its collateral guidelines were not necessary to correct a materially misleading statement and Colonial had no duty to include them. See id. at 1190. Plaintiffs do not allege that the loan-to-value ratios were being totally disregarded by Colonial, only that the loan operations team was no longer considering that criteria when assessing loans. Consolidated Complaint ¶¶ 408, 405. Colonial had no duty to disclose that certain employees were no longer responsible for assessing loan-to-value ratios because this insignificant information was not necessary to correct a misleading statement in the prospectus or registration statement. See Oxford, 297 F.3d at 1190. Only if loan-to-value ratios were wholly unchecked or not monitored by loan officers and "the senior credit administration function" would the statement in the 2007 Form 10-K be materially misleading and in need of clarification. Colonial 2007 Form 10-K at 43.

Similarly, the omission was immaterial because a reasonable investor would be unconcerned with the daily operations of Colonial, particularly which divisions are responsible for assessing loan-to-value ratios and other loan criteria. In the total mix of information, the exact divisions or personnel tasked with assessing loan-to-value ratios would be insignificant to a reasonable investor. See In re AMDOCS Ltd., 390 F.3d at 548; Escott, 283 F. Supp. at 681. Colonial had effectively disclosed the general information about its collateral guidelines. It did not need to disclose further specific, inconsequential information. Cf. Computervision Corp., 90 F.3d at 633 ("[P]laintiffs have no claim that Computervision's general statement that backlog was usually low, without the disclosure of specific numbers, was materially misleading."). Requiring this degree of disclosure of information of "dubious significance . . . may accomplish more harm than good" and prevent investors from accessing information that is crucial to their investment decisions. See TCS Indus., 426 U.S. at 448, 96 S. Ct. at 2132. Like the other statements Plaintiffs have cherry-picked from the lengthy Form 10-K, the description of Colonial's collateral guidelines were not misleading or material and did not omit material facts that would have been significant to a reasonable investor. These statements are insufficient as a matter of law to sustain Plaintiffs' causes of action under Sections 11 and 12.

     B.    <u>The 2007 Form 10-K Report Contained Sufficient Warnings of the Risks That Rendered the Alleged Misrepresentations Immaterial.</u>

Even if the alleged misrepresentations identified by Plaintiffs could be construed as materially misleading when read in isolation, the Court must consider the statements "together and in context" to determine whether a reasonable investor would have been mislead. In re WorldCom, 346 F. Supp. 2d at 658. A careful reading of the Consolidated Complaint reveals that Plaintiffs are asserting losses based on Colonial's exposure to risk in the Florida real estate market and mortgage crisis, see generally Consolidated Complaint ¶¶ 365, 370, 388, 394, 410, 449, losses that they were expressly warned about in the 2007 Form 10-K and both prospectuses.

Although they have selectively excerpted statements from the Form 10-K that they allege are misleading, the report warned of the exact risks that befell Colonial's investors. <u>See</u> <u>Colonial 2007 Form 10-K</u> at 9-11. "'[T]he allegations of the complaint are not read in isolation; they cannot be separated from the language of the prospectus, including whatever cautionary language appears in that text.'" <u>Zucker</u>, 891 F. Supp. at 1014 (quoting <u>Trump Casino</u>, 793 F. Supp. at 553). When read in context, along with the warnings, the general statements identified by Plaintiffs as misleading cannot be considered material. <u>Cf.</u> <u>In re Scientific-Atlanta</u>, 239 F. Supp. 2d at 1360; <u>In re Flag Telecom Holdings, Ltd.</u>, 308 F. Supp. at 255 ("When a prospectus contains detailed disclosures of the relevant risks involved, general statements concerning the state of the industry, such as the ones made here, are immaterial as a matter of law.").

The Form 10-K included extensive warnings about Colonial's sensitivity to "general business and economic conditions, particularly in the real estate industry." <u>Colonial 2007 Form 10-K</u> at 9. Specifically, the report warned that "commercial real estate and construction loans[, which comprise most of Colonial's loan portfolio,] generally involve higher credit risk than conventional single-family residential loans" and may be "affected to a greater extent than residential loans by adverse conditions in the real estate markets or the economy." <u>Id.</u> The report foreshadowed that "[a]n increase in the number of delinquencies or defaults could result in a higher level of nonperforming assets, net charge-offs and provision for loan losses, which could adversely affect our results of operations." <u>Id.</u> This is exactly what Plaintiffs contend occurred: "Colonial's stock price has plummeted in reaction to subsequent disclosures that (a) its goodwill was severely impaired; (b) its [nonperforming assets] were shockingly high; and (c) it needed to raise an additional $300 million in order to qualify for TARP funding." <u>Consolidated Complaint</u> ¶¶ 449, 410.

Plaintiffs acknowledge that the investment losses are tied to changes in the real estate market, particularly in Florida: "Colonial Bank's loan portfolio is comprised mainly of CRE and residential construction loans, with heavy exposure in the troubled Florida markets." Id. ¶ 365. "[F]acing a housing market in steep decline, Colonial found itself strapped for capital during the first quarter of 2007." Id. ¶ 388. The 2007 Form 10-K expressly warned that "a significant portion of the loans in [Colonial's] portfolio are secured by residential and commercial properties in Florida," which "makes us sensitive to changes in the economic, demographics, and regulatory conditions in that state." Colonial 2007 Form 10-K at 11. Additionally, the report stated that "[r]ecent developments in the residential mortgage and related markets and the economy may adversely affect our business." Id. at 9.

The Form 10-K also disclosed risks associated with Colonial's accounting measures: "Our accounting policies and methods determine how we report our financial condition and results of operations, and they may require management to make estimates about matters that are inherently uncertain." Colonial 2007 Form 10-K at 11. Specifically, with regard to Colonial's collateral guidelines, the report stated that loans "with relatively high loan-to-value ratios may have potentially higher risks which are offset by other factors including the borrowers' or guarantors' creditworthiness, deposits and other aspects of the overall relationship, the customer's history with Colonial and other potential sources of repayment." Id. at 43.

The prospectuses for the Notes Offering and the Stock Offering also included detailed cautionary language about the risks to investors. In addition to cautionary language similar to that in the Form 10-K, the prospectus for the Notes Offering included disclosures that warned of specific risks associated with the purchase of the notes. Prospectus Supplement for the Note Offering at S-8 to -10. The prospectus in the Stock Offering also included cautionary language

that warned of the risks associated with the allowance for loan losses and the effect of the mortgage crisis on Colonial. Prospectus Supplement for the Stock Offering at S-7.

The 2007 Form 10-K and the prospectuses warned of the specific risks associated with investing in Colonial notes and stocks. That these risks materialized and resulted in losses to investors is unfortunate, but it does not render select statements made in the Form 10-K materially misleading. A reasonable investor, reading the entire 2007 Form 10-K, would have appreciated the risks associated with investing, would not have been misled by generalized statements about Colonial's philosophy and company practices cherry-picked and taken out of context by Plaintiffs in the Consolidated Complaint, and would have been unaffected by the disclosure of the mundane business practices identified by Plaintiffs. Because "the prospectus contain[ed] all of the material information specifically required by the securities laws, d[id] not contain an untrue statement of a material fact and . . . the statement[s] therein were not materially misleading in any respect, there has been no material misrepresentation or material omission," Oxford, 297 F.3d at 1190, and, therefore, the Consolidated Complaint, and specifically Counts III, IV, VI, and VII against the Underwriter Defendants, must be dismissed as a matter of law.

## CONCLUSION

Colonial's "investors took a gamble, as do all investors. They lost." In re Worlds of Wonder, 35 F.3d at 1420 (quoting WOW, 814 F. Supp. at 873). They now attempt to selectively excerpt statements from an annual report to craft a violation of the securities laws. "Using tortured reasoning, convolution of the issues, and the benefit of hindsight, they point to the most innocuous of . . . language, and the most immaterial of omitted facts, and claim that they were somehow misled as to the nature of their investment," despite explicit and extensive cautionary language that warned of the exact risks that befell them. Id. The securities laws do not cure all ills when an investment sours or a company fails: "The securities laws do not insulate investors

26

against stock downturns which are caused by events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities." Id. Colonial warned investors of the exact risks that they now complain occurred. The loss to the investor Plaintiffs is unfortunate, but neither Section 11 nor Section 12 provides them a remedy under the law because Plaintiffs have failed to identify material misstatements and omissions by Colonial that led to their loss.

By: /s/ Carl S. Burkhalter
A. Inge Selden, III
iselden@maynardcooper.com
Carl S. Burkhalter
cburkhalter@maynardcooper.com
Alan F. Enslen
aenslen@maynardcooper.com
Steven L. McPheeters
smcpheeters@maynardcooper.com

*Attorneys for Underwriter Defendants*

**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Samuel H. Franklin
sfranklin@lightfootlaw.com
James F. Hughey
jhughey@lightfootlaw.com
Enrique "Henry" J. Gimenez
hgimenez@lightfootlaw.com
LIGHTFOOT, FRANKLIN & WHITE,
LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203-3200

Robert D. Segall
segall@copelandfranco.com
COPELAND, FRANCO, SCREWS &
GILL, PA
44 South Perry Street
P.O. Box 437
Montgomery, Alabama 36101-0347

Thomas A. Dubbs
tdubbs@labaton.com
James W. Johnson
jjohnson@labaton.com
Angelina Nguyen
anguyen@labaton.com
Alan Ellman
aellman@labaton.com
Christopher J. Keller
ckeller@labaton.com
Stefanie Sundel
ssundel@labaton.com
Thomas G. Hoffman
thoffman@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005

Tyrone C. Means
tcmeans@tmgslaw.com
H. Lewis Gillis
hlgillis@tmgslaw.com
Gerald C. Brooks
gcbrooks@tmgslaw.com
THOMAS, MEANS, GILLIS & SEAY, PC
3121 Zelda Court
Montgomery, Alabama 36106

Larry B. Childs
larry.childs@wallerlaw.com
WALLER LANSDEN DORTCH & DAVIS
LLP
1901 Sixth Avenue North
Suite 1400
Birmingham, Alabama 35203

Tabor R. Novak, Jr.
tnovack@ball-ball.com
E. Ham Wilson., Jr.
hwilson@ball-ball.com
BALL, BALL, MATTHEWS & NOVAK,
P.A.
P.O. Box 2148
Montgomery, Alabama 36102-2148

Elizabeth V. Tanis
etanis@kslaw.com
Dan S. McDevitt
dmcdevitt@kslaw.com
Shelby S. Guilbert, Jr.
sguilbert@kslaw.com
G. Patrick Montgomery
pmontgomery@kslaw.com
KING & SPALDING, LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521

01856189.2

Kimberly A. Sanders
kas@chimicles.com
Steven A. Schwart
sas@chimicles.com
CHIMICLES & TIKELLIS, LLP
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA 19041

Michael Dampier
VICKERS, RIIS, MURRAY AND
CURRAN, LLC
P.O. Box 2568
Mobile, Alabama 36652-2568


/s/ Carl S. Burkhalter
OF COUNSEL

01856189.2