IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

|  |  |  |
|---|---|---|
| In re<br>COLONIAL BANCGROUP, INC.<br>SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>) | Civil Action No.<br>2:09-cv-00104-MHT |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
THE UNDERWRITER DEFENDANTS' AND OUTSIDE DIRECTOR
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF RELEVANT FACTS ...........................................................3

ARGUMENT ..................................................................................................6

I.      THE APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS ..............6

        A.      The Standards Under Rule 12(b)(6) .........................................6

        B.      The Standards under Sections 11 and 12(a)(2) ........................7

II.     LEAD PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS .......................8

III.    LEAD PLAINTIFFS' SECURITIES ACT CLAIMS ARE PLEADED WITH
        THE REQUISITE PARTICULARITY ...........................................................11

        A.      Lead Plaintiffs Do Not Plead Or Allege Fraud  Against The Outside
                Director Defendants ................................................................13

        B.      The Section 11 Claims Against The Outside Director Defendants Are
                Distinguished From Any Allegations Of Fraudulent Conduct ..............15

IV.     THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS ..............................17

        A.      Lead Plaintiffs Allege Actionable False and Misleading Statements ..................17

                1.      Statements Regarding Goodwill Impairment Are Actionable ..................18

                2.      Statements Regarding Conservative Underwriting Standards Are
                        Actionable ................................................................20

                3.      Statements Regarding Early Recognition of Problem Loans and
                        Adequate Allowances Are Actionable ........................................22

                4.      Statements Regarding Collateral Guidelines Are  Actionable ..................23

        B.      The Underwriter Defendants Omitted Facts Necessary to  Make the
                Offering Materials Not False and Misleading ......................................24

        C.      The Defendants' Misstatements Were Material ....................................25

        D.      The Underwriter Defendants Are Not Protected by the  "Bespeaks
                Caution" Doctrine ...................................................................26

     E.       Defendants' Statements Are Not "Puffery" .............................................................29

CONCLUSION ....................................................................................................................31

## TABLE OF AUTHORITIES

### CASES

*In re AFC Enters., Inc. Sec. Litig.,*
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ................................................................13

*In re Airgate PCS, Inc. Sec. Litig.,*
    389 F. Supp. 2d 1360 (N.D. Ga. 2005) ...........................................................7, 19

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ...........................................................................................7

*Asher v. Baxter Int'l Inc.,*
    377 F.3d 727 (7th Cir. 2004) ...............................................................................29

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988).............................................................................................25

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................7

*In re Catalina Mktg. Corp. Sec. Litig.,*
    390 F. Supp. 2d 1110 (M.D. Fla. 2005)...............................................................29

*Central Laborers Pension Fund v. Merix Corp.,*
    No. 04-826, 2005 WL 2244072 (D. Or. Sept. 15, 2005), *reversed*, 275 Fed. Appx.
    599 (9th Cir. 2005)...............................................................................................15

*Cozzarelli v. Inspire Pharms., Inc.,*
    549 F.3d 618 (4th Cir. 2008) ...............................................................................12

*In re Cree Sec. Litig.,* No. 03-00549, 2005 WL 1847004 (M.D.N.C. Aug. 2, 2005), *aff'd,*
    *Teacher's Ret. Sys. of LA v. Hunter,* 477 F.3d 162 (4th Cir. 2007) ........................22

*Ehlert v. Singer,*
    245 F.3d 1313 (11th Cir. 2001) .........................................................................7, 8

*Feiner v. SS&C Techs., Inc.,*
    11 F. Supp. 2d 204 (D. Conn. 1998)....................................................................28

*In re Friedman's, Inc. Sec. Litig.,*
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...........................................................8, 13

*In re Giant Interactive Group, Inc. Sec. Litig.,*
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)...................................................................8

*In re Global Crossing, Ltd. Sec. Litig.,*
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................9, 10, 11

*Gross v. Medaphis Corp.*,
  977 F. Supp. 1463 (N.D. Ga. 1997) .................................................27

*In re Hamilton Bankcorp, Inc. Sec. Litig.*,
  194 F. Supp. 2d 1353 (S.D. Fla. 2002) .............................................14

*Harvey M. Jasper Ret. Trust v. Ivax Corp.*,
  920 F. Supp. 1260 (S.D. Fla. 1995) ...................................................8

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ....................................................................8, 12

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) ..........................................7, 14

*In re Immucor, Inc., Sec. Litig.*,
  No. 05-2276, 2006 WL 3000133 (N.D. Ga. Oct. 4. 2006) ...................24

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................9

*In re JDN Realty Corp. Sec. Litig.*,
  182 F. Supp. 2d 1230 (N.D. Ga. 2002) ..............................................9

*Johnson v. Aegon USA, Inc.*,
  355 F. Supp. 2d 1337 (N.D. Ga. 2004) .............................................25

*In Re LILCO Sec. Litig.*,
  111 F.R.D. 666 (E.D.N.Y. 1986) ......................................................10

*Lee v. Ernst & Young LLP*,
  294 F.3d 969 (8th Cir. 2002) ............................................................9

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ..........................................................29

*Marrari v. Med. Staffing Network Holdings, Inc.*,
  395 F. Supp. 2d 1169 (S.D. Fla. 2005) .........................................14, 26

*In re Mirant Corp. Sec. Litig.*,
  No. 02-CV-1467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009)................16

*In re Nash Finch Co. Sec. Litig.*,
  No. 05-2934, 2007 WL 1266658 (D. Minn. May 1, 2007)..................22

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..............................................30

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)...................................................................................22

*Oxford Asset Mgmt., Ltd. v. Jaharis,*
    297 F.3d 1182 (11th Cir. 2002) ...........................................................................20

*In re the PMI Group, Inc. Sec. Litig.,*
    Nos. C 08-1405 SI, C 08-1406 SI, 2009
    WL 1916934 (N.D. Cal. July 1, 2009).......................................25, 26, 28, 30

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................15, 16

*Reina v. Tropical Sportswear Int'l,*
    No. 8:03-1958, 2005 WL 846170 (M.D. Fla. Apr. 4, 2005)...........................28, 31

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)...........................................................................13, 27

*Rosen v. Textron, Inc.,*
    321 F. Supp. 2d 308 (D.R.I. 2004).....................................................................31

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ..............................................................................9

*Rubinstein v. Collins,*
    20 F.3d 160 (5th Cir. 1994) ...............................................................................24

*Rudolph v. Arthur Andersen & Co.,*
    800 F.2d 1040 (11th Cir. 1986) ..........................................................................24

*In re Scientific Atlanta, Inc. Sec. Litig.,*
    239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd, Phillips v. Scientific Atlanta, Inc.,*
    374 F. 3d 1015 (11th Cir. 2004*)* ....................................................................27, 30

*SEC v. Carriba Air, Inc.,*
    681 F.2d 1318 (11th Cir. 1982) ..........................................................................30

*In re Seebeyond Techs. Corp. Sec. Litig.,*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) .............................................................10

*Shapiro v. UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir. 1992)..........................................................................10, 29

*Shared Network Tech., Inc. v. Taylor,*
    669 F. Supp. 422 (N.D. Ga. 1987) ......................................................................23

*Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc.*,
  178 F. Supp. 2d 1255 (S.D. Fla. 2000) ...................................................................14

*Sinaltrainal v. Coca-Cola Co.*,
  578 F.3d 1252 (11th Cir. 2009) .............................................................................19

*In re Sterling Foster & Co., Inc. Sec. Litig.*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) ..................................................................10

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005)..................................................................................26

*In re Suprema Specialties, Inc. Sec. Litig.*,
  334 F. Supp. 2d 637 (D.N.J. 2004) *aff'd,* 438 F.3d 256 (3d Cir. 2006)..................9, 10, 15, 16

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................................................7

*In re Towne Servs. Inc. Sec. Litig.*,
  184 F. Supp. 2d 1308 (N.D. Ga. 2001) .................................................................28

*In re UniCapital Sec. Litig.*,
  149 F. Supp. 2d 1353 (S.D. Fla. 2001) ......................................................8, 12, 28

*Va. Bankshares v. Sandberg*,
  501 U.S. 1083 (1991)............................................................................................29

*Versyss Inc. v. Coopers and Lybrand*,
  982 F.2d 653 (1st Cir. 1992)...................................................................................9

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................31

*Wagner v. First Horizon Pharm. Corp.*,
  464 F.3d 1273 (11th Cir. 2006) .......................................................................12, 13

*White v. Aetna Life Ins. Co.*,
  No.08-1194, 2009 WL. 909272 (M.D. Fla. Apr. 1, 2009).......................................7

*Ziemba v. Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) .............................................................................17

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995) *aff'd,* 82 F.3d 408 (3d Cir. 1996) .....................19

## STATUTES

15 U.S.C. §77k ...........................................................................................................7

15 U.S.C. §77l(a) ........................................................................................................8

Court-appointed Lead Plaintiffs, the Arkansas Teacher Retirement System, State-Boston Retirement System, Norfolk County Retirement System, and City of Brockton Retirement System (collectively, "Lead Plaintiffs") respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss the Consolidated Class Action Complaint For Violation Of The Federal Securities Laws (the "Complaint"), filed on June 22, 2009 (Doc. No. 134), made by: (1) Lewis E. Beville, William Britton, Jerry J. Chesser, Augustus Clemens III, Robert S. Craft, Patrick F. Dye, Hubert L. Harris, Jr., Clinton O. Holdbrooks, Deborah L. Linden, John Ed Mathison, Milton E. McGregor, Joseph D. Mussafer, William E. Powell, III, James W. Ranes, Simuel Sippial, Jr., and Edward V. Welch (collectively, the "Outside Director Defendants")[1]; and (2) the Underwriter Defendants.[2]

## PRELIMINARY STATEMENT

On June 22, 2009, Lead Plaintiffs filed their Complaint against Colonial BancGroup, Inc. ("Colonial" or the "Company") and certain other entities and individuals. In short, Lead Plaintiffs allege that Colonial, along with Company management, defrauded investors with a series of materially false and misleading statements and omissions from April 18, 2007 through January 27, 2009 (the "Class Period") that related to the Company's lending practices, loan portfolios, and treatment of goodwill. Lead Plaintiffs' fraud-based claims are not at issue in this motion.

---

[1]    Outside Director Defendants William Britton and Jerry J. Chesser filed an independent motion to dismiss (*see* Doc. No. 233), but also "join the Outside Director Defendants in their Motion to Dismiss." Britton & Chesser Br. at 3 n.2. The Outside Director Defendants also represent that Colonial directors and named defendants Harold D. King and John C.H. Miller, Jr. are both deceased. See Dir. Br. at p. 1 n.1. Lead Plaintiff intends to undertake the process of removing King and Miller from this action.

[2]    The Underwriter Defendants are set forth in paragraphs 385 and 440 of the Complaint. At certain times, the Underwriter Defendants and Outside Director Defendants are collectively referred to as "Defendants" in this brief.

This motion concerns non-fraud-based claims brought by Lead Plaintiffs under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act") against the underwriters of Colonial's 2008 note and stock offerings and Colonial's outside directors, who signed the registration statements through which these offerings were issued.[3]

In advance of the two offerings, Colonial issued Prospectuses that incorporated certain of the Company's prior filings with the Securities & Exchange Commission ("SEC"). These Offering Materials contained material untrue statements of then-current and historical facts regarding Colonial's (1) financial statements for year-end 2007 being presented in accordance with GAAP; (2) goodwill impairment analysis for year-end 2007; (3) supposed "conservative" underwriting standards; (4) purported high credit quality; (5) claimed lack of increases in net charge-offs; (6) reserves for loans; (5) purportedly low non-performing asset ratios; (6) claimed levels of non-performing assets; and (7) current liquidity position, capitalization and loan-to-value ratios. *See, e.g.*, ¶¶395-411.[4]

The Complaint details how, in reality, Colonial failed to increase its loan loss reserves even though its volume of non-performing assets was skyrocketing; Colonial's net charge-offs exceeded Colonial's reserves altogether; Colonial was reporting NPA figures that were markedly lower than the default rate observed first hand by loan officers at the time; Colonial's NPAs and NCOs were ballooning in relation to their ALL; Colonial's goodwill had already been severely impaired; and Colonial's relaxed underwriting guidelines had taken their toll on the Company's

---

[3]    Specifically, Colonial raised capital in early 2008 with two separate offerings: first a $250 million subordinated debt offering in March 2008 (the "Note Offering"), and a $350 million common stock offering in April 2008 (the "Stock Offering") (collectively the "Offerings"). The Prospectuses issued in conjunction with the Offerings, as well as Colonial's 2007 10-K annual report, which was incorporated into the Offerings, are referred to herein as the "Offering Materials."

[4]    All citations to ¶__ refer to the corresponding paragraphs of the Complaint.

loan portfolio and resultant financial health. *See, e.g.*, ¶¶395-411. As such, Lead Plaintiff's Securities Act claims against the Defendants easily meet Rule 8's pleading standards and should be sustained.

In moving to dismiss Lead Plaintiffs' claims, the Defendants raise four primary arguments: (1) Lead Plaintiffs lack standing to pursue their claims; (2) heightened pleading standards under Rule 9(b) render Plaintiffs' claims inadequate; (3) the Offering Materials did not contain any untrue statements; and (4) even if the Offering Materials did contain untrue statements, they were not "material" and, thus, not actionable. Each of these arguments is unavailing.

First, the Complaint adequately alleges that Lead Plaintiffs have standing to pursue their claims against the Underwriter Defendants. Second, it is clear that Lead Plaintiffs' Section 11 claims do not sound in fraud and, as a result, are governed by Rule 8 pleading standards. Third, the Complaint fully details the statements contained in the Offering Materials alleged by Lead Plaintiffs to be untrue and the reasons for the statements' falsity. Finally, the Complaint explains how those false statements were material to investors.

Notwithstanding Defendants' efforts to inject factual issues into the mix and require Lead Plaintiffs to offer evidence at the pleading stage, Lead Plaintiffs have more than sufficiently met the pleading requirements under Rule 8 for their Securities Act claims. Accordingly, Defendants' Motions should be denied.

## STATEMENT OF RELEVANT FACTS

Prior to its bankruptcy, Colonial was a financial holding company that derived nearly all of its income from a subsidiary, Colonial Bank, which conducted a general commercial banking business in Florida, Alabama, Georgia, Nevada, and Texas. ¶2. As part of its business, Colonial Bank offered personal and commercial mortgages in each of these markets. *Id.* While the

Company also offered residential loans, its loan portfolio consisted mostly of commercial real estate and construction loans. *Id.*

For a number of years preceding the offerings, Colonial aggressively expanded its lending operations in the flourishing Florida real estate market. ¶3. During this growth period, the Company maintained its façade of being a disciplined lender with strict underwriting guidelines and spotless credit quality. In actuality, though, management staked Colonial's future on high-risk real estate loans to speculators, developers, homebuilders and homebuyers looking to capitalize on the Florida real estate boom, and cut corners to inflate Colonial's loan portfolio by abandoning many of the Company's long-standing conservative underwriting principles. ¶31.

To that end, whereas a designated "loan operations" team, designed to safeguard Colonial's loan portfolio, once carefully reviewed each loan that was processed by the Company, soon these personnel were forced out of the equation to allow loan officers to clear growing numbers of loans without interference. ¶¶43-45. Red flags in loan applications became irrelevant. By mid-2006, in the interest of boosting loan volume, Colonial's management authorized its loan officers and their assistants to ignore crucial risk metrics such as credit records, loan-to-value ratios, and debt-coverage ratios when evaluating loan files. ¶¶44-45. In that way, the Company shifted its emphasis to "quantity over quality" through 2007. ¶59.

At the same time Colonial represented itself to the market as a conservative lender that steered clear of underwriting subprime and other high-risk home mortgage loans. ¶47. Former employees described increasingly lax lending guidelines in which Colonial originated loans to borrowers with credit scores far below the industry standard for "subprime." ¶¶47-49. Furthermore, Colonial's construction loan portfolio was dangerously exposed to overheated markets such as Florida and Alabama; in fact, by December 2007, the Company witnessed a

default rate between 65% and 75% for its construction loans originated in Alabama. ¶54. A combination of a deteriorating loan portfolio and an aggressive growth strategy forced Colonial to raise capital for survival in early 2008, culminating with the $250 million Note Offering in March 2008 and the $350 million Stock Offering in April 2008.[5] ¶¶67, 70.

Colonial's 2007 10-K annual report was incorporated into its Offering Materials for both the Note Offering and Stock Offering. ¶¶389, 444. As outlined in the Complaint, the annual report included numerous materially false and misleading statements related to Colonial's recording of goodwill and underwriting standards. *See, e.g.*, ¶¶393, 395, 407. Specifically, Colonial falsely reported that no goodwill impairment write-offs were needed for 2007, that it maintained "conservative underwriting" standards, that it was "committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses," and that the Company had collateral guidelines that required loan-to-value ratios of a certain minimum percentage in each loan sector. ¶368. And, by virtue of the 10-K's incorporation by reference, the Offering Materials also contained these untrue statements of material fact.

It would later be revealed that Colonial's goodwill was, in fact, significantly impaired by the time of the Note Offering and that the Company's underwriting practices deviated demonstrably from the disciplined guidelines purportedly followed – yet still touted – by Colonial's management. ¶369. Former employees confirmed that Colonial's loan review specialists had lost all of their clout, all but 4 of 30 crucial risk metrics -- including those most material to evaluating credit risk-- were suddenly ignored by loan officers, and subprime

---

[5]    The Note Offering was issued pursuant or traceable to Colonial's Form S-3/A Shelf-Registration Statement, dated November 12, 2004. ¶¶ 389, 387(a), 387(b).

mortgages were regularly underwritten despite management's representations to the contrary. ¶¶397-405. Likewise, loan-to-value ratios became almost meaningless as they were consistently disregarded during the loan review process. ¶¶405, 408. Throughout 2007, the Company had one focus: to originate as many loans as possible. ¶404.

Then, in October 2008, Colonial shocked the market by announcing a third quarter loss of $0.35 per share, suspension of its customary dividend and a 66% increase in non-performing assets as compared to third quarter 2007. ¶6. The following day, the Company's stock price plunged more than 50%, followed shortly by a downgrade in Colonial's issuer default ratings. *Id.* On December 2, 2008, the Company announced it had received preliminary approval for $500 million of Troubled Asset Relief Program ("TARP") funding from the federal government. ¶8. The share price rebounded temporarily. However, on January 27, 2009, the public learned the whole truth: that TARP funding was actually contingent upon another private capital infusion of $300 million – roughly 94% of Colonial's market capitalization at the time. ¶¶8-9. To make matters worse, Colonial also revealed an $825 million loss for the fourth quarter of 2008, along with a $575 million goodwill impairment charge. ¶9. The next day, Colonial's stock price plummeted 46% to close at less than a dollar a share. *Id.*

## ARGUMENT

### I.    THE APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS

#### A.    The Standards Under Rule 12(b)(6)

In considering a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents *incorporated into the complaint by reference*, and matters of which a

court may take judicial notice." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).[6]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 12(b)(6) does not permit dismissals based upon "a judge's disbelief of a complaint's factual allegations." *Iqbal*, 129 S. Ct. at 1959 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).  Indeed, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder." *Twombly*, 550 U.S. at 563. The "threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low." *White v. Aetna Life Ins. Co.*, No.08-1194, 2009 WL 909272, at *2 (M.D. Fla. Apr. 1, 2009) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)).

### B.    The Standards under Sections 11 and 12(a)(2)

In order to allege a *prima facie* case under Section 11, a plaintiff need only allege that the registration statement (which includes the prospectus),[7] "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein to make the statements therein not misleading."  15 U.S.C. §77k; *Ehlert v. Singer*, 245 F.3d 1313, 1315-16 (11th Cir. 2001); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1371 (S.D. Fla. 2001) (upholding

---

[6]     Citations, internal quotations, and footnotes are omitted, and emphasis is added, unless otherwise noted.

[7]     *See In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp.2d 1360, 1368 (N.D. Ga. 2005) ("Sections 11 and 12(a)(2) allow liability for false or misleading statements that are part of a 'registration statement' or 'prospectus.'").

- 7 -

Section 11 claim and noting plaintiff need only allege a material false statement or omission); *In re UniCapital Sec. Litig.*, 149 F. Supp. 2d 1353, 1363-64 (S.D. Fla. 2001) (same). Section 11 does not require pleading or proof that a defendant acted with an intent to defraud or even knew that misrepresentations or omissions had been made. *UniCapital*, 149 F. Supp. 2d at 1363 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)). Such a claim can be asserted against the issuer of the securities, the issuer's directors and officers, the underwriters of the offering and the accountants who prepared or certified the registration statement. *Ehlert*, 245 F.3d at 1315 (citing 15 U.S.C. §77k(a)).

Similarly, Section 12(a)(2) imposes liability on any person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact. 15 U.S.C. §77l(a); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 569 (S.D.N.Y. 2009) (Section 12(a)(2) holds any person liable "who offers or sells a security by means of a prospectus which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading."); *see also Harvey M. Jasper Ret. Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995). "Those liable under Section 12 include only those who offer or sell securities pursuant to a misleading statement." *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1366 (N.D. Ga. 2005).

## II.    LEAD PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS

A plaintiff has standing to pursue a Section 11 claim if he purchased securities in the offering, or if he purchased shares in the aftermarket traceable to the misleading registration statement. *Unicapital*, 149 F. Supp. 2d at 1369 ("in order to have standing under Section 11, one must *simply* be able to trace the purchase of his securities to the registration statement that

allegedly violated Section 11."); *accord Versyss Inc. v. Coopers and Lybrand*, 982 F.2d 653, 657 (1st Cir. 1992); *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1244 (N.D. Ga. 2002); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 872 (5th Cir. 2003); *Lee v. Ernst & Young LLP*, 294 F.3d 969, 975 (8th Cir. 2002).

Despite this clear standard, the Underwriter Defendants argue that Lead Plaintiffs' allegations are too vague to establish standing on the Stock Offering.  Und. Br. at 5.[8]  However, Lead Plaintiffs have alleged Section 11 claims "on behalf of all persons and entities . . . who purchased or acquired Colonial's common stock traceable to the Company's April 23, 2008 stock offering."  ¶436.  This is sufficient to provide notice of standing under the pleading requirements of Rule 8.  *Iqbal*, 129 S. Ct. at 1960 (plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face.").

The Underwriter Defendants contend that the shares purchased by Lead Plaintiffs could "easily be shares already in the market that are traceable to a prior offering . . . ."  Und. Br. at 4.  This argument is irrelevant.  At this stage, general allegations that plaintiffs purchased shares in the aftermarket of a secondary offering are all that is required for standing to bring a Section 11 claim, and alone are sufficient to survive a motion to dismiss.  *See*, *e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) ("Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statements have been held sufficient to state a claim") (listing cases); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005); *In re Suprema Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 649 (D.N.J. 2004) *aff'd*, 438 F.3d 256

---

[8]    Notably, the Underwriter Defendants have not challenged Lead Plaintiffs' standing with respect to their Section 11, 12(a)(2), and 15 claims as to the Note Offering.

(3d Cir. 2006) ("Because Plaintiffs have alleged that they have purchased 'in' or 'traceable to' the 2000 and 2001 secondary offerings, [Lead] Plaintiffs have pled standing sufficiently at this motion to dismiss stage."); *In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003); *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F. Supp. 2d 216 (E.D.N.Y. 2002).

What the Underwriter Defendants really argue is that it is more difficult to prove that aftermarket purchases are traceable to a secondary offering, as opposed to an initial offering. However, whether members of the class can trace their aftermarket purchases to the Stock Offering is a factual determination that "goes to the merits of the [] Section 11 claim rather than to whether [plaintiffs have] standing to bring the claim in the first instance."  *Sterling Foster*, 222 F. Supp. 2d at 247-48; *see also In Re LILCO Sec. Litig.*, 111 F.R.D. 666, 671 (E.D.N.Y. 1986) ("In the instant case, determining whether a plaintiff owned 'old' or 'new' common stock does not merit denial of the motion for the class certification, because tracing is a question of fact reserved for trial.").

Members of the class should not be prevented from having the opportunity to prove that their aftermarket purchases are indeed traceable to the misleading Offering Materials.  *See In re Global Crossing*, 313 F. Supp. 2d at 208 ("before discovery takes place, [it may be] impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market.") (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992)) (alterations in original)*; Seebeyond Techs.*, 266 F. Supp. 2d at 1171-72 ("The Court acknowledges the defendants' argument that it may be difficult or impossible to trace the stock purchased [in a secondary offering] by the plaintiff, but the plaintiff should be provided the opportunity to prove its allegations in this respect.").

Accordingly, the Underwriter Defendants' standing argument raises factual issues beyond the scope of a motion to dismiss. *See In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 n.8 (S.D.N.Y. 2002) (standing issue premature until class certification stage); *Goldberger v. Bear, Stearns & Co.*, No. 98 CV 8677, 2000 WL 1886605 (S.D.N.Y. Dec. 28, 2000) (at the motion to dismiss stage, whether plaintiffs who purchased some, but not all, of the securities at issue could represent a class of plaintiffs who purchased different securities would be resolved later, at class certification).  Class members have not been afforded the opportunity to trace their shares back to the April 23, 2008 Stock Offering, and, in any event, should not be required to do so at the motion to dismiss stage of the litigation, where the Court must accept the well pleaded facts as true. *See Iqbal*, 129 S.Ct. at 1949.

Similarly, the Underwriter Defendants' attempt to dismiss Lead Plaintiffs' Section 12(a)(2) claim regarding the Stock Offering is premature.  Contrary to the Underwriter Defendants' assertion, Lead Plaintiffs have indeed alleged that members of the Class purchased shares pursuant to the defective Offering Materials issued for the Stock Offering.  ¶¶450, 465. These allegations are sufficient to survive a motion to dismiss under Rule 8 pleading. *See Iqbal*, 19 S. Ct. at 1950 (plaintiff need only allege enough facts to "nudge" his claims "across the line from conceivable to plausible.").  Accordingly, Lead Plaintiffs have sufficiently alleged standing to proceed at this early stage of the litigation on their Section 12(a)(2) claims relating to the Stock Offering. *See Global Crossing*, 313 F. Supp. 2d at 208.

## III.    LEAD PLAINTIFFS' SECURITIES ACT CLAIMS ARE PLEADED WITH THE REQUISITE PARTICULARITY

Lead Plaintiffs' claims against the Outside Director Defendants are based solely on the strict liability provisions of Section 11, which holds the Outside Director Defendants strictly liable for any false or misleading statements contained in the Offering Materials.  There is no

state of mind element to a Section 11 claim.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 n.14 (1983).  If the registration statements are false or misleading, liability is "virtually absolute, even for innocent misstatements.'"[9]  *Id.*

As the Underwriter Defendants concede, Lead Plaintiffs are only required to meet the pleading requirements of Rule 8 in pleading their Section 11 and 12(a)(2) claims.  *See Wagner v. First Horizon Pharm. Corp.,* 464 F.3d 1273, 1278 (11th Cir. 2006) (holding that where a plaintiff brings a Section 11 or 12(a)(2) claim without alleging the misrepresentation at issue in the claim was fraudulent, the heightened pleading requirements of Rule 9(b) do not apply); Und. Br. at 9.  Nevertheless, the Outside Director Defendants urge the Court to apply the heightened pleading requirements of Rule 9(b) based on the mistaken argument that the claims against them "sound in fraud."  Dir. Br. at 5.  That argument is misplaced.

Section 11 claims that "sound in fraud" are held to the heightened pleading requirements of Rule 9(b) due to the possibility of reputational harm inuring to a defendant named in a non-fraud claim but accused of fraudulent conduct.  *Wagner*, 464 F.3d at 1278 ("The purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to be fraudulent."); *see also Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("one of the primary purposes of Rule 9(b) [is] protecting defendants from … reputational harm").  Accordingly, some courts have held that Section 11 claims "sound in fraud" when: (1)

---

[9]    And, contrary to the sole argument raised by Outside Director Defendants Britton, Chesser, and Moody (Britton & Chesser Br. at 3; Off. Br. at 102 n.14), liability under Section 11 and 12(a)(2) plainly extends to directors who sign a registration statement, even if the directors are unaware that misrepresentations or omissions had been made.  *See UniCapital*, 149 F. Supp. 2d at 1363 ("claims under §§ 11 and 12(a)(2) of the Securities Act do not require any intent to defraud on the part of the defendant, or *even knowledge of the misrepresentation or omission*.")(citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  Britton, Chesser and Moody do not dispute that they signed the shelf registration statement pursuant to which the Note Offering was issued.  ¶¶ 386(b), 386(c), 387(n).   That is all that is required to establish their liability.

the complaint alleges fraud and non-fraud claims in the alternative against a single defendant based on the same misrepresentation, or (2) fraud claims against one defendant are inadequately separated from the non-fraud claims against another.  *See e.g., Wagner*, 464 F.3d at 1278 (claims pled in the alternative); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1358 (N.D. Ga. 2005).  As set forth below, neither concern is implicated here.

**A.    Lead Plaintiffs Do Not Plead Or Allege Fraud
        Against The Outside Director Defendants**

Lead Plaintiffs' Section 11 claims are not based on the theory that:  "[t]he defendant is a no good defrauder, but, even if he is not, the plaintiff can still recover based on the simple untruth of the otherwise fraudulent statement." *Wagner*, 464 F.3d at 1278.   Although some courts find that Section 11 claims "sound in fraud" when the claims are pleaded in the alternative to fraud claims (*see, e.g., Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004) (Section 11 claims "sound in fraud" where plaintiffs alleged both fraud and non-fraud claims against the individual defendants), Lead Plaintiffs have not pled fraud in the alternative here.  Accordingly, the Outside Director Defendants' argument is misplaced.

The Outside Director Defendants argue that fraud is the "overall theme" of the Complaint, and claim there is a "commonality of facts" supporting Lead Plaintiffs' fraud and Section 11 claims.  Dir. Br. at 7.  Such arguments are routinely rejected.  *See*, *e.g.*, *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1377-78 (N.D. Ga. 2004) (refusing to hold that Section 11 claims sounded in fraud where, even though the complaint as a whole "sounded in fraud," the Securities Act claims did not rely upon allegations of fraud, were physically separated

from Exchange Act claims, and specifically excluded allegations of knowledge or scienter).[10]

Lead Plaintiffs do not allege fraud in any shape or form against the Outside Director Defendants.

Rather, Lead Plaintiffs expressly allege that the Outside Director Defendants were merely

"innocent[ly] and/or negligent[ly]" responsible for the false or misleading statements.  ¶364.

Indeed, even where a complaint includes causes of action arising out of both the Securities Act

and the Exchange Act, and both claims rely upon "similar if not identical facts," the Securities

Act claims nevertheless escape heightened pleading requirements so long as it does not allege

scienter or otherwise rely upon the Exchange Act claims.  *Holmes*, 166 F. Supp. 2d at 1372.

        Moreover, Outside Director Defendants' argument – that a non-fraud claim is subject to

heightened pleading merely because the same underlying misrepresentation was fraudulent when

made by someone else – is simply wrong.  *See Marrari*, 395 F. Supp. 2d at 1180 (Section 11

claim did not "sound in fraud" despite being pled alongside Exchange Act claims with a

common theme of the defendants misrepresenting the financial health and viability of one of the

company's key programs); *In re Hamilton Bankcorp*, 194 F. Supp. 2d at 1357 (Section 11 claim

did not sound in fraud where plaintiffs alleged violations of both the Securities Act and

Exchange Act in connection with the company's lack of internal controls and inadequate loan

loss reserves); Dir. Br. at 5-6.  Defendants fail to inform the Court that their authority for this

_____

[10] *See also Marrari v. Med. Staffing Network Holdings, Inc*., 395 F. Supp. 2d 1169, 1180 (S.D. Fla. 2005) (despite being pled alongside Exchange Act claims with a common theme of the defendants misrepresenting the financial health and viability of one of the company's key programs, holding a Section 11 claim did not "sound in fraud" where plaintiffs "carefully craft their Section 11 count in a manner to avoid that claim from sounding in fraud"); *In re Hamilton Bankcorp, Inc. Sec. Litig*., 194 F. Supp. 2d 1353, 1357 (S.D. Fla. 2002) (where plaintiffs alleged violations of both the Securities Act and Exchange Act in connection with the company's lack of internal controls and inadequate loan loss reserves, their Securities Act claims did not "'sound in fraud' to require compliance with Rule 9(b)" because "[a]llegations of fraudulent conduct and scienter were pled only in Count IV and Section 10(b).");  *Sherleigh Assocs. LLC v. Windmere-Durable Holdings, Inc*., 178 F. Supp. 2d 1255, 1272-73 (S.D. Fla. 2000) (refusing to apply heightened pleading standards to Securities Act claims where "the Amended Complaint separates the '33 Act claims from the allegations of fraudulent conduct and scienter with respect to the '34 Act claims, which are pled only in Count IV.")

argument has been overruled.  *See Central Laborers Pension Fund v. Merix Corp.*, No. 04-826, 2005 WL 2244072 (D. Or. Sept. 15, 2005) (finding that Securities Act claim sounds in fraud where the substance of the alleged misrepresentations and omissions was "virtually identical" to the statements underlying the Exchange Act claims), *reversed* 275 Fed. Appx. 599 (9th Cir. 2005) *cert. denied* 129 S. Ct. 763 (2006).

### B.    The Section 11 Claims Against The Outside Director Defendants Are Distinguished From Any Allegations Of Fraudulent Conduct

The Outside Director Defendants do not point to a single allegation of intentional or reckless misconduct that is incorporated in the paragraphs of the complaint against them, because they cannot.  The only claims raised against the Outside Director Defendants appear in a separate, self-contained section of the Complaint, which expressly alleges claims solely based on innocent or negligent conduct.  Defendants' "sounds in fraud" argument should be rejected on this basis alone.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006) ("Lead Class Plaintiff carefully segregated its allegations of negligence against the Officers and BDO from its allegations of fraud against those defendants … by pleading its Section 11 … in negligence before-- and wholly apart from-- pleading its fraud-based Section 10(b) claims.  This manner of pleading makes for a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud."); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (the "complaint in this case is carefully structured so as to draw a clear distinction between negligence and fraud claims.  The Securities Act claims are found in the first half of the complaint …; the Exchange Act allegations, which include allegations of fraud by some -- but not all -- of the defendants named in the Securities Act claims, are found in the second half of the complaint…").

- 15 -

The Northern District of Georgia endorsed the *Suprema* approach as a means of insulating non-fraud claims against one set of defendants from fraud claims against another.  *See In re Mirant Corp. Sec. Litig.*, No. 02-CV-1467, 2009 WL 48188, at *14-15 (N.D. Ga. Jan. 7, 2009) ("Unlike the complaint in *In re Suprema Specialties*, in which the plaintiffs fully segregated their Securities Act allegations from their fraud allegations, placed their Securities Act allegations at the beginning of the Complaint, and did not incorporate any allegations alleging fraud into their Securities Act count, Plaintiffs here make little effort to distinguish their substantive allegations against the Underwriter and Director Defendants from their fraud allegations against the Individual Defendants.")  Here, the Complaint is bifurcated to separate the Securities Act claims from the Exchange Act claims, in accordance with the guidance of  *Mirant*, *Suprema*, *Refco*, and other courts.  The same result is called for here.

Lead Plaintiffs carefully crafted the Complaint to ensure that the fraud claims and allegations raised against the other defendants were completely segregated.  The Section 11 claims are set forth in a physically separate portion of the complaint (Section XIII), which itself is styled as a stand-alone complaint.  Section XIII contains all of the claims and all of the substantive allegations against the Defendants, none of which include a single allegation of fraud.  The structure of the Complaint, and the careful pleading of Section XIII, is sufficient to insulate Plaintiffs' Section 11 claims from any heightened pleading requirement. *See, e.g., In re Suprema Specialties*, 438 F.3d at 273; *In re Refco*, 503 F. Supp. 2d at 632.

Contrary to Outside Director Defendants' argument,  Lead Plaintiffs' Section 11 claims are not intermingled with, or inadequately separated from, fraud allegations and fraud claims raised against other defendants.  Notably, not one of the allegations identified by Outside

Director Defendants as alleging fraud has been incorporated into Section XIII of the Complaint at all. *See* Dir. Br. at 6-8.

Because the Outside Director Defendants' reputations have not been implicated by any allegations of fraud, and because Lead Plaintiffs have diligently insulated their Securities Act claims from their Exchange Act claims, the Section 11 claims need only meet the liberal pleading requirements of Rule 8. However, even if the Court were to find that Rule 9(b) governs, Lead Plaintiffs have nevertheless met their burden. Rule 9(b) is satisfied where the complaint sets forth which false and misleading statements were made in what documents, the time and place of each such statement, the person responsible for making such statements, the content of the statements and the manner in which they misled the plaintiff. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). As set forth below, Lead Plaintiffs have sufficiently alleged actionable misstatements in accordance with that standard.

## IV.    THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS

### A.    Lead Plaintiffs Allege Actionable False and Misleading Statements

The Offering Materials contained untrue statements of material fact by virtue of their incorporation of Colonial's 2007 annual report on Form 10-K. Specifically, the 2007 10-K, and thus the Offering Materials, falsely asserted that: (1) Colonial's goodwill impairment analysis for 2007 indicated that no impairment write-offs were required; (2) the Company maintained "conservative underwriting" standards; (3) Colonial was "committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses"; and (4) the Company had collateral guidelines that required loan-to-value ratios of a certain minimum percentage in each loan sector. ¶368. In reality, Colonial's goodwill had already been severely impaired, ¶394, and relaxed underwriting guidelines had taken their toll on Colonial's loan portfolio and resultant financial health. ¶396. The Complaint meticulously outlines the accounts

of five former employees who confirmed that the Company's underwriting standards were, in fact, far from "conservative." *See* ¶¶397-406. For these reasons, Lead Plaintiffs' Securities Act claims against the Defendants easily meet Rule 8's generous pleading standards and should be sustained.

### 1.    Statements Regarding Goodwill Impairment Are Actionable

According to the 2007 10-K, Colonial's "goodwill impairment analysis for 2007 indicated that no impairment write-offs were required." ¶393. The Complaint details, however, that Colonial failed to properly account for its goodwill impairment at the time of the 2008 Note and Stock offerings. *See* ¶394. While the 2007 10-K falsely asserted that goodwill was not impaired by the end of 2007, Colonial was forced to recognize an impairment loss of *$575 million* only one year later. ¶¶137, 394. Indeed, the Company claimed to perform assessments for impairment charges at least annually, and more frequently in the interim where circumstances required. However, Colonial had never actually performed an interim test. ¶¶129, 136. According to Statement of Financial Accounting Standards No. 142, events requiring an interim goodwill impairment test include any significant adverse change in a company's business climate. *See* ¶130.

In Colonial's case, its business climate had dramatically worsened throughout 2007: the housing market began a steep decline, underwriting guidelines had steadily deteriorated, non-performing assets were quickly rising, and the credit quality of the Company's loan portfolio sank. ¶388. The Company's goodwill undoubtedly had been affected given Colonial's recent series of acquisitions during this tumultuous time period. *Id.* In fact, approximately 97% of its eventual goodwill impairment write-off was attributed directly to the Florida Regional Bank reporting unit, which was the region in which the Company had concentrated its acquisitions. ¶137. Yet the Offering Materials fallaciously assured investors in early 2008 that write-offs

- 18 -

were unnecessary.  This is sufficient to satisfy Rule 8's liberal pleading standard and give the Underwriter Defendants "fair notice of what the. . .claim is and the grounds upon which it rests." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009).

In response, the Underwriter Defendants argue that Lead Plaintiffs have "failed to allege any circumstances that should have prompted Colonial to conduct an interim assessment in 2007."  *See* Und. Br. at 11; *see also* Dir. Br. at 12.  However, as set forth in the Complaint and highlighted above, Lead Plaintiffs provided numerous circumstances that should have precipitated an interim goodwill assessment, especially in light of the massive 2008 write-off. ¶388.  Similarly, these circumstances existed at the time of the Note and Stock Offerings, thereby rendering the cases proffered by the Defendants inapposite.  *See* Und. Br. at 12; Dir. Br. at 12.

For example, the plaintiffs in *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360 (N.D. Ga. 2005) alleged that the defendants had understated the company's allowance for doubtful accounts in a disputed prospectus, but the plaintiffs premised this argument on nothing more than a subsequent write-off by the company.  *Id*. at 1377.  In stark contrast, here Lead Plaintiffs have provided robust context for the misrepresented 2007 goodwill beyond the subsequent 2008 impairment charge of $575 million: the declining housing market at the time, the Company's dangerously loose underwriting standards, ballooning non-performing assets, and a series of recent acquisitions that had created much of the goodwill being carried on Colonial's books in the first place.  ¶388.  Furthermore, all of these conditions existed when the goodwill was misrepresented in the Offering Materials.

For this reason, the Underwriter Defendants' reliance on *Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995) *aff'd*, 82 F.3d 408 (3d Cir. 1996), is also misplaced.  Lead Plaintiffs have,

indeed, "show[n] that the omitted information [about Colonial's goodwill impairment] in fact existed at the time that the allegedly misleading statement was made." *Id*. at 1017; *see also* ¶388. Moreover, the Complaint sufficiently alleges facts to support the conclusion that the goodwill analysis in the 2007 10-K was false. *See* ¶¶388, 394; *cf. Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1193 (11th Cir. 2002) (*see* Und. Br. at 12) (where, in a securities fraud suit against a pharmaceutical company, the complaint had failed to allege facts to support the position that a claim in the prospectus regarding the efficacy of a cholesterol drug was false, because studies referred to in the same prospectus had, in fact, proven such claimed results).

## 2.    Statements Regarding Conservative Underwriting Standards Are Actionable

Colonial's 2007 10-K falsely asserted that the Company "has maintained conservative underwriting and credit product standards and has generally avoided nontraditional credit products." ¶395. Colonial touted its supposedly "strong and effective loan approval process…" *Id*. The goals of its credit risk management activities included "providing a sound basis for new credit extensions." *Id*. All of these assertions were untrue statements of material facts, as confirmed by the accounts of former employees.

Specifically, a former Loan Document Review Specialist for the Company led a team of personnel who reviewed all processed loan files for Colonial. This "loan operations" team was tasked to ensure that loan officers kept within the bounds of Colonial's "conservative" lending guidelines. ¶397. For years, the team had analyzed each loan file to verify that it satisfied approximately 30 criteria. ¶398. Any missing criteria prompted "exceptions" to be logged in a central database and reviewed by loan operations personnel. *Id*. But, by the end of 2006, loan officers and their assistants were given authority to clear "exceptions" on their own. ¶399. Loans with defects freely passed through the system, unchecked by the loan operations team. *Id*.

Underwriting standards were no longer "conservative" by the start of 2007, nor was the approval process "strong and effective."  To be sure, loan officers were motivated by lucrative commissions to clear "exceptions" on their own – without the interference of the operations team – and process as many loans as possible.  ¶400.  As the safeguards of the operations team fell by the wayside, volume became of paramount concern.  The thirty risk criteria reviewed in years past were pared down to four by mid-2007.  ¶405.  Team personnel simply ignored crucial risk metrics such as loan-to-value ratio and debt-coverage ratio when reviewing Colonial's new loans.  *Id*.  The loan operations team limited their review of loan files to just three items: (a) confirming that the legal description on the mortgage matched that on the title; (b) confirming that properties had flood and mortgage insurance; and (c) confirming that large loans had been authorized by sufficiently senior management.  *Id*.  While this type of cursory review allowed the inundated operations team to keep pace with the growing number of files to be reviewed that were stacked from floor to ceiling in their offices, such inadequate review stands in direct contrast to the Company's supposedly "conservative" lending practices.  *Id*.

Moreover, "nontraditional credit products" were regularly underwritten, not "generally avoided."  The Complaint details how Colonial originated subprime loans, along with other types of high-risk, "nontraditional" loans such as "stated income" and "no doc" loans for which the applicant could not or would not provide verification of income and/or assets.  ¶401  Whether or not these loans were sold into the secondary market, *see* Und. Br. at 16, is irrelevant.  Regularly originating these types of high-risk loans flies in the face of "generally avoiding" them, making the Offering Materials false and misleading.

The detailed allegations outlined above represent more than mere "conclusory allegations and unrelated facts."  Und. Br. at 13; *see also* Dir. Br. at 14.  Lead Plaintiffs have relied upon the

- 21 -

recollection of numerous former insiders to paint a clear picture of Colonial's risky lending practices.[11]  The deterioration of the Company's underwriting standards was well documented by the accounts of a former Loan Document Review Specialist, a former Auditor-Document Review Specialist, a former mortgage loan officer and a former mortgage consultant with the Company. *See* ¶¶397-403.  The Complaint provides exacting detail of how Colonial changed courses by the end of 2006 to focus on quantity over quality in its loan originations – far more detail than is necessary under Rule 8's liberal notice pleading standard.

### 3.    Statements Regarding Early Recognition of Problem Loans and Adequate Allowances Are Actionable

In the Offering Materials, Colonial assured investors that it was "committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses."  Such an assurance was an untrue statement of material fact because Colonial, in fact, lacked sufficient capital allowance to cover the inherent losses in its loan portfolio.  ¶369.  With the tumbling of the housing market from 2007 into 2008, the Company experienced a groundswell of non-performing assets in its loan portfolio, which necessarily required a significant capital cushion.  ¶367.  And this deluge was a direct result of the drastic deterioration in Colonial's underwriting standards described above.  ¶388.

Far from mere "passing references," *see* Und. Br. at 9, Lead Plaintiffs have adequately identified the false and misleading statements in the 2007 10-K, incorporated them into the

---

[11]    Because the use of confidential witnesses is appropriate in cases under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), they no doubt are appropriate under the far less stringent pleading rules applicable here.  *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 313-314 (2d Cir. 2000); *In re Nash Finch Co. Sec. Litig.*, No. 05-2934, 2007 WL 1266658, at *11 (D. Minn. May 1, 2007).  Here, each confidential witness in the Complaint is described with sufficient particularity to support the probability that a person in their position would possess the information that he or she did in fact supply.  *See In re Cree Sec. Litig.*, No. 03-00549, 2005 WL 1847004, at *3 (M.D.N.C. Aug. 2, 2005), *aff'd, Teacher's Ret. Sys. of LA v. Hunter*, 477 F.3d 162 (4th Cir. 2007).

Offering Materials, and also have described the specific circumstances that rendered them false and misleading. *See* ¶¶367-369, 388. The Complaint therefore satisfies the pleading requirements of Rule 8.

### 4.    Statements Regarding Collateral Guidelines Are Actionable

The Offering Materials also mischaracterized Colonial's use of collateral guidelines in evaluating loan files. Contrary to the assertions in the Offering Materials, collateral guidelines (loan-to-value ratios) were *not* "standard policies and procedures for the evaluation and underwriting of new credits," nor were they "monitored and estimated by loan officers and the senior credit administration function. . . ." ¶407. Lead Plaintiffs have provided exceptional detail, well beyond the requirements under Rule 8, as to how Colonial's loan officers consistently disregarded loan-to-value ratios altogether. ¶¶405, 408. A former Loan Document Review Specialist, who supervised a team of loan operations personnel dedicated to reviewing loan files after the loans were processed, confirmed that loan-to-value ratios were ignored by the team during the regular course of their reviews. ¶¶397, 405. And this type of practice dated back to mid-2007, if not earlier. ¶405. By this time, the only risk metrics considered by the operations team were the legal description of the property, the existence of flood and mortgage insurance, and larger loans having been authorized by senior management. *Id.*

In response, the Underwriter Defendants argue that Lead Plaintiffs have "offered no evidence" that the standard procedures were abandoned, or that other divisions or personnel at Colonial were not observing loan-to-value ratios. Und. Br. at 22. In so doing, the Underwriter Defendants impermissibly attempt to hold Lead Plaintiffs to a far higher standard than what is required under the law. It is axiomatic at this point in the proceedings that Lead Plaintiffs are not required to present evidence in order to proceed with their Securities Act claims; Lead Plaintiffs' well-pled allegations are sufficient to survive dismissal. *See Shared Network Tech., Inc. v.*

- 23 -

*Taylor*, 669 F. Supp. 422, 426 n.1 (N.D. Ga. 1987) (holding that, upon deciding a motion to

dismiss, "Defendant's argument fails to acknowledge that Rule 8 only requires that plaintiff

provide a short and plain statement showing it is entitled to relief.  Plaintiff, at this juncture, is

not required to plead evidence to support its allegations").  Because the Offering Materials

contained untrue statements that collateral guidelines were "standard policies and procedures"

used in evaluating Colonial's underwriting, the Underwriter Defendants may be held liable for

these false statements under Sections 11 and 12(a)(2) of the Securities Act.

> **B.    The Underwriter Defendants Omitted Facts Necessary to Make the Offering Materials Not False and Misleading**

In securities cases, "a duty to speak the full truth arises when a defendant undertakes a

duty to say anything.  Although such a defendant is under no duty to disclose every fact or

assumption underlying a prediction, he must disclose material, firm-specific adverse facts that

affect the validity or plausibility of that prediction."  *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th

Cir. 1994); *see also Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986)

("A duty to disclose may also be created by a defendant's previous decision to speak voluntarily.

Where a defendant's failure to speak would render the defendant's *own* prior speech misleading

or deceptive, a duty to disclose arises.") (emphasis in original); *In re Immucor, Inc., Sec. Litig.*,

No. 05-2276, 2006 WL 3000133, at *11 (N.D. Ga. Oct. 4. 2006) ("A duty to disclose arises

when a defendant's failure to speak would render the defendant's own prior speech misleading or

deceptive.").

Here, when the Underwriter Defendants chose to speak on their goodwill impairment

analysis for 2007, "conservative underwriting" standards, "commit[ment] to the early recognition

of problem loans and to ensuring an adequate level of allowance to cover inherent losses," and

loan-to-value ratio requirements, they had a duty to speak fully and truthfully about those areas

of the business.  They failed to do this.  Rather than provide the whole truth about these matters, the Underwriter Defendants instead provided a one-sided and misleading view of Colonial's business, thus "creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists."  *In re PMI Group, Inc. Sec. Litig.*, Nos. C 08-1405 SI, C 08-1406 SI, 2009 WL 1916934, at *7 (N.D. Cal. July 1, 2009).  In addition, despite dramatically altering their approach for underwriting loans, the Offering Materials never revealed these undeniably material findings to the market.[12] ¶370.  Without this information, the Offering Materials portrayed the Company's unsecured debt securities as being less risky than they actually were.  ¶¶370, 450.  As such, the Underwriter Defendants omissions are actionable.

## C.    The Defendants' Misstatements Were Material

For a statement to be material, there must be a substantial likelihood that a reasonable purchaser or seller of a security would have considered the fact important in deciding whether to buy or sell the security and would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Whether a statement is material presents a mixed question of law and fact requiring a delicate assessment of the inference a reasonable shareholder would draw from a given set of facts and the significance of these facts to him, and these assessments are peculiarly ones for the trier of fact.  *See, e.g.*, *Johnson v. Aegon USA, Inc.*, 355 F. Supp. 2d 1337, 1346 (N.D. Ga. 2004) (finding that plaintiffs sufficiently asserted the materiality of the alleged omissions in the

---

[12]    The Underwriter Defendants argue that Colonial "did not have a duty to disclose its routine business decisions that allowed loan officers, in addition to other company personnel, to clear exceptions and approve loans and that altered the number of criteria used to assess a loan over a ten year span."  *See* Und. Br. at 19.  This argument misses the point.  While the Offering Materials did not need to describe every detail of Colonial's underwriting process, the rapid changes in the underwriting process – which had the effect of greatly diminishing the review of loan applications – were required to be disclosed, particularly in light of Colonial's claim to have "conservative" underwriting standards.

prospectus in order to survive the underwriter defendants' motions to dismiss even though "the evidence presented in this case may ultimately support the defendants' contention that the prospectus at issue in this case sufficiently disclosed all material information to prospective inventors"). For this reason, the determination of whether a particular statement would be material to a reasonable investor is a question of fact inappropriate for resolution on a motion to dismiss. *In re the PMI Group*, 2009 WL 1916934, at *7.

Here, there can be no doubt that the Defendants' untrue statements concerning Colonial's goodwill impairment analysis, "conservative underwriting" standards, ability to recognize early problem loans, and the Company's loan evaluation processes were material to investors. Each of these statements go directly to the Company's bottom line or otherwise concern the core of Colonial's business operations. As a result, these statements were material to reasonable investors.

> **D.    The Underwriter Defendants Are Not Protected by the "Bespeaks Caution" Doctrine**

The Underwriter Defendants also invoke the bespeaks caution doctrine to argue their statements were immaterial. *See* Und. Br. at 23-26. As an initial matter, the bespeaks caution doctrine only applies to those statements that are forward-looking, not those that are misstatements of historical fact. *Marrari*, 395 F. Supp. 2d at 1188; *see also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). Here, the misstatements contained in the Offering Materials are clearly not forward-looking and, thus, not even arguably entitled to any protection. *See, e.g.*, ¶393 ("The goodwill impairment analysis for 2007 indicated that no impairment write-offs were required");

¶395 ("Consistent with this philosophy, Colonial has maintained conservative underwriting and credit product standards and has generally avoided nontraditional credit products"); ¶395 ("The overall goals of Colonial's credit risk management activities include providing a sound basis for new credit extensions and early recognition of problems/risks so that Colonial can maintain a high quality loan portfolio and achieve long-term earnings growth."); *see Gross v. Medaphis Corp.,* 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) (holding that the safe harbor provisions were inapplicable where the plaintiffs' complaint "refer[red] to repeated misrepresentations or omissions of historical facts or 'hard' facts about current or past conditions."); *Rombach v. Chang*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Second, even if the statements contained in the Offering Materials were forward-looking, which they are not, to be meaningful, "cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re Scientific Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002), *aff'd*, *Phillips v. Scientific Atlanta, Inc.*, 374 F. 3d 1015 (11th Cir. 2004) (finding bespeaks caution doctrine inapplicable because false statements were not forward-looking and, even if they were, the defendants "did not caution against the more specific risks known to them at the time the statements were made."). "Boilerplate warnings will not suffice as meaningful cautionary statements." *Id.* Here, the Underwriter Defendants' purported cautionary language – particularly, a general and indefinite warning about "Colonial's sensitivity to 'general business and economic conditions, particularly in the real estate industry,'" *see* Und. Br. at 24, fails to effectively warn investors of the true risks at hand and falls far short of the specific, factual statements required to invalidate the Underwriter Defendants'

untrue statements.  *UniCapital,* 149 F. Supp. 2d at 1375 (generic, boilerplate warnings that did not provide notice of the risks realized were not entitled to safe-harbor protection).[13]

In any event, warning about risks that *may* occur stands far afield from warning about debilitating operational problems that the Underwriter Defendants knew or should have known *were already occurring.  In re Towne Servs. Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320-21 (N.D. Ga. 2001) ("The plaintiffs do not contend that the statements in the prospectus are false or misleading because of later events, but rather, that they are false or misleading because of events that had already occurred at the time of the SPO.  A claim of this type is not barred by the safe harbor for 'forward-looking' statements or the 'bespeaks caution' doctrine.); *see also Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) (holding that a risk disclosure which warned that a delay could materially affect the "business, financial condition, and results of operations" failed to nullify a misleading omission as to the delay's impact on historical financial statements).

Third, "[a] defendant remains liable, even for a forward-looking statement, if the plaintiff shows that the defendant knew at the time of the statement of false and misleading content and thus lacked a reasonable basis for making the statement."  *Reina v. Tropical Sportswear Int'l*, No. 8:03-1958, 2005 WL 846170, at *7 (M.D. Fla. Apr. 4, 2005).  As discussed above, Lead Plaintiffs have alleged "sufficient facts to give rise to a strong inference that Defendants had actual knowledge that the forward-looking statements were false or misleading and the safe

---

[13]        Furthermore, Defendants' supposed cautionary statements must be juxtaposed against the strong statements made by the Company concerning, inter alia, "conservative" underwriting practices.  *See PMI Group*, 2009 WL 1916934, at *7 (rejecting safe-harbor argument because "the disclosures do not insulate defendants because the statements create an impression of a state of affairs that differs in a material way from the one that actually exists.").

harbor provision is not applicable." *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005).[14]

### E.    Defendants' Statements Are Not "Puffery"

Finally, Defendants argue that certain of their statements are "so vague" that they constitute puffery and are therefore immaterial. *See* Und. Br. at 18; Dir. Br. at 14. However, "[i]t has been said that the puffing concept in the securities context has all but gone the way of the dodo . . . . dismissals on this ground are increasingly rare." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250, n.11 (D. Mass. 2006).

As the Supreme Court explained in *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1091 (1991), even "statements of reasons, opinions, or beliefs" are actionable. *Id.* at 1093 ("indefinite and unverifiable" terms such as "high value" or "fair" are actionable). Indeed, investors pay close attention to the opinions of corporate insiders who "usually have knowledge and expertness far exceeding the normal investor's resources." *Id.* at 1091.

Here, as set forth above, Defendants' false statements concerning Colonial's "conservative" underwriting standards were undoubtedly material to investors. While the Offering Materials may not explicitly have defined "conservative," *see* Und. Br. at 18, the word's ordinary meaning is plainly at odds with Colonial's actual underwriting standards. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("if a defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it

---

[14]    Further, dismissal on the pleadings under the safe harbor "requires a stringent showing" by Defendants. "There must be sufficient cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946-48 (9th Cir. 2005). *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("There is no reason to think--at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery--that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) 'important' sources of variance.").

exposes itself" to possible liability).   That is, "a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers."  *Id.* at 281.[15]

Likewise, the court in *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) held that statements such as "higher credit quality," "improved underwriting controls and appraisal review process," and "strict underwriting and risk management disciplines," cannot be "chalked up to 'mere puffery'":

> The allegations suggest New Century's repeated assurances of strong credit quality and strict underwriting practices.  Even in the sub-prime world, there must be a basis for distinction between loans to at-risk borrowers that meet basic standards of good lending practice and loans that plainly do not.  Those standards may provide the measure for evaluating Defendants' statements. Here, Plaintiffs offer New Century's *statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards.*  That is sufficient to plead false and misleading statements.

*Id*. at 1226.  *See also PMI*, 2009 WL 1916934, at *7 (holding that defendant's statements such as "very careful risk selection," and "high credit quality," among others, were false and misleading).

At bottom, the statements contained in the Offering Materials are not so obviously unimportant that "reasonable minds cannot differ in finding that the statement[s] lack[]

---

[15]       In fact, the two cases from courts in this Circuit relied upon by the Underwriter Defendants *support* Lead Plaintiffs' position.  *See SEC v. Carriba Air, Inc.¸* 681 F.2d 1318, 1323-24 (11th Cir. 1982) (Und. Br. at 18) ("It is also apparent that several false statements were made on the prospectus. . . . Under these circumstances, there can be no doubt of the materiality of the errors and omissions in the prospectus."); *Scientific Atlanta*,  239 F. Supp. 2d at 1360 (Und. Br. at 18) (rejecting puffery argument because "[s]uch statements were not so exaggerated or vague that the Court can find as a matter of law that the statements were not material.").

importance." *Reina*, 2005 WL 836170, at *6.[16]  Accordingly, Defendants' "puffing words"

argument should be rejected.

## CONCLUSION

As discussed herein, Lead Plaintiffs have standing to bring their claims under Sections 11

and 12(a)(2) of the Securities Act, and have pled these claims consistent with Rule 8.

Additionally, Plaintiffs have pled their Securities Act claims to meet the heightened pleading

requirements of Rule 9(b), although Rule 9(b) does not govern these claims.  Accordingly, the

Underwriter Defendants' and Outside Director Defendants' motions to dismiss should be denied

in their entirety.

Dated: January 29, 2010                                    Respectfully submitted,

                                                           By:   *s/Tyrone C. Means*
                                                           Tyrone C. Means (MEA003)
                                                           H. Lewis Gillis (GIL011)
                                                           Gerald C. Brooks (BRO212)
                                                           **THOMAS, MEANS, GILLIS & SEAY, P.C.**
                                                           3121 Zelda Court
                                                           Montgomery, Alabama 36106
                                                           Telephone: (334) 270-1033
                                                           Facsimile: (334) 260-9396

                                                           *Liaison Counsel*

---

[16]     In any event, "whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made." *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D.R.I. 2004).   Consequently, this determination should be made by the trier of fact, and not by the court at the motion to dismiss stage. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("Whether the opinion or 'soft information' is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action.").

Thomas A. Dubbs (NY 2318863)
James W. Johnson (NY 2108686)
Angelina Nguyen (NY 4233581)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for Lead Plaintiffs Arkansas Teacher
Retirement System, State-Boston Retirement
System, Norfolk County Retirement System
and City of Brockton Retirement System*


**COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP**
Paul J. Geller
Jack Reise
Douglas S. Wilens
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364

**CHIMICLES & TIKELLIS LLP**
Steven A. Schwartz
Kimberly A. Sanders
Timothy N. Mathews
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

*Additional Counsel for Lead Plaintiffs and the
Class*

## CERTIFICATE OF SERVICE

I hereby certify that on  January 29, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Enrique Jose Gimenez**  Lightfoot Franklin & White LLC
  hgimenez@lightfootlaw.com

- **James Fletcher Hughey, III**  Lightfoot Franklin & White LLC
  jhughey@lightfootlaw.com

- **Samuel Holley Franklin**  Lightfoot Franklin & White LLC
  sfranklin@lightfootlaw.com

- **Robert David Segall**  Copeland Franco Screws & Gill
  segall@copelandfranco.com

- **Edward Hamilton Wilson, Jr.**  Ball Ball Matthews & Novak PA
  hwilson@Ball-Ball.com

- **Tabor Robert Novak, Jr.**  Ball Ball Matthews & Novak PA
  tnovak@ball-ball.com

- **Alan Frederick Enslen**  Maynard, Cooper & Gale, P.C
  aenslen@maynardcooper.com

- **Armistead Inge Selden, III**  Maynard, Cooper & Gale, P.C
  iselden@maynardcooper.com

- **Carl Stanley Burkhalter**  Maynard, Cooper & Gale, P.C.
  cburkhalter@maynardcooper.com

- **Steven L. McPheeters**  Maynard, Cooper & Gale, P.C.
  smcpheeters@maynardcooper.com

- **Larry Brittain Childs**  Waller Lansden Dortch & Davis LLP
  larry.childs@wallerlaw.com

- **Elizabeth V. Tanis**  King & Spalding LLP
  etanis@kslaw.com

- **Dan S. McDevitt**  King & Spalding LLP
  dmcdevitt@kslaw.com

- **George Patrick Montgomery**  King & Spalding LLP
  pmontgomery@kslaw.com

- **Shelby S. Guilbert**  King & Spalding LLP
  sguilbert@kslaw.com

- **Walter Edgar McGowan** Gray Langford Sapp McGowan Gray, Gray & Nathanson PC
  wem@glsmgn.com

- **Gerald Clark Brooks , Jr.**  Thomas, Means, Gillis & Seay, P.C.
  gcbrooks@tmgslaw.com

- **Henry Lewis Gillis**  Thomas Means Gillis & Seay PC
  hlgillis@tmgslaw.com

- **Ira M Levee**  Lowenstein Sandler PC
  ilevee@lowenstein.com

- **Kimberly A. Sanders**  Chimicles & Tikellis LLP
  kas@chimicles.com

- **Michael Stephen Dampier**  Vickers, Riis, Murray and Curran, LLC
  stevedampier@bellsouth.net

- **Michael S Etkin**  Lowenstein Sandler PC
  metkin@lowenstein.com

- **Steven A. Schwartz**  Chimicles & Tikellis LLP
  sas@chimicles.com

- **Timothy N Mathews**  Chimicles & Tikellis LLP
  TNM@chimicles.com

- **Geoffrey Michael Ezgar**  King & Spalding, LLP
  gezgar@kslaw.com

  s/Tyrone C. Means