IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| | ) | Civil Action No. |
| In re | ) | 2:09cv104-MHT |
| COLONIAL BANCGROUP, INC. | ) | |
| SECURITIES LITIGATION | ) | |
| | ) | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS ROBERT E. LOWDER, SARAH H. MOORE,
T. BRENT HICKS AND SHEILA MOODY'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF RELEVANT FACTS ............................................................................. 5

    Colonial Pursues An Aggressive Growth Strategy In Florida While Secretly
        Compromising Its Underwriting Standards ............................................................. 5

    Colonial Continuously Misleads the Market And Misstates LTVs, Sending Stock
        Prices Soaring ......................................................................................................... 9

    Colonial Bank, Desperate For Capital And Seeking To Hide Its Rising Default
        Rates From The Market, Raised Money Through Its Stock And Bond
        Offerings ............................................................................................................... 10

    Colonial's Financial Reporting Violated Generally-Accepted Accounting
        Principles............................................................................................................... 11

    The Misrepresentations Concerning TARP ...................................................................... 13

    The Truth Begins to Emerge ............................................................................................ 14

    Post-Class Period Revelations ......................................................................................... 15

    Defendants' False and Misleading Statements ................................................................ 17

        A.     Underwriting Standards ............................................................................ 17

        B.     Portfolio Performance .............................................................................. 23

        C.     Goodwill .................................................................................................. 29

        D.     TARP ....................................................................................................... 30

ARGUMENT ......................................................................................................................... 31

I.      THE APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS ........... 31

        A.     The Standards Under Rule 12(b)(6) and the PSLRA............................... 31

        B.     The Standards Governing The Individual Defendants' Submission Of
             Extraneous Material And Reliance On Market Conditions ..................... 32

II.     THE FRAUDULENT MISSTATEMENTS AND OMISSIONS DESCRIBED IN
        THE COMPLAINT ARE ACTIONABLE ........................................................ 34

        A.      The Complaint is Based on Misrepresentations and Omissions of Then-
                Current Fact ......................................................................................... 36

        B.      There Was No Meaningful Cautionary Language Accompanying the
                Statements ........................................................................................... 41

        C.      The Misstatements and Omissions Described in the Complaint Are Not
                Mere Optimistic Puffery ...................................................................... 43

III.    THE COMPLAINT IDENTIFIES THE MATERIAL MISSTATEMENTS AND
        OMISSIONS WITH THE REQUISITE PARTICULARITY .......................... 45

        A.      The Complaint Is Not A "Shotgun Pleading" ....................................... 46

        B.      The Complaint Is Not A "Puzzle Pleading" ......................................... 49

IV.     THE COMPLAINT PLEADS FACTS RAISING A STRONG INFERENCE OF
        SCIENTER ................................................................................................... 54

        A.      Defendants Are Deemed to Have Known That Their Statements
                Regarding Conservative Underwriting Practices and High Quality Loans
                Were False ........................................................................................... 55

        B.      Lack of Stock Sales Does Not Negate Scienter .................................... 62

        C.      The TARP Misstatements and Omissions Support a Strong Inference of
                Scienter ................................................................................................ 67

        D.      Lead Plaintiffs' Confidential Witnesses are Competent and Their
                Statements Support a Strong Inference of Scienter .............................. 69

        E.      Defendants' GAAP Violations Further Support a Strong Inference of
                Their Scienter ....................................................................................... 75

        F.      Defendants Present No Competing Nonculpable Inference ................... 80

V.      THE COMPLAINT ESTABLISHES LOSS CAUSATION ........................... 81

VI.     PLAINTIFFS' SECURITIES ACT CLAIMS AGAINST THE INDIVIDUAL
        DEFENDANTS ARE PLEADED WITH THE REQUISITE PARTICULARITY ......... 88

VII.    THE COMPLAINT ADEQUATELY STATES CONTROL PERSON
        LIABILITY CLAIMS AGAINST LOWDER, MOORE AND HICKS .......................... 88

CONCLUSION ................................................................................................. 90

## TABLE OF AUTHORITIES

### CASES

*Acito v. Imcera Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ....................................................................63

*In re Ancor Commc'ns, Inc.*,
    22 F. Supp. 2d 999 (D. Minn. 1998)....................................................78

*Amalgamated Bank v. Coca-Cola*,
    No. 05-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006)............................42, 43

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)...............................................56, 57

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)..............................................55, 56, 61, 77

*In re Baan Co. Sec. Litig.*,
    103 F. Supp. 2d 1 (D.D.C. 2000) ..........................................................78

*Barnette v. City of Phenix City*,
    No. 3:05-473, 2007 WL 3307213 (M.D. Ala. Nov. 6, 2007) ..................................80

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................30

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 983 (9th Cir. 2008) ............................................................57

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ......................................................56

*Carley Capital Group v. Deloitte & Touche, L.L.P.*,
    27 F. Supp. 2d 1324 (N.D. Ga. 1998) ..................................................75

*In re Ceridian Corp. Sec. Litig.*,
    504 F. Supp. 2d 617 (D. Minn. 2007)...................................................63

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)..................................................74

*Commc'ns Workers of Am. Plan for Employees' Pensions and Death Benefits v. CSK
    Auto Corp.*, 525 F. Supp. 2d 1116 (D. Ariz. 2007)..................................52

*Cornerstone Propane Partners, L.P., Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ..............................................48, 49

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................................ *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................85, 88

*In re Daou Sys. Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ...................................................................75

*In re Downey Sec. Litig.*,
No. CV 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ............................................32

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................80

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................................55

*Eastwood Enters., LLC v. Farha, et al.*,
No. 8:07-cv-1940, 2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)..........................................62

*In re Enron Corp. Sec., Derivative & ERISA  Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ...................................................................64

*In re FBR Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)...................................................................32

*Fuechtman v. Mastec, Inc.*,
390 F. Supp. 2d 1264 (S.D. Fla. 2005) ...................................................................62

*In re FVC.com Sec. Litig.*,
136 F. Supp. 2d 1031 (N.D. Cal. 2000) ...................................................................63

*In re Faro Techs. Sec. Litig.*,
534 F. Supp. 2d 1248 (M.D. Fla. 2007)...................................................................80

*Fine v. American Solar King Corp.*,
919 F.2d 290 (5th Cir. 1990) ...................................................................75

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...................................................................62, 64, 66

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005)...................................................................55

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ...................................................................79

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ..................................................... *passim*

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ..................................................74

*Holmes v. Baker*,
    166 F. Supp. 2d 162 (S.D. Fla. 2001) ..................................................64

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ..................................................89

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ......................................... *passim*

*Hubbard v. BankAtlantic Bancorp, Inc.*,

No. 07-61542, 2009 WL 3261941 (S.D. Fla.  May 12, 2009) ................................73, 74

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................64

*In re Immucor Sec. Litig.*,
    No. 05-2276, 2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) ............................. *passim*

*In re Impac Mortgage Holdings Sec. Litig.*
    554 F. Supp.2d 1083 (C.D. Cal 2008) ..................................................32

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..................................................74

*In re Juniper Networks, Inc. Sec. Litig.*,
    542  F. Supp. 2d 1037 (N.D. Cal. 2008) ..................................................89

*In re K-Tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ..................................................63

*Laperrier v. Vesta Ins. Group, Inc.*,
    526 F.3d 715 (11th Cir. 2008) ..................................................88

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV 04-1255, 2006 WL 538756 (D. Or. Jan. 3, 2006) ..................................................79

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................86

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..................................................65, 70

v

*McAdams v. Greenberg Traurig, LLP*,
   No. 06-1778, 2007 WL 2310112 (N.D. Ga. Aug. 9, 2007) ....................................................48

*McDonald v. Alan Bush Brokerage Co.*,
   863 F.2d 809 (11th Cir. 1989) ...............................................................................................53

*Mellette v. Branch*,
   No. 07-2065, 2008 WL 4001044 (D. Colo. Aug. 26, 2008)............................................47, 52

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ..................................................................................... *passim*

*In re Moneygram Int'l Inc. Sec. Litig.*,
   626 F. Supp. 2d 947 (D. Minn. 2009).....................................................................................86

*In re NTL, Inc. Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004).................................................................................51, 52

*In re Navarre Corp. Sec. Litig.*,
   299 F.3d 735 (8th Cir. 2002) ..................................................................................................63

*In re Netbank Sec. Litig,*
   No. 07-2298, 2009 WL 2432359 (N.D. Ga. Jan.29, 2009)............................................ *passim*

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................49, 50, 55, 78

*New York  State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,|
   No. 2:07-cv-05756, 2008 WL 4812021 (C.D. Cal. Oct. 28, 2008) ........................................32

*In re 2007 Novastar Fin. Sec. Litig.*,
   No. 07-139, 2008 WL 2354367 (W.D. Mo. June 4, 2008).....................................................33

*In re 2007 Novastar Fin. Sec. Litig.*,
   579 F.3d 878 (8th Cir. 2009) ..................................................................................................51

*In re NPS Pharms., Inc. Sec. Litig.*,
   No. 2:06-CV-00570, 2007 WL 1976589 (D. Utah  July 3, 2007) ..........................................72

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
   199 F.R.D. 338 (N.D. Cal. 2000)............................................................................................63

*In re PXRE Group, Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................................74

*In re Paincare Holdings Sec. Litig.*,
   541 F. Supp. 2d 1283 (M.D. Fla. 2008).................................................................................80

*Patel v. Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008) ..................................................................33

*Phillips v. Scientific-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) ................................................35, 36, 54, 75

*Pittleman v. Impac Mortgage Holdings, Inc.*,
    No. SACV07-0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) .........................32

*In re PMA Capital Corp. Sec. Litig.*,
    No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ................................36, 37, 39, 40

*In re Pronetlink Sec. Litig.*,
    403 F. Supp. 2d 330 (S.D.N.Y. 2005)..........................................................86

*In re Proquest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007).........................................................79

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) ...........................................................33

*In re Refco Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..........................................................64

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .............................................................76

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ..............................................................81, 85

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ...................................................................63

*Rosenberg v. Gould*,
    554 F.3d 962 (11th Cir. 2009) ..................................................................53

*Roth v. Aon Corp.*,
    No. 04-C-6835, 2008 WL 656069 (N.D. Ill. Mar. 7, 2008) ...............................75

*Sloman v. Presstek, Inc.*,
    No. 06-cv-377-JD, 2007 WL 2740047 (D.N.H. Sept. 18, 2007)..........................54

*South Ferry LP #2 v. Killinger*,
    No. C04-1599-JCC, 2009 WL 3153067 (W.D. Wash. Oct. 1, 2009)....................61

*In re Spear & Jackson Sec. Litig.*,
    399 F. Supp. 2d 1350 (S.D. Fla. 2005) .....................................................54, 65

*In re Spiegel, Inc. Sec. Litig.*,
   382 F. Supp. 2d 989 (N.D. Ill. 2004) ...................................................49

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...............................................49

*Stumpf v. Garvey*,
   No. 03-1352, 2005 WL 2127674 (D.N.H. Sept. 2, 2005).......................88

*In re Sunbeam Sec. Litig.*,
   89 F. Supp. 2d 1326 (S.D. Fla. 1999) ..................................................75

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................81, 84

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
   633 F. Supp. 2d 763 (D. Ariz. 2009) ...............................48, 50, 51, 54

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................54, 72, 79

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   513 F.3d 702 (7th Cir. 2008) ..........................................................64, 70

*In Re Terry Mfg. Co., Inc.*,
   No. 2:07-0620, 2007 WL 4287366 (M.D. Ala. Dec. 5, 2007)................80

*Thornton v. MicroGrafx, Inc.*,
   878 F. Supp. 931 (N.D. Tex. 1995) .....................................................63

*In re Towne Servs, Inc. Sec. Litig.*,
   184 F. Supp. 2d 1308 (N.D. Ga. 2001) ...............................32, 35, 45, 56

*Tripp v. IndyMac Fin., Inc.*,
   No. 07-1635, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ............33, 63

*In re Tyco Int'l, Ltd.*,
   No. 02-1335, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ................51, 52

*Wagner v. First Horizon Pharm. Corp.*,
   464 F.3d 1273 (11th Cir. 2006) .....................................46, 57, 87

*In re Wash. Mut., Inc. Sec. Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009) .....................................................33

*Watts v. Florida  Int'l Univ.*,
   495 F.3d 1289 (11th Cir. 2007) ...........................................................30

viii

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................63

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001) ....................................................56

## STATUTES & RULES

Fed. R. Civ. P. 12(b)(6).....................................................................3, 30, 48

Fed. R. Civ. P. 9(b) .................................................................................44

15 U.S.C. § 78u-4(b)(1)......................................................................31, 45

15 U.S.C. § 78u-5(c)(1)......................................................................34, 35

Fed. R. Civ. P. 12(d) .................................................................................3

15 U.S.C. § 78u-4 ..................................................................................45

15 U.S.C. §§ 77k ...................................................................................87

Court-appointed Lead Plaintiffs, the Arkansas Teacher Retirement System, State-Boston Retirement System, Norfolk County Retirement System, and City of Brockton Retirement System (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the Consolidated Class Action Complaint For Violation Of The Federal Securities Laws (the "Complaint") made by defendants Robert E. Lowder, Sarah H. Moore, T. Brent Hicks (the "Officer Defendants") and Sheila Moody[1] (collectively, the "Individual Defendants").

## PRELIMINARY STATEMENT

Lead Plaintiffs have filed a detailed Complaint alleging that senior executives of Colonial BancGroup, Inc. ("Colonial" or the "Company"), led by Robert E. Lowder, engaged in a fraud upon investors. The Complaint alleges that, in order to fuel its rapid growth, the Officer Defendants, *without any disclosure to the investing public*, threw out the Company's underwriting policies – designed to ensure high credit quality and loans that were properly collaterized – and secretly placed enormous bets on high-risk real estate loans to speculators, developers, homebuilders and home purchasers.

The Officer Defendants' decision to ignore traditional underwriting standards achieved the desired goal. By the end of 2007, Colonial was experiencing a huge influx of new loans, and loan application files were stacked from the floor to the ceiling in the loan operations office, representing a time-bomb of low-quality, high-risk loans. ¶ 50.[2]

---

[1] Sheila Moody is a former director of Colonial BancGroup, Inc.

[2] All citations to "¶" herein refer to numbered paragraphs of the Complaint, filed June 22, 2009 (Doc. No. 134).

While Colonial was undertaking these high-risk and imprudent loan origination and underwriting practices, the Officer Defendants repeatedly told the investing public the opposite – that the Company utilized sound lending practices, issued high quality loans and had "tightened" and "strengthened" their already "conservative" underwriting standards.  ¶¶ 178, 184, 193, 195, 221, 222, 232, 278.  Colonial concealed the fact that its underwriting standards were being sacrificed in favor of loan quantity, thereby artificially inflating the Company's earnings and the prices of the Colonial securities purchased by Lead Plaintiffs and the Class.[3]

As a result of this concealment, the Officer Defendants failed to: (1) record impairment losses relating to goodwill; (2) reserve adequately for loan losses; and (3) design and supplement an adequate system of internal controls and report on the Company's internal controls in accordance with United States Securities and Exchange Commission ("SEC") rules.  Colonial's financial statements were materially false and misleading in violation of generally accepted accounting principles ("GAAP") throughout the Class Period.[4]  ¶¶ 126-64.

Lead Plaintiffs' allegations are amply supported by, among other sources of information, compelling, non-public facts obtained from various confidential witnesses who described the Company's deteriorating underwriting standards during the Class Period.

In moving to dismiss, the Individual Defendants blithely attribute the Class' damages to "the gasping and heaving in the financial sector through these unprecedent times . . ." that simply

---

[3] The Class is defined as all those persons or entities who purchased or acquired the securities of Colonial between April 18, 2007 and January 27, 2009, inclusive, and who were damaged thereby.  Excluded from the Class are defendants and those individuals who were, at all relevant times officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.  ¶ 24.

[4] The Class Period is defined in the Complaint as the period from April 18, 2007 to January 27, 2009, inclusive.

2

had nothing to do with them.  Br. at 1.[5]  In doing so, the Individual Defendants ignore the well-pleaded allegations clearly showing that *Colonial's problems were of its own making, caused by the fraud here*, and that the market understood that fact.  As one court stated in sustaining claims based on similar allegations:

> [i]ndependent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default.  When combined with what Plaintiffs allege are misrepresentations concerning the quality of [defendant's] loans, these underwriting issues would ultimately undermine confidence in the secondary market for [defendant's] products.

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1065-66 (C.D. Cal. 2008).

In making their contrary argument, (*see infra* Point I.B), the Individual Defendants improperly invite the Court to consider matters entirely extrinsic to the Complaint.  In support of a forty page Statement of "Undisputed" Facts that is essentially a wholesale rewrite of the Complaint, *see* Br. at 8-49, the Individual Defendants filed an "Evidentiary Submission" consisting of over 2,000 pages of exhibits, many of them entirely unrelated to Colonial.[6]  Under such circumstances, Rule 12(d) of the Federal Rules of Civil Procedure requires that either the Court exclude the extraneous facts, or if they are not excluded, that "the motion…be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Further, if these extraneous

---

[5] All citations to "Br." herein refer to pages of Defendants Robert E. Lowder, Sarah H. Moore, T. Brent Hicks and Sheila Moody's Motion to Dismiss Lead Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed Sept. 18, 2008 (Doc. No. 236) (the "Individual Defendants' Motion to Dismiss").

[6] Exhibits 1-59, Evidentiary Submission of Defendants Robert E. Lowder, Sarah H. Moore, T. Brent Hicks and Sheila Moody in Support of Their Motion to Dismiss Lead Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed Sept. 18, 2009 (Doc. No. 237).

matters are not excluded, Plaintiffs should be allowed discovery to develop the record, affording them "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*[7]

Lead Plaintiffs submit that the Complaint is more than sufficient under the applicable standards. *First*, as set forth in Points II and III, *infra*, Lead Plaintiffs in their Complaint have adequately identified the material misstatements and omissions with the requisite particularity. The misstatements and omissions are actionable and, contrary to the Individual Defendants' argument, were neither protected by cautionary language, nor constituted mere puffery. Indeed, they were misrepresentations and omissions of then-current fact on which shareholders relied to their detriment.

*Second*, the Complaint pleads facts raising a strong inference of scienter. *Infra* Point IV. Under the "core operations" doctrine, the Officer Defendants are deemed to have known that their repeated statements concerning "conservative" underwriting practices and high quality loans were false. Scienter is also established through the Officer Defendants' blatant misrepresentations and omissions concerning Colonial's acquisition of TARP financing and the Company's pervasive GAAP violations. The lack of stock sales by the Officer Defendants does not negate scienter since Lead Plaintiffs have not attributed their scienter to insider trading allegations. Moreover, their inflated equity holdings reinforce that the Officer Defendants were strongly motivated to conceal the fraud from investors.

*Third*, Lead Plaintiffs have established loss causation. Two statistically significant disclosures resulted in dramatic stock drops that entirely removed the inflation from Colonial's stock. There is no basis at this stage to conclude otherwise. *Infra* Point V.

---

[7] Lead Plaintiffs have filed, concurrently with this memorandum, a motion to strike these extraneous materials (the "Motion to Strike").

*Fourth*, Lead Plaintiffs' Securities Act claims against the Individual Defendants are strict liability claims and, therefore, are subject only to notice pleading requirements under Rule 8. Even if, *arguendo*, the Securities Act claims are governed by the heightened fraud pleading standard of Rule 9(b), they are pleaded with the requisite particularity to sufficiently meet that standard. *Infra* Point VI.

Finally, Lead Plaintiffs have adequately stated a claim for control person liability against Lowder, Moore and Hicks. *Infra* Point VII.

## STATEMENT OF RELEVANT FACTS

**Colonial Pursues An Aggressive Growth Strategy In Florida**
**While Secretly Compromising Its Underwriting Standards**

Colonial[8] was a financial holding company that derived substantially all of its income from its subsidiary, Colonial Bank. Colonial Bank derived a large share of its profits from its personal and commercial mortgage lending business, which was based primarily in Florida and Alabama, with lesser operations in Georgia, Nevada and Texas. Colonial Bank's loan portfolio was comprised mainly of commercial real estate ("CRE") and construction loans. Residential loans comprised a smaller, though not insignificant, portion of Colonial Bank's loan portfolio. ¶ 2.

Formed in 1981 and headquartered in Alabama, Colonial had, at the time the Complaint was filed, approximately $26 billion in assets and 352 branches throughout Florida, Alabama, Georgia, Nevada, and Texas. Colonial operated one of the largest financial services companies in the southeast United States, and its common stock was traded on the New York Stock

---

[8] On December 2, 2009, the Court issued an order dismissing without prejudice Colonial as a defendant in this action, due to its bankruptcy. (Doc. No. 271).

Exchange ("NYSE"). ¶ 20. In order to grow its asset base and gain the capital necessary to fund its growth strategy, Colonial – under the guidance of the Officer Defendants – capitalized on the Florida real estate boom (which peaked in 2005) by aggressively acquiring regional banks in Florida, opening new branches, and expanding its commercial, residential and residential construction lending businesses. ¶¶ 20, 30, 33, 34. By 2007, Colonial had 196 locations in Florida (out of 338 nationwide) and 59% of Colonial's total assets were Florida-based, making it Florida's fifth largest commercial bank. ¶ 36.

Colonial's quest to be bigger also led it to spend excessively and recklessly. For example, in January 2007 Colonial bought Florida's Commercial Bank in a transaction with an aggregate value of $317 million – more than *four times* the $74.4 million book value of Commercial Bank – despite the fact that Commercial Bank's President reportedly cited tighter earnings as a reason why that bank's Board of directors decided to sell. Colonial paid for the acquisition with $157.5 million in cash and 6.5 million shares of Colonial stock. The acquisition expanded Colonial's Florida footprint to 180 branches and over $10 billion in assets. ¶ 34. Colonial's excessive spending, not surprisingly, had a deleterious effect on its capital resources. As a bank holding company, Colonial had to satisfy certain minimum risk-based and capital guidelines. The most important metric used to gauge a bank's financial health is its tangible common equity ("TCE") ratio, which represents what shareowners stand to receive in the event a bank is liquidated, and is obtained by dividing a bank's tangible common equity by its tangible assets. Colonial's board set a minimum TCE ratio of 5%. ¶ 36. By the end of 2007, following its twenty-third acquisition (of Citrus and Chemical Bancorporation, Inc., a Florida bank), Colonial's TCE ratio had sunk below its own minimum benchmark of 5%, a casualty of Colonial's reckless growth strategy and concomitant capital expenditure. *Id.* Colonial's

precarious capital position would only worsen throughout the Class Period, contributing to the Officer Defendants' increasing desperation, as the Company's loan portfolio deteriorated and default rates increased.  ¶¶ 36, 68.

As its capital resources diminished, Colonial took increasing risks to continue fueling its rapid growth.  The Officer Defendants placed enormous bets on high-risk real estate loans to speculators, developers and homebuilders hoping to capitalize on the Florida real estate boom, cutting corners to inflate Colonial's loan portfolio and failing to follow the Company's own underwriting policies, which were intended to ensure high credit quality and loans that were properly evaluated, documented and collateralized.  ¶ 31.

The Officer Defendants, however, continued to misleadingly tout Colonial's purportedly high credit quality and its conservative and prudent underwriting practices.  ¶ 32.  By September 2007, when the credit markets had begun to collapse, Colonial falsely asserted that it was protected from the crisis by virtue of its supposed conservative loan practices and the "high" credit quality of its loan assets, even positioning itself for *more* growth.  ¶ 35.  Indeed, when the Officer Defendants stated that they intended to double Colonial's size "within five years through selected fill-in acquisitions and de novo expansion," the market did not react with any skepticism, indicating that investors believed the Officer Defendants' false statements about Colonial's conservative lending and the health of its loan portfolio.  *Id*.

Starting in the second half of 2006, Colonial began bypassing its loan operations department, which had previously reviewed loan files to ensure the Company's loan officers made loans in accordance with Colonial's internal lending guidelines.  ¶ 43.  Prior to late 2006, each loan file had to satisfy about thirty criteria, including crucial metrics such as loan-to-value ("LTV") ratios and debt-coverage ratios.  ¶ 44.  If a loan failed even one of these criteria, an

exception would be logged in a computer database called OnePoint. If the loan operations department could not subsequently "clear" the exception by making sure it met Colonial's lending guidelines, the defective loan would be added to an "exception report," which was distributed to senior management on a weekly basis. *Id.* In the second half of 2006, however, the Officer Defendants abruptly, and without explanation, abandoned this longstanding practice and gave both loan officers and their assistants the authority to clear exceptions without having to consult the loan operations department. This had the immediate effect of loan officers automatically "clearing" loan exceptions themselves, and stripped Colonial's "lending guidelines" of any meaning. ¶ 45. Now, loan officers could make loans that would not have met the previous guidelines, and with the push of a button, make it appear as if problem loans had been vetted and "cleared." *Id.* Moreover, loan officers were under heavy pressure to push through bad loans, and "clear" associated exceptions, because their monthly commission was based on the volume of "cleared" loans made. ¶ 46.

In conjunction with giving loan officers free rein to "clear" exceptions, the Officer Defendants instructed Colonial's loan operations team to ignore all but four of the more than thirty credit criteria used to ensure high quality loans. ¶ 51. Crucial metrics most predictive of a loan's default risk, including loan-to-value ratio, debt-coverage ratio and the borrower's credit record, would no longer be considered. *Id.*

In a further push to increase its loan volume, Colonial began writing loans that required no documentation ("no-doc" loans), as well as subprime and "stated income" loans. ¶¶ 47-48. In keeping with its "anything goes" strategy, Colonial also made a substantial number of loans to foreign national customers who, because they were not United States citizens, could not provide credit scores or other standard documentation and proof of creditworthiness. ¶ 49.

8

Colonial's rapidly deteriorating underwriting standards achieved the desired goal – a huge influx of new loans in 2007. Indeed, by the end of 2007, files were stacked from floor to the ceiling in the loan operations office, representing a ticking time-bomb of low-quality, risky loans. ¶ 50.

**Colonial Continuously Misleads the Market And
Misstates LTVs, Sending Stock Prices Soaring**

Colonial never disclosed the severe deterioration in its underwriting standards. Instead, the Officer Defendants repeatedly stated on numerous occasions that Colonial had "consistent[ly]" maintained "strong", "very solid," "conservative," "stringent," and "strict" underwriting standards. ¶¶ 178, 184, 193, 195, 221-22, 228, 232, 278. Because this was blatantly false, the Officer Defendants were also forced to conceal the declining credit quality of Colonial's portfolio and – not surprisingly – the concomitant increase in portfolio default rates. Well into 2008, the Officer Defendants continued to falsely represent that Colonial had "tightened" and "strengthened" underwriting standards, even though Colonial was, at the time, originating subprime, "stated income" and "no doc" loans. ¶¶ 242, 267.

From May through September of 2008, the Officer Defendants continued to falsely reassure the market that Colonial's loan portfolio remained healthy. Responding to public concerns about a lack of transparency regarding crucial financial metrics in May 2008,[9] the Officer Defendants reached out to analysts in one-on-one calls to insist that Colonial's reported nonperforming assets ("NPAs") were under control. ¶¶ 74-77. Indeed, the Officer Defendants

---

[9] In a further attempt to hide from scrutiny, Colonial Bank switched from being a nationally chartered bank to an Alabama state-chartered bank on June 10, 2008. Although Colonial portrayed this switch as a "business decision" to achieve approximately $1 million in cost savings, commentators suggested that Colonial's true motivation was to avoid regulation by the Office of the Comptroller of the Currency ("OCC"), and instead come under regulation by state bank examiners; certain commentators viewed the state bank examiners as being more compliant than the OCC. ¶ 80.

continually referred to their "strong capital position" as providing them with "significant cushion for loss absorption." ¶ 82.

Bowing to public pressure, the Officer Defendants also released LTV ratios by property type for the first time in the second quarter of 2008. ¶ 83. Consistent with the ongoing fraud, the Officer Defendants reported very low average LTVs across the board, strengthening the misleading impression that Colonial underwriting practices were very conservative. ¶¶ 83-86. In response, Colonial's stock soared an incredible *260%* from $3.36 on July 14, 2008 to $8.72 on September 22, 2008. ¶ 90.

**Colonial Bank, Desperate For Capital And Seeking To Hide Its Rising Default Rates From The Market, Raised Money Through Its Stock And Bond Offerings**

Unknown to the market, Colonial's default rates began to skyrocket as the quality of its loan portfolio deteriorated. ¶ 54. Indeed, by December 2007 almost 75% of Colonial's Alabama branch construction loans had defaulted. *Id*. In marked contrast, the default rate for Colonial's Alabama construction loans in 2005 was between zero and two percent. *Id*. The explosion of defaults was consistent in other territories, including Florida. *Id*. Colonial's reported NPAs, however, did not reflect this reality. For example, in the October 22 Form 8-K Colonial reported $88.8 million in NPAs for its Alabama construction portfolio, even though between 65% and 75% of Colonial's $526.1 million Alabama construction portfolio, or approximately $350 million, was in default. ¶ 154.

Colonial further failed to establish an adequate allowance for loan losses ("ALL") that was sufficient to cover the Company's mounting losses, even though it had: (1) deviated from its underwriting standards; and (2) experienced a concomitant rise in delinquencies, impaired loans and NPAs. As a result, Colonial's reported financials were drastically overstated. ¶¶ 141-155.

Because the Officer Defendants tracked Colonial's financials closely through Bankstar, the Company computer system that allowed them to monitor loan portfolios, default rates and late payments, they were aware of the rapid increase in NPAs.  ¶ 56.  The Officer Defendants were also aware that the deteriorating loan portfolio would, inevitably, lead to a corresponding increase in net charge-offs ("NCOs") as borrowers defaulted on their loans.  ¶ 4.  Exacerbating the situation,  Colonial had depleted its capital resources, which were exhausted during its acquisition spree in Florida.  Desperate to raise enough capital to cover their inevitable loan losses, and to maintain the image of a financially sound institution by raising Colonial's TCE, the Officer Defendants turned to the unsuspecting market.

On March 3, 2008, Colonial issued $250 million worth of Subordinated Notes, due in 2038, paying 8.875% interest on a quarterly basis (the "Note Offering").  ¶ 368.  Barely a month after raising $250 million in the Note Offering, Colonial issued another $350 million worth of common stock on April 23, 2008 (the "Stock Offering").  ¶ 70.  The investors who purchased these securities were unaware that: (1) Colonial's underwriting standards had materially deteriorated; (2) as a result, its NPAs were underreported, its goodwill impaired; and (3) additional defaults were inevitable.  Instead, the Officer Defendants had primed the market with their continuous misstatements about Colonial's commitment to quality underwriting, and their portrayal of Colonial as a bank insulated from the housing market crisis *because* of that commitment.  ¶¶ 178, 184, 193, 195, 221-22, 228, 232, 278.

## Colonial's Financial Reporting Violated Generally-Accepted Accounting Principles

The Officer Defendants ensured that their misstatements regarding Colonial's financial condition gained a false appearance of legitimacy, by falsely certifying that Colonial's financial statements were prepared in accordance with GAAP, and by falsely certifying under Section 404 of Sarbanes-Oxley ("SOX") that the Company maintained adequate internal controls over

financial reporting.  ¶¶ 126-164, 177-182, 202-213, 227-262, 266-302, 307-309, 313-327.  In so doing, the Officer Defendants falsely assured investors that Colonial's financial statements were prepared in compliance with the rules and procedures for public companies established by the SEC and Financial Accounting Standards Board ("FASB"), and therefore were accurate, reliable and not misleading.  ¶¶ 126, 130-132, 144-148, 156-160.

The performance of Colonial's loans bore directly on the question of whether Colonial's financial statements complied with GAAP.  ¶¶ 126-155.  Although GAAP required the Officer Defendants to establish a sufficient ALL to cover the Company's non-performing and charged-off loans, the Officer Defendants allowed non-performing assets to increase by *a factor of 27* and charged-off loans to increase by *a factor of 292*, which grossly exceeded the Company's ALL. ¶¶ 146-152.  Although GAAP required the Officer Defendants to determine whether a goodwill impairment charge was required on loans the Company had obtained through its many acquisitions, the Officer Defendants failed to do that until January 27, 2009, when the losses were too staggering to further conceal:  an astounding $575 million.  ¶¶ 130-134, 144-145.

The Officer Defendants were aware of – or grossly indifferent to – the fact that  the Company's financial statements did not comply with GAAP.  ¶¶ 21-23, 56, 328, 337.  Yet, the Officer Defendants falsely certified under SOX that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," and that "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" had been disclosed.  ¶¶ 182, 213, 238, 259, 286, 302, 323.  The Officer Defendants did so even while the Company was on the brink of insolvency.  ¶ 323.

**The Misrepresentations Concerning TARP**

With NPAs continuing to balloon out of control, and the market already tapped to capacity through the Note and Stock Offerings, the Officer Defendants turned to the government in a desperate bid for more capital. On December 2, 2008, Colonial announced that it had been preliminarily approved for the government Troubled Asset Relief Program ("TARP"), and stood to gain $550 million of additional capital. ¶¶ 98-100. In response, Colonial's share price soared 54%, the largest one day gain in 25 years. ¶ 101.

However, the Officer Defendants omitted a crucial condition for Colonial's TARP funding: Colonial would only get its government lifeline *if* it first raised $300 million in equity capital – an impossible feat, given that Colonial had already tapped the market to capacity with the Note and Stock offerings just a few months previously. ¶ 103. The December 2, 2008 8-K announcing Colonial's approval and participation in TARP only stated that, "Colonial BancGroup will receive $550 million from the Emergency Economic Stabilization Act of 2008 aimed at enhancing the economy by restoring liquidity and increasing financing to businesses and consumers. The preliminary approval is subject to certain conditions and the execution of definitive agreements." ¶ 99.

Certainly, the $300 million condition would have been a key material fact to investors, had Colonial disclosed it – a reasonable investor would not assume such a key condition would be contemplated in the boilerplate language that "[t]he preliminary approval is subject to certain conditions and the execution of definitive agreements." *Id.* This is especially so because, at the time, $300 million represented an unbelievable *94%* of the Company's current market capitalization, making it virtually impossible for Colonial to raise the required amount. ¶¶ 8, 103.

**The Truth Begins to Emerge**

On October 22, 2008, the Officer Defendants partially disclosed the truth regarding their mounting loan losses, shocking the market by announcing a staggering 66% increase in NPAs from the same period the year before and NCOs for the quarter of $121 million. ¶ 6. Colonial's share price immediately dropped an astonishing 56% in extremely heavy trading. ¶ 92.

The Officer Defendants, however, continued to insist that credit problems were "contained," and that Colonial's capital "remain[ed] solid." ¶ 94. In support of this false contention, the Officer Defendants also released another surprisingly low LTV ratio for the residential construction loan portfolio, reassuring the market that Colonial's underwriting standards remained extremely conservative. ¶ 94.

On January 27, 2009, Colonial announced staggering net losses for the fourth quarter of 2008 of $825 million and $880 million for the year ended December 31, 2008. ¶ 102. Of this amount, a massive and unexpected $575 million was attributed to impairment of goodwill. *Id*. The huge goodwill writedown revealed that the Officer Defendants had used previously inflated fair values, even though the carrying values of Colonial's reporting units, particularly Florida Regional Bank, were overstated and failed to reflect the true poor credit quality and deteriorating underwriting standards. ¶ 138.

Even more shockingly, Colonial stunned the market by announcing that the government had conditioned TARP approval on Colonial raising an additional $300 million in capital funding, or *94%* of the Company's current market capitalization. ¶¶ 8, 103. As one analyst succinctly noted, this condition "was never explained to the investment community...." ¶ 107.

The market's reaction was swift and severe: Colonial stock went into free fall, plummeting in value from $1.58 to $0.85 per share, for a single day drop of 46%. ¶ 106. On

January 28, 2009, at $0.85, Colonial's stock stood at just 3% of its $24.85 price at the beginning

of the Class Period, on April 18, 2007.  ¶ 110.

**Post-Class Period Revelations**

      Colonial also belatedly disclosed that it was under investigation by the Federal Deposit

Insurance Corporation ("FDIC") and the Alabama State Banking Department.  In its 2008 10-K,

the Company revealed, for the first time, that it had entered into Memorandums of

Understanding ("MOUs") with the FDIC and the Alabama State Banking Department on

December 15, 2008 and January 6, 2009, respectively, requiring, among other things,

improvement of regulatory capital ratios and enhancement of the Company's credit process.

¶ 111.  Ultimately, the MOUs led to final cease and desist orders in June 2009, which concluded

that Colonial had been:

      (a) Operating with inadequate management and Board of Directors ("Board")
      oversight;

      (b) Operating with inadequate equity capital in relation to the volume and quality
      of assets held by the Bank;

      (c) Operating with an inadequate methodology for the allowance for loan and
      lease losses;

      (d) Operating with a liquidity and funds management policy that is insufficient to
      meet the Bank's current needs;

      (e) Operating with a business strategy that has resulted in unprofitable operations
      and poor asset quality; and

      (f) Operating with inadequate policies and procedures to monitor and control risks
      within concentrations of credit in the Bank's loan portfolio.

¶ 123.

      On May 4, 2009, Colonial posted earnings for the first quarter of 2009, including, among

other things, a net loss of $168 million and a 65% increase in NPAs, and the next day Colonial's

stock fell a further 18%.  ¶¶ 118-119.  Shortly thereafter, on May 28, 2009, Colonial announced

the retirement of Lowder from his positions as Chairman, Director, Chief Executive Officer and President of Colonial and its subsidiary, Colonial Bank. ¶ 121.

On August 4, 2009, Colonial confirmed that federal agents associated with the Special Inspector General for TARP had "executed" a search warrant at Colonial's Mortgage Warehouse Lending Division located in Orlando, Florida. Declaration of James W. Johnson in Support of Motion to Modify the Stay of Discovery ("Johnson Decl."), filed August 20, 2009, Ex. 1 (Doc. No. 201-2). According to an August 4, 2009 *New York Times* article, the federal agents seized and removed "dozens of boxes" of records from the Orlando offices. Johnson Decl. Ex. 2 (Doc. No. 201-3). Because the warrant was executed by the Special Inspector General for TARP, the government investigation apparently concerned disclosures made by Colonial relating to its eligibility for TARP funding. The August 4, 2009 article also reported that a simultaneous raid had been carried out at the Florida offices of Taylor Bean Whitaker ("TBW"), a mortgage lender which borrowed substantial sums from Colonial to finance its loan origination business. *Id*. Colonial and TBW had been involved in a failed deal to raise capital for Colonial's TARP eligibility. *Id*.

A mere three days later, on August 7, 2009, Colonial issued another press release stating that the DOJ had informed Colonial on August 6, 2009 that it was "the target of a federal criminal investigation relating to the Company's mortgage warehouse lending division and related alleged accounting irregularities." Johnson Decl. Ex. 4 (Doc. No. 201-5).

In the same August 7, 2009 press release, Colonial also revealed that the Company was in receipt of subpoenas from the SEC "seeking documents related to, among other things, [Colonial's] disclosures related to its participation in the U.S. Treasury Department's Troubled

Asset Relief Program and [Colonial's] disclosures respecting accounting for loan loss reserves." *Id.*

On August 14, 2009, Colonial Bank was closed by the FDIC and the Alabama State Banking Department, and on August 26, 2009, Colonial filed for bankruptcy. *See* Br. at 8 n.1.

## Defendants' False and Misleading Statements

The Officer Defendants knowingly or recklessly made numerous false and misleading statements about the true state of affairs at Colonial throughout the Class Period in SEC filings, press releases, and conference calls with analysts.[10]

### A.    Underwriting Standards

As detailed above, the Officer Defendants made repeated misstatements of then-current and historical fact, asserting throughout the Class Period that Colonial maintained stringent underwriting standards and avoided subprime loans, while concealing that Colonial had: (1) materially loosened its underwriting standards by bypassing its loan operations departments; (2) ceased evaluating crucial loan metrics including loan-to-value ratio, debt-coverage ratio and the borrower's credit record; (3) handed loan clearing power to loan officers whose interest was in increasing volume to gain higher commissions; (4) underwritten subprime loans; and (5) drastically increased the number of loans it was making, emphasizing quantity over quality. The following table demonstrates the numerous and repeated nature of these misstatements and omissions:

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| **QUARTERLY AND** | 5/9/2007 10-Q | Historically, Colonial has experienced favorable | 178-179 |

---

[10] As detailed in the complaint, Defendant Moody is responsible only for negligent or unintentional false and misleading statements by virtue of her position and the fact that she signed certain registration statements and prospectuses.

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| **ANNUAL REPORTS** | | levels of nonperforming assets and other credit quality measures as a result of ***management's consistent focus on maintaining strong underwriting standards***, collection activities, work-out strategies and risk management efforts. <br><br> … <br><br> As mentioned previously, Colonial's credit risk management area performs detailed verification and testing to ensure appropriate identification of impaired loans and that proper reserves are held against these loans. | |
| | 8/8/2007 10-Q | ***Colonial has maintained conservative underwriting and credit product standards*** and has generally avoided nontraditional credit products. <br><br> . . . . <br><br> Colonial does not have subprime mortgage products. <br><br> … <br><br> [D]iversification and ***Colonial's emphasis on quality underwriting*** serve to reduce the risk of losses. <br><br> … <br><br> ***The Company has conservative underwriting guidelines and has not offered any products targeting sub-prime borrowers . . . .*** | 202-208 |
| | 11/8/2007 10-Q | ***Colonial has maintained conservative underwriting and credit product standards*** and has generally avoided nontraditional credit products. <br><br> **. . . .** <br><br> ***Colonial does not have subprime mortgage products.*** <br><br> [D]iversification and ***Colonial's emphasis on quality underwriting*** serve to reduce the risk of losses. <br><br> … <br><br> ***The Company has conservative underwriting guidelines and has not offered any products targeting sub-prime borrowers . . . .*** | 227-238 |
| | 5/5/2008 10-Q | ***The Company has conservative underwriting guidelines and has not offered any products targeting sub-prime borrowers*** and does not offer higher risk mortgage products such as option ARMS, "pick a payment" loans and low or no | 274-286 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | documentation loans.<br><br>…<br><br>**Colonial has maintained conservative underwriting and credit product standards and has generally avoided nontraditional credit products.**<br><br>…<br><br>[D]iversification, **in addition to Colonial's emphasis on quality underwriting**, serves to reduce the risk of losses. | |
| | 8/5/2008 10-Q | **The Company has conservative underwriting guidelines and has not offered any products targeting sub-prime borrowers** and does not offer higher risk mortgage products such as option ARMS, "pick a payment" loans and low or no documentation loans.<br><br>…<br><br>**Colonial has maintained conservative underwriting and credit product standards and has generally avoided nontraditional credit products.**<br><br>…<br><br>…<br><br>[D]iversification, **in addition to Colonial's emphasis on quality underwriting**, serves to reduce the risk of losses. | 290-302 |
| | 11/6/2008 10-Q | **The Company has conservative underwriting guidelines and has not offered any products targeting sub-prime borrowers** and does not offer higher risk mortgage products such as option ARMS, "pick a payment" loans and low or no documentation loans. The weighted average loan to value of this portfolio was 73.0% at September 30, 2008. | 315-316 |
| **8-K's AND PRESS RELEASES** | 4/18/07 8-K | Taken as a whole, the Financial Services industry went on a roller coaster ride in the first quarter of 2007. **I am pleased to report that Colonial's performance did <u>not</u> join that ride, and continues to reflect the results of our long time commitment to conservative lending to borrowers we know**. . . . Colonial's credit quality has historically been measurably ahead of its southeastern peer average and the average of all FDIC insured commercial banks. | 165-167 |
| | 5/1/07 | 107 Highlights<br><br>… | 174-176 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | Excellent Credit Quality – provision of $2.3 million exceeded new charge-offs of $2.2 million | |
| | 7/18/2007 | Some years ago at Colonial, *we made the conscious decision not to enter the sub-prime business, and, fortunately, sub-prime issues don't affect the Company*. | 183-185 |
| | 10/17/2007 | While there have been significant liquidity issues in the industry, fortunately Colonial's liquidity position remains strong.  Due to our high quality assets, solid core deposit base and diverse wholesale funding sources, *we have not experienced funding challenges*.<br><br>…<br><br>*During the third quarter, Colonial experienced declining loan volumes which we expect will continue into the fourth quarter and beyond.*  However, even in times of slow to no loan growth, we remain committed to our core strategy of not sacrificing credit quality for the sake of growth.<br><br>…<br><br>[M]ost important in today's environment, we *have strict underwriting standards that serve us well as evidenced by our sound credit quality*. | 214-220 |
| | 11/26/2007<br>8-K | *Strong Credit Culture with Proven Policies and Underwriting*<br><br>…<br><br>We have a rigorous appraisal review process<br><br>…<br><br>Credit Quality – YTD 2007 Update<br><br>*Credit quality is sound and within expectations*<br><br>*Quality Residential RE portfolio – no subprime; no stated income; no exotic products*<br><br>…<br><br>Allowance was 246% of nonperforming assets at 9/30/07<br><br>*Allowance would be sufficient to cover charge-offs for 6.42 years at YTD annualized levels*<br><br>. . . .<br><br>What Gives Us Comfort in Today's Market<br><br>We *do not* sacrifice credit quality for loan growth<br><br>*Our real estate portfolios are diverse – by collateral type, location, and borrower*<br><br>*The dynamics of our markets continue to be* | 239-241 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | *positive (population and job growth)* | |
| | | *Commercial real estate within our markets remains strong* | |
| | | … | |
| | | *We have stayed away from riskier products such as subprime*, option ARM's, stated income, mezzanine financing, credit cards, and we do very little unsecured lending | |
| | | . . . . | |
| | | Strong liquidity | |
| | | Ample sources of liquidity which allows Colonial to use the lowest cost funding available | |
| | | *Strong, high quality investment portfolio* | |
| | | 99.8% of the portfolio is AAA rated or government backed | |
| | | *No subprime exposure* | |
| | | … | |
| | | Why Invest in Colonial BancGroup? | |
| | | … | |
| | | *Conservative Lending Philosophy* | |
| | | *Sound credit quality* | |
| | 1/23/2008 8-K | We began to see signs of overbuilding and excess inventories in 2006, mainly in markets and in property types with large speculative components. As a result, *we tightened our underwriting standards considerably* and therefore generated little new loan volume outside of the State of Texas, which so far remains a bright spot in the country. | 242-244 |
| | 4/21/2008 8-K | We have systematically identified and isolated problematic credits, created a bankwide loan monitoring process that ends with me, and dedicated highly experienced, skilled people to the task of resolving individual credit situations. *We've further strengthened our underwriting criteria to include lower loan to value ratios on residential property types, tightened credit criteria for consumer loan products and implemented increased risk based pricing across all lending lines.* | 266-270 |
| **CONFERENCE CALLS** | 4/18/2007 | Lowder: *We think we have excellent credit quality*, our annualized net chargeoffs were .06 of average loans and our allowance for loan loss has increased to 1.16 of loans or 525% of nonperforming assets. | 168-173 |

21

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | I know credit quality has been on everybody's minds for the last 3 months so we'll just jump right into that. **Credit quality remains excellent. We have no subprime products.** | |
| | 7/18/2007 | Lowder: **I think our credit quality remains excellent.  Let's remember we have no subprime products, no subprime products.**<br><br>…<br><br>**We focus on** finance and commercial real estate as strong market support, experienced owners, solid preleasing, and **very supportive debt to coverage ratio--ratios.**<br><br>…<br><br>**How is our loan portfolio impacted by the fallout in the subprime market?  We have not had any impact so far.  We do not offer products that target customers with bad credit. . . .** Our underwriting of residential mortgage loans is very conservative and I think you can see that in our continued results in those areas.<br><br>…<br><br>Do we believe the credit quality within our residential mortgage portfolio will weaken?  Foreclosure rates have increased across the nation, especially in Florida and Nevada where we have offices.<br><br>However, our numbers do not reflect these trends.  We have a low level of foreclosures in ORE [Other Real Estate] and have only noticed a small increase during the year of a few more homes.  **We attribute this to not having subprime lending and not offering high-risk loan products such as Option ARMs.  Also, we have very solid underwriting in place as follows.**  We don't credit score, we don't capitalize debt-to-income ratios, we review unsecured debt levels, we look closely at credit history throughout a borrower's life, we underwrite to conservative loan-to value-ratio rules and we underwrite, as I said to a 200 basis point increase in the rate. | 186-200 |
| | 4/21/2008 | Lowder:  Our credit quality is sound and within expectations.  We have no sub-prime, no stated income, no exotic loan or investment products. | 263-265 |
| | 9/9/2008 | Lowder: A lot of talk about loan to value ratios; you can see from these numbers if you can read those on the board, **our weighted loan-to-value ratios in all categories are in very good shape**.  You would ask how current are these appraisals?  They are as current as they need to be.  If they | 303-306 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | have some reason to get a new appraisal we get it. Because if we suspect something is going on, if a loan comes up for renewal, if a loan is delinquent, certainly if the loan is going into nonperforming we get new appraisals.  You can see all these numbers and especially you look at the total commercial real estate portfolio at less than 64% weighted average, ***it certainly gives us excellent loan to value ratios***.<br><br>…<br><br>***[W]e have had very strict underwriting of our loans***. . . . And so when all this is said and done at some point down the road, I think everybody will look back and say the banks that did the best were the ones that had good, strict, conservative underwriting policies and we know that Colonial is one of those banks. | |

## B.    Portfolio Performance

Similarly, the Officer Defendants made numerous and repeated misstatements that: (1) underreported Colonial's NPAs; (2) concealed Colonial's increasing NPAs and NCOs; and (3) concealed Colonial's inadequate ALLs for the inevitable defaults, while falsely insisting that Colonial regularly reviewed its loan portfolio for compliance with its purportedly high credit standards:

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| **QUARTERLY AND ANNUAL REPORTS** | 5/9/2007 10-Q | [Reporting NPAs of $33 million and stating:]<br><br>***The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms. Management also expects that the resolution of these problem credits will not materially impact future operating results, liquidity or capital resources.***<br><br>…<br><br>***Given the level of reserves and the demonstrated ability of the borrowers to comply with the existing repayment terms, management believes any exposure from these loans has been adequately addressed.*** | 177-179 |
| | 8/8/2007 10-Q | [Reporting NPAs of $45.5 million and | 211-212 |

23

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | stating:]<br><br>***The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.*** | |
| | 11/8/2007<br>10-Q | [Reporting NPAs of $70 million and stating:]<br><br>***The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.*** | 236-237 |
| | 2/25/2008<br><br>2007 10-K | [Reporting NPAs of $138 million and stating:]<br><br>***The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.***<br><br>…<br><br>Management's ongoing evaluation of the adequacy of the allowance for loan losses considers both impaired and unimpaired loans and takes into consideration Colonial's past loan loss experience, known and inherent risks in the portfolio, existing adverse situations that may affect the borrowers' ability to repay, estimated value of any underlying collateral, an analysis of existing guarantees and an analysis of current economic conditions.<br><br>***Colonial, through its lending and credit functions, continuously reviews its loan portfolio for credit risk. Colonial employs an independent credit review area that reviews the lending and credit functions to validate that credit risks are appropriately identified. The Company remains committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses.***<br><br>…<br><br>***Management reviews the methodology, calculations and results and ensures that the calculations are appropriate and that all material risk elements have been assessed in order to determine the appropriate level of allowance for the inherent losses in the loan portfolio at each quarter end.*** | 251-259 |

24

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | 5/5/2008 10-Q | [Reporting NPAs of $33 million and stating:]<br><br>*The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.*<br><br>…<br><br>*The Company's credit risk management process is centered on comprehensive credit and underwriting policies and procedures, a strong and effective loan approval process, continual audit and review functions and experienced credit professionals at the regional, businessline and BancGroup levels.* …<br><br>*In addition, the internal auditors and regulatory examiners review and perform detailed tests of the Company's credit risk management activities, such as credit underwriting, loan administration and the allowance process.*<br><br>…<br><br>*Colonial, through its lending and credit functions, continuously reviews its loan portfolio for credit risk. Colonial employs an independent credit review area that reviews the lending and credit functions to validate that credit risks are appropriately identified. The Company remains committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses.*<br><br>…<br><br>*Management reviews the methodology, calculations and results and ensures that the calculations are appropriate and that all material risk elements have been assessed in order to determine the appropriate level of allowance for the inherent losses in the loan portfolio at each quarter end.* | 274-286 |
| | 8/5/2008 10-Q | [Reporting NPAs of $408 million and stating:]<br><br>*The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.*<br><br>… | 294-302 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | *The Company's credit risk management process is centered on comprehensive credit and underwriting policies and procedures, a strong and effective loan approval process, continual audit and review functions and experienced credit professionals at the regional, businessline and BancGroup levels.*<br><br>…<br><br>*In addition, the internal auditors and regulatory examiners review and perform detailed tests of the Company's credit risk management activities, such as credit underwriting, loan administration and the allowance process.*<br><br>…<br><br>*Colonial, through its lending and credit functions, continuously reviews its loan portfolio for credit risk. Colonial employs an independent credit review area that reviews the lending and credit functions to validate that credit risks are appropriately identified. The Company remains committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses.*<br><br>…<br><br>*Management reviews the methodology, calculations and results and ensures that the calculations are appropriate and that all material risk elements have been assessed in order to determine the appropriate level of allowance for the inherent losses in the loan portfolio at each quarter end.* | |
| | 11/6/2008 10-Q | [Reporting NPAs of $688 million and stating:]<br><br>*The above nonperforming loans represent all material credits for which management has significant doubts as to the ability of the borrowers to comply with the loan repayment terms.*<br><br>…<br><br>*The Company's credit risk management process is centered on comprehensive credit and underwriting policies and procedures, a strong and effective loan approval process, continual audit and review functions and experienced credit professionals at the regional, businessline and BancGroup* | 313-323 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | *levels.*<br><br>…<br><br>*Colonial, through its lending and credit functions, continuously reviews its loan portfolio for credit risk. Colonial employs an independent credit review area that reviews the lending and credit functions to validate that credit risks are appropriately identified. The Company remains committed to the early recognition of problem loans and to ensuring an adequate level of allowance to cover inherent losses.*<br><br>…<br><br>*Management reviews the methodology, calculations and results and ensures that the calculations are appropriate and that all material risk elements have been assessed in order to determine the appropriate level of allowance for the inherent losses in the loan portfolio at each quarter end.* | |
| **8-K'S AND PRESS RELEASES** | 6/2/2008 8-K | *Colonial's capital is significantly above well-capitalized levels.* | 287-289 |
| | 10/28/2008 8-K | [Reporting NPAs of $88.8 million for Alabama.] | 307-309 |
| **CONFERENCE CALLS** | 4/18/2007 | Lowder: I tried to say it but I didn't say it too eloquently, but you've got more – you're going to have some more of this moving in and out. ***And I don't think it's going to result in chargeoff increases.*** But I think that's just where we are as we move projects in and out. | 168-173 |
| | 7/18/2007 | Lowder: So I feel very good about where we are with a nonperforming asset ratio of 0.29. I think that that's better than anybody I have seen, and so we're not going to apologize for it, but we're going to try to talk about it and explain it to you. The increase in our nonperforming was due to the addition of a small handful, and that will be four or five if you're counting, loan relationships that-- relationships that went into non-accrual status. We charged down those credits, as we always do. Whenever we put a loan into nonperforming, we charge it down to what we fully realize the value to be . . . . So on nonperforming at 0.29%, it's higher than 0.22% from the previous quarter, but we feel very good about those numbers and where we are.<br><br>… | 186-200 |

27

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | Why did our loan reserve ratio decline by one basis point when nonperformance and past dues increased? The chargedowns we took during this quarter were already factored into our reserve model. Remember, last quarter we put some extra in. Well, that's because we were looking ahead and we were planning and we--we knew that snapshot at the end of the month may change. So going forward our model tells us that this is the right level of reserve and I feel very comfortable about where we are in our reserves.<br><br>…<br><br>Well, I don't have a crystal ball. We're expecting some recoveries this quarter. We think that we're going to have some nice recoveries coming in this quarter from things that we'd charged off either the end of last year or the first and second quarter this year. **So [with] those recoveries come in, then-- then they should be less than this quarter.** But--Andrea, I'm not going to apologize for 0.20% charge-offs for the quarter.<br><br>. . . .<br><br>What I'm telling you is that--that our asset quality is good. … Because, listen, our credit quality for the last two years has been unbelievably great. Now, other people's have been unbelievably great too, but their unbelievably great hasn't been as good as what ours is right now. … If you look--if you look on that sheet on there, that goes back through the years as far as what our nonperformings were, back in--we didn't get to--that level--in 2002 and 2003, when our credit quality was better than everybody's, it was 0.78 and 0.65. And we're less than half of that at 0.29. **So I can't want guarantee you what it is. I will guarantee you this. It's going to be better than anybody else.** | |
| | 10/17/2007 | Lowder: So our nonperforming asset ratio at 0.46 is very good. The question would be, is it going to go any higher? It could go higher. . . . But we think that we can keep within a respectful range of our goal of 0.50, and that's our target, to stay in there and we think that we can do that.<br><br>[O]ur goal [is] to keep the net charge-offs below the 0.25 on an annualized basis. And we think we can do that. | 221-226 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | … <br><br> So what about our loan reserves? Because our net loans had decreased some $250 million, with most of that being in the higher-risk categories, with our loan metrics, we felt like we were well reserved, and we feel that we are well-reserved. | |
| | 10/22/2008 | Moore: ***Colonial's capital ratios remain solid*** and are significantly above the well-capitalized minimums.  There is a Tier 1 risk based capital ratio of 10% and a total risk based capital ratio of over 14%, which compares very favorably to many of our peers. <br><br> Page 10 of the slide presentation compares Colonial's capital to the well-capitalized minimum.  The analysis shows that the Company has significant capital in excess of those minimums.  ***Additionally, at the bottom of the page is a summary which compares Colonial's excess capital plus loan loss reserve to its non-performing assets, to its NPAs still accruing that were past due 90 days or greater, and residential construction loans.  You can see that the coverage represented by our excess capital reserves are very healthy***. | 310-312 |

### C.    Goodwill

The Officer Defendants also made numerous and repeated misstatements throughout the Class Period regarding Colonial's goodwill, even though the goodwill associated with Colonial's reckless bank acquisitions was impaired as credit quality fell:

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| **QUARTERLY AND ANNUAL REPORTS** | 5/9/2007 10-Q | Stating that Colonial's goodwill was $672.2 million. | 180-181 |
| | 8/8/2007 10-Q | Stating that Colonial's goodwill was $465 million | 209-210 |
| | 11/8/2007 10-Q | Stating that Colonial's goodwill was $856.4 million | 234-235 |
| | 2/25/2008 2007 10-K | ***BancGroup tests goodwill for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment***. | 245-246 |

29

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| | | . . . .<br><br>*The goodwill impairment analysis for 2007 indicated that no impairment write-offs were required.* | |
| | 5/5/2008 10-Q | *BancGroup tests goodwill for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment.*<br><br>…<br><br>*BancGroup continues to monitor this matter and, based on current results and expectations, has determined that the fair value of its reporting units continues to exceed their carrying values.* | 274-275 |
| | 8/5/2008 10-Q | *BancGroup tests goodwill for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment.*<br><br>…<br><br>*BancGroup has determined that the fair values of its reporting units continue to exceed their carrying values. Therefore, management determined that no goodwill impairment charge was required as of June 30, 2008.* | 290-291 |
| | 11/6/2008 10-Q | *BancGroup tests goodwill for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment.*<br><br>…<br><br>*Management determined that no goodwill impairment charge was required as of September 30, 2008 as the implied value of goodwill for each tested reporting unit exceeded its carrying value.* | 313-314 |

## D.    TARP

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
| **QUARTERLY AND ANNUAL REPORTS** | 12/2/2008 8-K | Announcing Colonial's approval and participation in the U.S. Treasury's capital purchase program, and stating that "Colonial BancGroup will receive $550 million from the Emergency Economic Stabilization Act of 2008 aimed at | 99 |

| Location | Date | False and Misleading Statements | Complaint ¶ |
|---|---|---|---|
|  |  | enhancing the economy by restoring liquidity and increasing financing to businesses and consumers.  The preliminary approval is subject to certain conditions and the execution of definitive agreements." |  |

## ARGUMENT

## I.    THE APPLICABLE STANDARDS GOVERNING A MOTION TO DISMISS

### A.    The Standards Under Rule 12(b)(6) and the PSLRA

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need not contain "detailed factual allegations," but must only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The court must determine whether the plaintiff "has alleged enough facts to suggest, raise a reasonable expectation of, and render plausible" its claims.  *Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007).  The court must also construe the complaint in the plaintiff's favor, and accept the facts alleged as true.  *See In re Netbank, Inc. Sec. Litig.*, 1:07-cv-2298-BBM, 2009 WL 2432359, at *3 (N.D. Ga. Jan. 29, 2009) (citing *M.T.V. v. DeKalb County Sch. Dist.*, 446 F.3d 1153, 1156 (11th Cir. 2006)).

In order to state a claim under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresenta- tion or omission and the loss, commonly called "loss causation."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008) (internal citation omitted).

Under the Private Securities Litigation Reform Act ("PSLRA"), a private securities complaint alleging that the defendant made a false or misleading statement must also: (1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, 15 U.S.C. § 78u-4(b)(1); and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  15 U.S.C. § 78u-4(b)(2).

In their motion to dismiss, the Officer Defendants claim that the fraudulent misrepresentations and omissions described in the Complaint have not been identified with the requisite specificity, Br. at 54, and that they are not actionable because they are "forward looking" statements and entitled to protection under the safe harbor provision of the PSLRA, Br. at 80.  The Officer Defendants also claim that the Complaint fails to allege particularized facts giving rise to a "strong inference" of scienter, Br. at 61-79, and that it further fails to "adequately plead" loss causation establishing that Plaintiffs' losses were caused by the Officer Defendants' fraudulent statements and omissions, Br. at 95.  For the reasons below, the Officer Defendants' arguments fail to demonstrate that the Complaint should be dismissed under the applicable standards.

### B.    The Standards Governing The Individual Defendants' Submission Of Extraneous Material And Reliance On Market Conditions

As more fully set forth in Lead Plaintiffs' memorandum of law in support of their motion to strike, the Individual Defendants have improperly introduced evidentiary submissions in support of their motion to dismiss.  While the Court may consider documents that are referenced in or central to the complaint," *In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1313 (N.D. Ga. 2001), and documents that are routinely judicially noticed, such as corporate filings with the Securities and Exchange Commission, *id.* at 1312-13, the Officer Defendants cannot submit, in context of a Rule 12(b)(6) motion to dismiss, "evidentiary submissions" concerning

the "unprecedented economic downturn," and, citing a string of inapposite authorities, ask this Court at the outset of their brief to follow other "federal courts [that] have consistently dismissed these opportunistic lawsuits." Br. at 1.

The Individual Defendants' argument should be rejected for two reasons. First, *not one* of the authorities cited by these Defendants mentions a "rash of securities litigation." Indeed, most of the decisions cited by the Individual Defendants did not address any economic downturn at all.[11]

Notably, one court *explicitly rejected* the argument that the Individual Defendants seek to raise here – that an "unprecedented economic downturn" caused plaintiffs' losses, rather than defendants' fraud:

> Defendants argue that loss causation does not exist because the recent downturn in the housing market, not any disclosure regarding [Washington Mutual's ("WaMu")] financial health, caused WaMu's stock price to plummet. However, Plaintiff is not required to show that WaMu's misrepresentations were the only cause of the stock decline. *In re Daou*, 411 F.3d at 1025. Although the market downturn may have affected WaMu stock prices, this does not foreclose the possibility that the alleged disclosures had an impact as well.

*In re Wash. Mut., Inc. Sec. Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009).

---

[11] *See In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) (defendants' "statements regarding Downey's 'strong' capital position … are far too vague to be actionable under the PSLRA."); *Pittleman v. Impac Mortgage Holdings, Inc.*, No. SACV07-0970-AG(MLGx), 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) (alleged misstatements regarding loans approved for sale were "so vague as to be meaningless" and therefore "too generic to satisfy the scienter requirement."); *In re Impac Mortgage Holdings Sec. Litig.*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) (alleged misstatement that defendant "continued to expect solid loan acquisitions and originations" held to be too vague to satisfy the PSLRA); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267 (S.D. Fla. 2008) (plaintiff alleged defendants "knew, or were reckless in not knowing, about certain lending and accounting practices…."); *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) (plaintiff alleged that defendants made "materially false and misleading statements and omissions concerning FBR's involvement in and potential liability for improprieties arising out of FBR's provision of certain investment banking services…."); *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-05756-FMC, 2008 WL 4812021 (C.D. Cal. Oct. 28, 2008) (dismissing complaint with leave to replead due to "the haphazard ordering of the allegations regarding the misrepresentation and scienter allegations as to the Individual Defendants."); Br. at 1.

Second, two of these courts rejected the tactic – employed by the Individual Defendants here – of interjecting into the action materials outside of the pleadings regarding deteriorating market conditions. *See id.* at 495; *Patel v. Parnes*, 253 F.R.D. 531, 550 (C.D. Cal. 2008). These courts refused to take judicial notice of "reports and newspaper articles pertaining to the recent economic downturn and deterioration of the housing market," because such matters are "not necessary to decide the issues presented in these motions ...." *Wash. Mut.*, 259 F.R.D. at 495; *Parnes*, 253 F.R.D. at 550 (refusing to take judicial notice of "articles that concern the general housing market.").[12]

Put simply, not one of the cases cited by the Individual Defendants supports their argument. In fact, these cases illustrate the converse proposition: that the Individual Defendants may *not* interject the issue of a "subprime crisis," financial "meltdown," or other market deterioration in an attempt to deflect attention from Lead Plaintiffs' substantive allegations of securities fraud committed by the Officer Defendants and others.

## II.    THE FRAUDULENT MISSTATEMENTS AND OMISSIONS DESCRIBED IN THE COMPLAINT ARE ACTIONABLE

As set forth in detail in the Statement of Relevant Facts, Lead Plaintiffs, in their Complaint, sufficiently allege actionable false statements and omissions by the Officer Defendants concerning Colonial's credit quality, underwriting standards, capitalization and loan

---

[12] When courts have allowed defendants to interject such materials, it is when plaintiffs themselves relied upon allegations of deteriorating market conditions to frame their securities fraud claims, something Lead Plaintiffs here have not done. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 618 (E.D. Pa. 2009) ("plaintiffs here are attempting to show that the defendants recklessly ignored trends in the subprime industry … and that they therefore possessed the requisite scienter"); *In re Novastar Fin. Inc. Sec. Litig.*, No. 07-139, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008) ("Plaintiff alleges Defendants failed to properly anticipate and plan for the downturn."); *Tripp v. IndyMac Fin., Inc.*, No. CV07-1635-CW, 2007 WL 4591930, at *1 (C.D. Cal. Nov. 29, 2007) ("Plaintiffs allege that 'Defendants falsely portrayed IndyMac as a company that was, and would continue to be, financially stable despite industry-wide downturns….").

portfolio, upon which the Plaintiffs "justifiably relied," *see supra* pp. 17-30.  *In re Netbank*, 2009 WL 2432359, at *4.

Nonetheless, the Officer Defendants claim that the "alleged misrepresentations are forward-looking" statements, Br. at 80, which purportedly are not actionable under § 10(b) because they are protected under the safe harbor provision of the PSLRA.  15 U.S.C. § 78u-5(c)(1); *Harris v. Ivax Corp*., 182 F.3d 799, 803 (11th Cir. 1999).

This argument fundamentally misapprehends that Lead Plaintiffs' core allegations have nothing to do with economic projections or forecasts, and everything to do with misstatements of Colonial's then-current underwriting standards and financial condition.  Accordingly, the statements are *not* forward-looking statements based on future risk, and the Officer Defendants' fraudulent misstatements and omissions cannot fall within the PSLRA safe harbor.  Moreover, even if the Officer Defendants were able to meet the "forward-looking" threshold requirement for applying the safe harbor provision, the cautionary language identified by the Officer Defendants is completely inapposite because it addresses *future* risk of "economic downturn" and a "challenging market."  Br. at 84.  The purported cautionary language pointedly did *not* address the risk that the Officer Defendants would continually misrepresent information concerning Colonial's deterioration in underwriting standards and its then-current financials, including falsely overstating its capitalization and loan loss reserves, when the Officer Defendants knew that those financials were misleading and false based on then-current information known only to them.[13]

---

[13] For the same reasons that the Officer Defendants cannot avail themselves of the PSLRA's safe harbor provision, they cannot invoke protection under the bespeaks caution doctrine, "the safe harbor's judicially created counterpart."  Br. at 91.

### A.   The Complaint is Based on Misrepresentations and Omissions of Then-Current Fact

The PSLRA's safe harbor provision applies only to forward looking statements. *See* 15 U.S.C. § 78u-5(c)(1); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002). Significantly, courts have rejected attempts to escape liability for fraudulent statements and omissions by cloaking the statement or omission in language implicating the future. *See, e.g., In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. at 1320 ("An otherwise actionable omission concerning past or present problems, however, cannot be sanitized by forward-looking statements about similar problems"); *see also Scientific-Atlanta*, 239 F. Supp. 2d at 1361 (noting that "the [c]omplaint refers to misrepresentations or omissions of historical fact along with the forward-looking statements" and holding safe harbor inapplicable.)

Here, the Officer Defendants unconvincingly attempt to portray the misrepresentations described in the Complaint as "statements regarding management's plans, objectives and future economic performance," Br. at 83, even though the Complaint clearly states that the fraudulent misrepresentations are centered on then-current and historical facts regarding Colonial's supposedly: (1) "stringent" underwriting standards (*see, e.g.*, ¶¶ 154, 155, 203, 207, 219, 228, 232, 266, 305), (2) high credit quality (*see, e.g.*, ¶¶ 166, 167, 268); (3) lack of increases in net charge-offs (*see, e.g.*, ¶¶ 82, 169, 171, 199); (4) proper reserves for loans (*see, e.g.*, ¶¶ 71, 151, 178, 194, 224, 337); (5) low non-performing asset ratios (*see, e.g.*, ¶ 189) and non-performing assets (*see, e.g.*, ¶¶ 236, 257, 307); (6) current liquidity position (*see, e.g.*, ¶ 215); (7) low loan-to-value ratios (*see, e.g.*, ¶¶ 253, 303); (8) capitalization (*see, e.g.*, ¶ 287); and (9) the lack of conditions attached to Colonial's TARP funding (*see, e.g.*, ¶¶ 1, 7, 8, 95, 98, 99, 100,104, 105, 324, 326, 410, 449).

These categories have nothing to do with economic forecasts or projections, but are misstatements of then-current and historical fact.[14]  Indeed, the Officer Defendants' claim that "statements regarding reserves and allowances for losses are also routinely viewed as forward-looking,"[15] Br. at 80, is belied by courts holding that such reserves are "*not* per se forward-looking."  *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *6 (E.D. Pa. 2005) (emphasis added), citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. July 27, 1992) (holding that there is "nothing unique about representations… regarding loan loss reserves that removes them from the purview... of the federal securities laws"); *see also Netbank*, 2009 WL 2432359, at *4 (rejecting argument that "allegations merely charging that reserves ultimately proved inadequate fail to state a federal securities fraud claim" where complaint alleged that defendants "*knew* [their] underwriting guidelines were insufficient, and that the reserves that [they] knew or should have known were necessary were not in place," and declining to dismiss on safe harbor grounds).

In *PMA*, the plaintiffs had alleged that the defendants "made a number of false statements regarding PMA's 'solid' underwriting practices and 'adequate' loss reserves."  *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *5 (E.D. PA. July 27, 2005).  The PMA defendants, just like the Officer Defendants here, argued that statements regarding loss reserves

---

[14] Even if the misstatements and omissions could be considered forward-looking, which they cannot for the reasons given, they would still not be entitled to protection under the safe harbor provision because: (1) the Officer Defendants had actual knowledge or were severely reckless in not knowing that the statements were false when made, *see infra* Point IV; and (2) there was no meaningful cautionary language warning against the risk that the Officer Defendants would misrepresent then-current and historical facts bearing directly on Colonial's financial health, *see infra* Point II.B.  *See Scientific-Atlanta*, 239 F. Supp. 2d at 1361 (discussing the two conditions that must apply to statements accorded protection under the safe harbor).

[15] The Officer Defendants' citation to *Harris*, 182 F.3d at 806-07 for this proposition is inapposite.  The *Ivax* court was discussing a statement regarding the adequacy of loss reserves as a factor underlying the *prediction* of the company's third quarter results.  Here, there is no such economic prediction at issue.  The defendants' repeated false statements concerning Colonial's loan loss reserves stand on their own as statements regarding then-current financials.

were protected by the PSLRA safe harbor and the bespeaks caution doctrine because "loss reserves are forward looking [as] they are estimates or predictions of future financial liabilities." *Id*. The PMA court flatly rejected this argument, noting that "[a] company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable." *Id*. (internal citation omitted). The court concluded that "[i]f [p]laintiffs can prove that any of the PMA [d]efendants spoke untruthfully about the loss reserves, [p]laintiffs *are entitled to recover under the Exchange Act*. Neither the bespeaks caution doctrine nor the statutory safe harbor provision support [d]efendants' motion." *Id*. (emphasis added).

Here, Lead Plaintiffs have alleged that Colonial failed to increase its loan loss reserves even though its volume of non-performing assets was skyrocketing, ¶¶ 151-52 ("[w]hile NPAs increased 27-fold from year-end 2006 to year-end 2008, Colonial did not even double its ALL"), and that Colonial's net charge-offs, which increased by *a factor of 292* between the first quarter of 2007 and the fourth quarter of 2008, eventually exceeded Colonial's reserves altogether. ¶ 153. Moreover, the Officer Defendants were actively concealing their true NPAs, reporting figures that were markedly lower than the default rate observed first hand by loan officers at the time. *See, e.g.*, ¶¶ 73, 312. Despite their knowledge that their NPAs and NCOs were ballooning in relation to their ALL, Defendants continued to mislead the market throughout the class period, including: (1) stating that "Colonial's credit risk management area performs detailed verification and testing to ensure appropriate identification of impaired loans and that proper reserves are held against these loans," ¶ 178; (2) declaring that "I [Lowder] feel very comfortable about where we are in our reserves," ¶ 197; and (3) asserting that "the coverage represented by our excess capital reserves [over NPAs] are very healthy." ¶ 311. In this context, the Officer Defendants may not argue that their false statements about Colonial's loan loss reserves are

protected.  *See Netbank*, 2009 WL 2432359, at *4 (dismissal inappropriate where plaintiffs alleged that defendants touted adequacy of reserves even though NetBank's "own analysis indicated that its reserves were severely deficient.")

In addition to making the inaccurate assertion that loan loss reserves are inherently forward looking in all possible circumstances, Br. at 80, the Officer Defendants next attempt to bizarrely transmute the *entire* Complaint into a forward looking economic projection, in order to claim that their false and misleading statements are the sort of legitimately forward-looking statements discussed in *Harris*, 182 F.3d at 806-07, Br. at 81 (quoting *Harris*, 182 F.3d at 807: "when the factors *underlying a projection or economic forecast* include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement.") (emphasis added).  Here, the Complaint describes false and misleading statements that have nothing to do with economic projections, *see supra* pp. 17-30.

The Officer Defendants falsely draw an analogy to *Harris* by taking several other ancillary statements out of context and then implying that the core false statements identified by Lead Plaintiffs are only "factors" that underlie the so-called economic projections the Officer Defendants have erroneously (and misleadingly) "identified" as the misrepresentations.  For example, the Officer Defendants quote the statement "we do not currently see any systemic risk unique to Colonial," declaring it "forward looking", but ignore the crucial clause that precedes it: "*because of our stringent underwriting standards*, we do not currently see…."  Br. at 82 (emphasis added).  The Officer Defendants' continuing misrepresentation of Colonial's underwriting standards was not a forecast or projection of any kind, but a stand-alone

misrepresentation that forms a core allegation in the Complaint. *See, e.g.*, ¶¶ 154, 155, 203, 207, 219, 228, 232, 266, 305.

Lead Plaintiffs nowhere allege that the Officer Defendants made inaccurate predictions about systemic risk[16] – rather, the Officer Defendants' continuing misrepresentation of Colonial's underwriting standards enabled them to convince the investing public that their current loan portfolio was healthy and Colonial's credit quality high, when the opposite was true. *Cf. PMA*, 2005 WL 1806503, at *2 (holding actionable defendants' statements that they were "committed to a philosophy of strict underwriting discipline," focused on "sound underwriting and prudent reserving," and maintained "underwriting and actuarial expertise" with a "solid underwriting performance," while later disclosing inadequacy of underwriting when business underperformed.)

Moreover, while *Harris* held that factors based on current fact could – when coupled with other forward looking factors that *collectively* form the basis for an allegedly fraudulent economic projection – be considered part of the forward looking projection, the Officer Defendants' *one-factor* predicate for the statement they erroneously label an asserted misrepresentation is, on its face, distinguishable for that reason alone. *See Harris*, 182 F.3d at 802, 806 (noting that "[t]here are two theories of liability: first, that Ivax's *economic projections were fraudulent*, and second, that Ivax's disclosure of factors affecting its projections misled by omitting the possibility of a goodwill writedown," and describing "laundry list" of factors

---

[16] Similarly, the other "misrepresentations" identified by the Officer Defendants, Br. at 82, do not accurately reflect the false and misleading statements that Plaintiffs clearly describe in the Complaint. As detailed in Section VII of the Complaint, the Plaintiffs describe misstatements regarding Colonial's then-current finances, reserves, underwriting standards, credit quality, and overall health of its loan portfolio. These statements bear no relation to the statements highlighted by the Officer Defendants, which relate to the "expectations" of management, and whether commercial real estate was "projected to remain strong." Br. at 82.

underlying the allegedly fraudulent projections.) (emphasis added).  Unlike the fraud alleged in

*Harris*, Lead Plaintiffs here do not allege that Colonial's economic projections were fraudulent.

Accordingly, the Officer Defendants' analogy to *Harris* is misplaced.

### B.    There Was No Meaningful Cautionary Language Accompanying the Statements

As shown above, the Officer Defendants' statements were fraudulent misrepresentations

of *current* facts.  Thus the "cautionary" language identified by the Officer Defendants, Br. at 83-

90, wholly fails to warn against the current risks presented.  The Officer Defendants quote

boilerplate language over the span of four pages regarding the *future* risks of an "economic

slowdown or recessions," Br. at 85, the *possibility* of "a significant economic downturn in

Florida," *id.*, the volatility of stock prices, *id.*, the *potential* inadequacy of loan losses, Br. at 88,

and the *potential* inability to raise capital or failure to receive final approval and funding from

the U.S. government.  *This language does nothing* to warn against the risk that the Officer

Defendants would deliberately misstate the quality of their underwriting and credit quality,

underreport their NPAs, fail to increase their reserves even though they knew their NCOs were

ballooning, and conceal the condition attached to their TARP funding at the time they received

it, *see supra* pp. 17-30.

All these occurrences were not remote future possibilities – rather, they were *concurrent*

with Defendants' false statements to the contrary.  *See PMA*, 2005 WL 1806503, at *6 ("When a

company addresses the quality of a management practice, that representation becomes material

to the reasonable shareholder.  *At that time*, the company must speak truthfully about the

subject.") (internal citation omitted, emphasis added); *see also Netbank*, 2009 WL 2432359, at

*9 (refusing to dismiss claims that defendants failed to "timely recognize known losses regarding

the impairment of its MSRs (mortgage servicing rights assets)," where defendants knew "*that*

41

*market conditions, such as the decline in home values*, had significantly decreased the fair value of its MSRs [but] disregarded the significant indications of the impairment of its MSRs.") (emphasis added).

The Officer Defendants base their claim that Colonial "saturat[ed]…the marketplace with cautionary language," Br. at 84, on a faulty premise that they aptly term a "hypothesis": "Plaintiffs' allegations of omission *support the single hypothesis* that Colonial's public statements expressed *an overly optimistic view of its business*…." Br. at 84 (emphasis added). The Officer Defendants then proceed to recite boilerplate language cautioning generally against the risks of the business in which Colonial operated. Br. at 85-88. Under this flawed logic, every company would be entitled to commit fraud by misrepresenting *current* facts about its business, because those facts merely support an "optimistic view" of the company's business, and any language pertaining to general business risks would be sufficiently "cautionary" to invoke the statutory safe harbor. Indeed, the Officer Defendants strain credulity by arguing that omissions and misrepresentations regarding "the conservative nature of [Colonial's] underwriting" and "its lack of subprime lending" are "optimistic" statements regarding Colonial's business, when instead they are statements of current fact that directly reflect, in real time, Colonial's financial health. Portraying these statements as "optimistic" is akin to a company issuing false financial results, and then applying the safe harbor protection to the false results because they were merely "optimistic" about the company's financial health.

Similarly, the omissions and misrepresentations relating to Colonial's TARP funding were not just related to "the availability of TARP funds," Br. at 84, but to the misrepresentation that Colonial had successfully obtained TARP funding, without the disclosure that the funding was conditioned on Colonial raising another $300 million (representing a staggering 94% of

Colonial's market capitalization at the time, and making it virtually impossible for Colonial to raise the required amount.  ¶¶ 8, 103).  This omission was not mere "optimism" that Colonial would get TARP funds, but a deliberate omission that misled the investing public into believing that Colonial had already obtained the TARP funding, without any conditions.  The cautionary language prong of the statutory safe harbor cannot support such an absurd result.

### C.    The Misstatements and Omissions Described in the Complaint Are Not Mere Optimistic Puffery

The Officer Defendants also unconvincingly assert that the misstatements and omissions described in the Complaint are "general, optimistic statements and opinions regarding Colonial's future prospects," Br. at 93, to argue that the statements are "mere puffery," Br. at 92.  The Officer Defendants, however, overlook a crucial qualification in the applicable legal standard: "Subjective characterizations of a company's current performance or predictions about future performance, *absent a false misstatement of fact*, are generally not actionable."  *Amalgamated Bank v. Coca Cola Co.*, No. 05-CV1226, 2006 WL 2818973, at *3 (N.D. Ga. Sept. 26, 2006) (emphasis added).  As explained above, the core misrepresentations and omissions detailed in the Complaint center on then-current and historical facts about Colonial's financial health, and the Officer Defendants consequently cannot rely on the absurd position that misstatements about *then-current fact* are merely "optimistic," and that their falsity is of no consequence to a reasonable investor.

Indeed, the very statements highlighted by the Officer Defendants as "optimistic" are self-evidently statements made about then-current or historical facts.  Lead Plaintiffs have alleged that these statements of fact are false and misleading, and detailed why they were false and misleading.  *See* Compl. Section VII; *supra* pp. 17-30.  The Officer Defendants cannot term

these statements "optimistic puffery," because they are false statements of fact.  *See*

*Amalgamated Bank*, 2006 WL 2818973, at *3.

      The Officer Defendants' attempt to transform these statements into ones of optimism –

merely by labeling them as such – defies logic and common sense.  *See, e.g*., Br. at 93 ("Colonial

*has maintained* conservative underwriting and credit product standards"; "The Company's credit

risk management process *is centered* on comprehensive credit and underwriting policies and

procedures"; "our weighted loan-to-value ratios in all categories *are in* very good shape"); Br. at

93-94 ("especially you look at the total commercial real estate portfolio at less than 64%

weighted average, it certainly *gives us* excellent loan to value ratios"); Br. at 93-94 ("the banks

that did the best were the ones that had good, strict, conservative underwriting policies and *we*

*know that Colonial is* one of those banks"; "Colonial's capital ratios *remain* solid and *are*

significantly above the well-capitalized minimums … the coverage represented by our excess

capital reserves *are* very healthy.")  These statements are not "[s]ubjective characterizations of a

company's current performance or predictions about future performance," but false statements of

hard facts, and simply cannot be deemed "optimistic puffery."  *See Amalgamated Bank*, 2006

WL 2818973, at *3.

      Similarly, the descriptions that the Officer Defendants claim are "vague" and "lacking in

specificity" are clearly not.  Statements that Colonial's capital ratios "are significantly above the

well-capitalized minimums," Br. at 94, refer to specific, government-regulated benchmarks for

commercial banks, *see, e.g.,* ¶ 72 , and statements that "Colonial has maintained conservative

underwriting and credit product standards," Br. at 93, have clear meaning within the mortgage

lending industry, as do "excellent loan-to-value ratios," Br. at 94, which are essential indicators

of credit quality.  *See* ¶ 3.  Moreover, Colonial *continuously* referred to its standards as

"conservative" both before and during the Class Period, even though it began ignoring key credit criteria in mid-2007 and drastically lowered its previous underwriting standards. *See* ¶¶ 44-48, 51-52 (describing how Colonial's lending practices during the Class Period deteriorated from the period prior to 2007). Thus, by its own benchmarks, Colonial did not "maintain[] conservative underwriting and credit product standards," ¶ 203, and – in this context – the term "conservative" is not a subjective, isolated term devoid of meaning.

Because there is a "substantial likelihood" that a reasonable shareholder would have "considered [these misstatements of then-current fact about the fundamental aspects of Colonial's business] important to an investment decision, they are "material" misrepresentations. *See In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *8 (quoting *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1359 (N.D. Ga. 2005)). Accordingly, none of the misleading statements described in the Complaint can be characterized as "optimistic puffery."

## III. THE COMPLAINT IDENTIFIES THE MATERIAL MISSTATEMENTS AND OMISSIONS WITH THE REQUISITE PARTICULARITY

Under Federal Rule of Civil Procedure 9(b), Lead Plaintiffs must plead allegations of securities fraud with particularity. *See Towne Servs.*, 184 F. Supp. 2d at 1316. Thus, Rule 9(b) requires Lead Plaintiffs to specify "the who, what, when, where and how of the alleged fraud."[17]

---

[17] Despite the Officer Defendants' assertion to the contrary, Br. at 56 n. 7, Lead Plaintiffs are entitled to rely on the group pleading doctrine in this Circuit. *See Netbank*, 2009 WL 2432359, at *15 (explaining that "[t]he group pleading doctrine in securities litigation ... can be broadly characterized as a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under [Rule] 9(b)….The doctrine has been used to impute the actions or knowledge of some defendants to other defendants, or to presume action or knowledge solely from a defendant's title or position.") (internal citation omitted); *see also Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *8, n. 5 (noting that "[t]he Eleventh Circuit has not definitively ruled on the continuing viability of the group pleading doctrine after the enactment of the PSLRA" and finding application of the doctrine "particularly fair and appropriate [where] the alleged misrepresentations are contained in releases in which the Individual Defendants-as Chief Executive Officer and President-were necessarily involved and under whose authority they were issued"); *Hubbard v. BankAtlantic Bancorp, Inc*., 625 F. Supp. 2d 1267, 1282 at n.9 (S.D. Fla. 2008) ("it is not necessary for Plaintiff to set forth a specific connection between each individual

*(continued)*

*See Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *8 (citing *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1353 (N.D. Ga. 2000)). Further, the PSLRA, 15 U.S.C. § 78u-4, requires that Lead Plaintiffs identify the specific statements or omissions alleged to be misleading, articulate the reasons why each statement or omission was misleading, identify the time, place and context of each allegedly misleading statement, and state facts sufficient to create a strong inference of scienter. 15 U.S.C. § 78u-4(b)(1), 78u-4(b)(2).

The Officer Defendants argue that Lead Plaintiffs fail to comply with Rule 9(b) because the Complaint allegedly is a "shotgun pleading" and a "puzzle pleading." As more fully set forth below, both arguments are specious.

## A.    The Complaint Is Not A "Shotgun Pleading"

The Officer Defendants misleadingly state that "shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief." Br. at 57 (citations omitted). This statement, however, encompasses virtually all securities fraud complaints, which can, and do, properly incorporate preceding allegations into claims for relief precisely *because* those preceding allegations support the claims asserted. Rather, the defining characteristic of a shotgun pleading is one that "fails to link specific factual allegations with the substantive counts of a complaint," *Immucor*, 2006 WL 3000133, at *9, and, therefore, does "not permit the court to discern whether a claim [has] been stated with the particularity required by Rule 9(b) and the PSLRA." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006).

---

*(continued)*

corporate defendant and every alleged omission or misrepresentation when the allegedly misleading information is contained in group published information.")

The failure to "link specific factual allegations with the substantive counts of a complaint," however, does not mean that it is impermissible for a complaint to properly incorporate preceding allegations by reference, as virtually all securities fraud complaints do.  In *Immucor*, the Court held the complaint had satisfied the particularity requirements of Rule 9(b) and the PSLRA where it (1) identified specific misleading statements; (2) asserted the reasons those statements were misleading; (3) identified the time, date, and circumstances of each misstatement; and (4) alleged facts associated with each statement that allowed the court to evaluate whether there was a strong inference of scienter.  2006 WL 3000133, at *10.  Thus, even though the *Immucor* plaintiffs "incorporate[d] all of the [c]omplaint's ninety-seven paragraphs of alleged fact into their § 10(b) count," *id.*, the complaint was not a shotgun pleading, as it "also restate[d] certain specific facts within the count to provide sufficient linkage between the fact allegations and the count."  *Id.*

Moreover, "[b]ecause the § 10(b) count [was] the only independent count of the [c]omplaint, the [c]ourt [was] not required to guess which of the incorporated alleged facts [were] intended to support the count," and "[concluded] that all of the incorporated alleged facts [were] intended to support the 10(b) count."  *Id.*;[18] *see also Mellette v. Branch*, No. 07-02065, 2008 WL 4001044, at *9 (D. Colo. Aug. 26, 2008) (noting that "most of the general allegations and specific fraud allegations are material to the various causes of action," and that "[t]he causes of action are, in essence, the plaintiffs' theory of how the intertwined and previously detailed alleged facts and alleged misrepresentations fit the elements of the legal claim being asserted.")

---

[18] The *Immucor* court noted that the complaint also alleged a count under § 20(a), which depends on an underlying 10(b) violation and consequently did not affect its analysis.  2006 WL 3000133, at *10 n.6.

Here, as in *Immucor*, the Complaint clearly identifies each misstatement by date, time, and circumstance, and carefully articulates the reasons why each is misleading.  *See* Compl. Section VII.  Moreover, the Complaint is organized into clearly labeled sections that identify the facts supporting scienter and  loss causation, as well as the facts specifying each false and misleading statement.  *See* Compl. Sections VII, VIII and XI.  Like the complaint in *Immucor*, the Complaint here also incorporates these supporting facts into only one independent Section 10(b) count.[19]  Thus, this Court is "not required to guess which of the incorporated alleged facts are intended to support the count."[20]  *Immucor*, 2006 WL 3000133, at *10.

Finally, the §10(b) count incorporates language that sufficiently links the preceding factual allegations to the count.  *See* ¶ 354 (stating that the "Section 10(b) Defendants' false and misleading statements and omissions…as alleged herein" deceived the investing public, artificially created, inflated and maintained the market for and market price of the Company's securities, and caused Lead Plaintiffs and the other members of the Class to purchase the Company's securities at inflated prices.)  Accordingly, the Complaint satisfies the pleading requirements of Rule 9(b) and the PSLRA, and does not impermissibly constitute a shotgun pleading.[21]

---

[19] The Complaint segregates the facts supporting the Securities Act claims into a wholly separate section.  *See* Compl. Section XIII.

[20] For the same reasons, the Complaint here is distinguishable from the complaint in *Wagner*, where "the factual particularity of the first 175 paragraphs [was] not connected to the otherwise generally pled claim in any *meaningful way*." 464 F.3d at 1279 (emphasis added).

[21] Even if the Complaint could be labeled a shotgun pleading, which it is not for the reasons given, the appropriate remedy is not dismissal under Rule 12(b)(6), but repleading under Rule 12(e).  *See Immucor*, 2006 WL 3000133, at *9 ("[i]f [p]laintiffs fail to connect their factual allegations to their substantive counts, the [c]ourt will use its discretion under Federal Rule of Civil Procedure 12(e) to require repleading"; *see also McAdams v. Greenberg Traurig, LLP*, No. 06-1778, 2007 WL 2310112, at *6 (N.D. Ga. Aug. 9, 2007) (noting that "[t]he Eleventh Circuit has addressed Rule 12(e) in the context of so-called "shotgun" pleadings.")

48

### B.    The Complaint Is Not A "Puzzle Pleading"

As an initial matter, the Officer Defendants cite only to law outside the Eleventh Circuit for their argument that the Complaint is a "puzzle pleading."  Br. at 58-60.  Indeed, Lead Plaintiffs have been unable to locate a single case in the Eleventh Circuit dismissing a securities fraud complaint on "puzzle pleading" grounds, or even a case discussing "puzzle pleading" in the securities fraud context.

Like "shotgun pleading," the real objection to "puzzle pleading" is that a complaint fails to meet the pleading requirements of Rule 9(b) and the PSLRA with respect to the allegations of securities fraud, not that a complaint is overly long or complicated.[22]  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005).  As the *Cornerstone* court explained:

> [P]uzzle-style pleadings in securities cases abuse the principles of Rule 8 *not because they are not short, which would run afoul of a concern expressed in this Circuit that Rule 9(b) and PSLRA pleading standards must not be placed on a collision course with Rule 8*….Instead, puzzle-style pleadings clash with Rule 8 because they are not plain-their evasive, non-committal style significantly increases the burdens to both the defendants and the court in evaluating a complaint's satisfaction of the PSLRA pleading requirements.

355 F. Supp. 2d at 1081 (emphasis added).

Therefore, if the Complaint "has identified specific statements alleged to be false, as well as a broad investigation revealing facts suggestive of scienter," it has "serv[ed] the purpose of Rule 8 to put defendants on notice of the "true substance" of the claims against them."  *Id.*, citing *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001).

---

[22] As with shotgun pleading, the remedy for "puzzle pleading" is not the "drastic step of dismissal based on the form of the pleading[,]" *Cornerstone Propane Partners, L.P., Sec. Litig.*, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005), but rather allowing the plaintiff to "streamline and reorganize the complaint."  *Teamsters Local 617 Pension And Welfare Funds v. Apollo Group Inc.*, 633 F. Supp. 2d at 786 (D. Ariz. 2009).

"Where causes of action describe the alleged unlawful acts with sufficient particularity, delineate causes of action, and give defendants notice of the claims against them, they have satisfied the baseline requirements of Rule 8." *Cornerstone*, 355 F. Supp. 2d at 1081 (internal citation omitted).

Courts are cognizant that securities fraud complaints are, by necessity, typically long and complicated. The court in *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008), noted:

> [A] long and detailed complaint is not a work of "puzzle pleading" as a matter of law. Furthermore, in the securities class action context, the stringent pleading requirements appear to invite both parties to throw everything and the kitchen sink into their respective pleadings and motions to dismiss. *The plaintiff creates an inevitably detailed complaint in anticipation of defendants' rigorous 12(b)(6) motions, and the plaintiff's expectations are confirmed when defendants in due course file those motions.*

*Id.* at 1219 (emphasis added).

Indeed, the fact that the Officer Defendants were able to file a 106-page motion attempting to rebut the false and misleading statements identified in the Complaint itself belies their "puzzle pleading" argument. *See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1012 (N.D. Ill. 2004) ("[g]iven the complexity of the allegations and Defendants' extensive motions to dismiss, however, the claim of prejudice is not well-taken").

The *New Century* court also recognized that Rule 8's requirement that a complaint be "clear and concise" must be evaluated in context:

> The plaintiff has the responsibility to craft a clear and concise complaint, but the allegations that discharge this responsibility *will depend on the type of action, the specific facts, the number of parties, and other variables*. Here, [p]laintiffs' [c]omplaint provides adequate organization and sufficiently clear allegations such that this [c]ourt is able to rule on Defendants' motions, and Defendants have adequate notice of the allegations against them. Is the pleading still long? Yes. Is it still extremely detailed and complex? Yes. Is this by itself a reason to dismiss the complaint? No.

588 F. Supp. 2d at 1219 (emphasis added).

Not surprisingly, courts have deemed complaints "puzzle pleadings" only where they have been unable to discern (1) what statements were alleged to be false and misleading; and (2) the alleged facts supporting why alleged misstatements were false. *See, e.g., Apollo Group,* 633 F. Supp. 2d at 786 (noting that "the 'vague allegations of deception' [are] 'unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful,'" and that the complaint "'often rambles through long stretches of material quoted from defendants' public statements ... unpunctuated by any specific reasons for falsity.'") (internal citation omitted).

Moreover, a long quotation does not automatically render the Complaint an incomprehensible "puzzle pleading," contrary to the Officer Defendants' implication. Br. at 59. Instead, courts view the selected misstatements in the appropriate context. *See New Century*, 588 F. Supp. 2d at 1218, 1219 (observing that one paragraph in the complaint quoted approximately *65 pages* but holding that "despite the lengthy quotation from the Bankruptcy Examiner's Report, *[p]laintiffs' organization shows that this quotation was deliberate and selective*. The Court is now able to evaluate whether the allegations sufficiently state a claim.") (emphasis added).

The Officer Defendants cite *In re 2007 Novastar Fin. Inc. Sec. Litig.*, Br. at 59, in which the court concluded that it could not identify which statements were false and misleading in a quote from a press release that spanned two-and-a-half pages. 579 F.3d 878 (8th Cir. 2009). In contrast, the Complaint here contains no quote even approaching that length, and the false statements can be clearly identified from both their context, and the paragraphs immediately following each identified misstatement that explain why the statement is false, *see, e.g.*, ¶¶ 166, 167 and Section VII generally. Compare *Apollo*, 633 F. Supp. 2d at 786 ("long stretches of

material quoted from defendants' public statements [were] unpunctuated by any specific reasons for falsity'") (internal citation omitted), with *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 23 (S.D.N.Y. 2004) (rejecting puzzle pleading argument where complaint "recit[ed] detailed reasons after each alleged misstatement" for why the statement was false, in keeping with particularity requirement).

Courts have even upheld pleadings where the reasons given for why a statement is false is in an entirely different section of the complaint, in keeping with the principle that as long as the complaint allows the court to discern what statements are false, and why, it cannot be a "puzzle pleading." *See In re Tyco Int'l, Ltd.*, No. 02-1335, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) ("After identifying each specific misleading statement, the complaint refers readers to other sections that list multiple reasons why the statement is misleading.  This is a reasonable way to address a complicated securities fraud case.  It does not violate the PSLRA merely because it makes the complaint difficult to understand").  In other words, as long as a complaint "is sufficiently clear to enable Defendants to respond and this Court to rule," it is not a "puzzle-pleading" even in cases where a court deems a complaint "too long, too repetitive, and somewhat imprecise." *Commc'ns Workers of Am. Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1118 n.1 (D. Ariz. 2007).

Here, the Complaint has been clearly organized into identifiable sections concerning the fraud, each containing allegations with clear, concise headings and subheadings.  Lead Plaintiffs have satisfied the pleading requirements of Rule 9(b) and the PSLRA by providing excerpts from each statement alleged to be false or misleading, and identifying each statement by date and

speaker.[23]  *See, e.g.*, ¶¶ 165, 166. Thus, Plaintiffs identify the "who, what, when, and where" concerning each false and misleading statement. *Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *8. Immediately following each misstatement, the Complaint provides detailed reasons for why each statement is false. *See, e.g.*, ¶ 167 (setting forth facts demonstrating Colonial's deterioration in underwriting standards); *Tyco*, 2004 WL 2348315, at *9 ("[a]fter identifying each specific misleading statement, the complaint refers readers to other sections that list multiple reasons why the statement is misleading. This is a reasonable way to address a complicated securities fraud case.")

Moreover, the length of the quoted sections is irrelevant, where "Plaintiffs' organization shows that [the] quotation was deliberate and selective" and the complaint "is adequately presented to 'facilitate a proper decision on the merits.'" *Mellette v. Branch*, 07-2065, 2008 WL 4001044, at *9 (D. Colo. Aug. 26, 2008) (quoting *Conley v. Gibson*, 355 U.S. at 48). Here, the Complaint identifies each misstatement *after* background facts explaining how crucial industry parameters such as LTV ratios are to Colonial's business (*see, e.g.*, ¶¶ 3, 83), and describing how Colonial's underwriting standards had deteriorated over the Class Period (*see, e.g.*, ¶¶ 53-57). Thus, every misstatement has been presented in context in order to aid the Court in evaluating the falsity of each.

The Officer Defendants attempt to overwhelm the Court by sheer enumeration and a statistical breakdown of the Complaint. *See* Br. at 60 ("While 40 of those 52 multi-

---

[23] As explained *supra* p. 45 n.17, Plaintiffs are entitled to rely on group pleading in this Circuit. Where, as here, "Plaintiffs have alleged sufficiently that each individual defendant was an insider with direct involvement in the daily affairs of the company… for purposes of this motion, each individual defendant is responsible bears [sic] for statements in press releases, SEC filings and annual reports even where the statement at issue was made by another." *NTL*, 347 F. Supp. 2d at 22 n.26 (rejecting puzzle pleading argument and holding that complaint adequately identified the "date, publication and speaker" of each misstatement).

sentence/paragraph allegations contain highlighted portions, at least 23 contain multiple

highlighted portions....")  However, the numerical breakdown of the Complaint is of no moment,

as long as the Complaint affords the Officer Defendants a fair response to the allegations and

permits the Court to identify each misstatement and the reasons why each statement was false,

which the Complaint does here.  Accordingly, the Complaint cannot be a "puzzle pleading."

## IV.    THE COMPLAINT PLEADS FACTS
## RAISING A STRONG INFERENCE OF SCIENTER

The PSLRA requires plaintiffs alleging securities fraud to "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."  § 78u-

4(b)(2).  In the Eleventh Circuit, the required state of mind is either intent to deceive, manipulate

or defraud or "severe recklessness."  *Mizzaro*, 544 F.3d at 1238; *McDonald v. Alan Bush

Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989).  Severe recklessness encompasses "highly

unreasonable omissions or misrepresentations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of ordinary care, and that

present a danger of misleading buyers or sellers which is either known to the defendant or is so

obvious that the defendant must have been aware of it."  *Rosenberg v. Gould*, 554 F.3d 962, 965

(11th Cir. 2009) (internal citation omitted).

The United States Supreme Court has rejected a piecemeal analysis of factual allegations

in Rule 10b-5 cases.  "[T]he inquiry . . . is whether *all* of the facts alleged, taken collectively,

give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

(emphasis in original); *see Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir.

2004) (PSLRA permits "aggregation of facts to infer scienter"); *In re Spear & Jackson Sec.

Litig.*, 399 F. Supp. 2d 1350, 1358 (S.D. Fla. 2005) ("the inference of scienter can arise from an

aggregation of particularized facts, even if each individual fact standing alone does not create a sufficiently strong inference").

*Tellabs* also directed that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre," or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted).  Rather, a complaint should be sustained if, considering the allegations as true and taken collectively, a reasonable person would consider the inference of scienter "cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added).  Thus, on a motion to dismiss, it is the defendant's burden to demonstrate that the allegations give rise to an inference of non-culpable conduct that is *stronger* than the inference of scienter.  *Id.*  As several post-*Tellabs* courts have put it, "a tie goes to the plaintiffs in terms of competing inferences." *Apollo*, 633 F. Supp. 2d at 792; *Sloman v. Presstek, Inc.*, No. 06-cv-377-JD, 2007 WL 2740047, at *7 (D.N.H. Sept. 18, 2007) ("a tie ... goes to the plaintiff.").  As set forth below, the detailed allegations in the Complaint pass muster under the pleading standards of the PSLRA, Rule 9(b) of the Federal Rules of Civil Procedure and *Tellabs*.

### A. Defendants Are Deemed to Have Known That Their Statements Regarding Conservative Underwriting Practices and High Quality Loans Were False

Post-*Tellabs* courts find false statements regarding loan quality and underwriting to be actionable and probative of scienter.  *See In re New Century*, 588 F. Supp. 2d at 1229  (finding plaintiffs' "allegations [regarding underwriting and loan quality] are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different - the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching"); *Countrywide*, 554 F. Supp. 2d at 1062 (inferring scienter as to officer defendants and all but two directors due, in

part, to fact that "the underwriting violations… were not disclosed to the public" and "[officer defendant] Mozilo repeatedly assured investors of Countrywide's underwriting discipline and loan quality"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156-57 (S.D. Cal. 2008) (scienter of officer defendants found with respect to plaintiffs' allegations that company deviated from its own underwriting standards and officer defendants "knew their public statements regarding Accredited's compliance with those standards were false and misleading."). Here, the Officer Defendants routinely hyped the Company's conservative underwriting, low credit risk and high loan quality. *See, e.g.,* ¶¶ 168-79, 183-96. The Officer Defendants are deemed to have knowledge that these statements were false under the "core operations" doctrine.

The core operations doctrine holds that "if the subject-matter of the alleged misstatements is sufficiently 'significant' to a defendant company, it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants *even in the absence* of specific information contradicting their public statements." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) (emphasis added); *see also In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1363 (N.D. Ga. 2005) (denying motion to dismiss, in part, because plaintiffs alleged controller's position demonstrated his knowledge of adverse facts affecting important segments of the business); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) (imputing knowledge of facts relating to core operations of company to company's key officers); *In re Towne Servs., Inc.*, 184 F. Supp. 2d at 1325 (same); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (denying motion to dismiss in part because the plaintiff successfully pled that facts critical to the business's core operations were so important they could be attributed to key officers); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 223 (D. Conn. 2001) (finding scienter adequately

alleged because, *inter alia*, "[t]he problems Xerox was having, the plaintiffs allege, affected the company's 'core operations' and jeopardized the success of the company's most significant initiative at that time").

> The *Atlas* court summarized the doctrine as follows:
>
> [I]f facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them. Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.

*Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 489 (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)). Accordingly, the Officer Defendants are not entitled to "ignore reasonably available data that would have indicated that [public] statements were materially false or misleading." *Id.* at 491.

The core operations doctrine applies here. First, as a mortgage lender, loan underwriting was at the heart of the Company's core business, loan origination. *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d at 1155 ("as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors"); *Countrywide*, 554 F. Supp. 2d at 1062 ("Loan origination is at the core of all of Countrywide's business operations, and risks related to loan performance and delinquency are central to the Company's overall risk position."). Loan underwriting directly impacted default rates and the reported value of Colonial's income and assets. Indeed, Colonial stressed that it had implemented "comprehensive" underwriting policies and a "strong and effective loan and approval process, continual audit and review functions" precisely because "the majority" of the credit risk it faced in its business was "associated with lending." ¶ 330. Only rigorous

implementation of its underwriting policies and procedures would allow Colonial to deliver on its public assurances regarding high loan quality and low credit risk.

Second, throughout the Class Period, the Officer Defendants were key officers of the Company. Lowder was Colonial's founder, Chairman of the Board, Chief Executive Officer, President and Chairman of its Executive Committee, as well as Chairman of the Board, Chief Executive Officer and President of Colonial's subsidiary, Colonial Bank; Moore was Colonial's Chief Financial Officer and a Senior Executive Vice President; Hicks was Colonial's Chief Accounting Officer and a Senior Executive Vice President. Given their integral roles in the Company, the Officer Defendants knew, or were severely reckless in not knowing, of significant facts regarding the Company's core operations. *See Atlas Air*, 324 F. Supp. 2d at 496 (discussing roles of CEO and CFO and that they made public statements and signed SEC filings as evidence of scienter); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 983, 988 (9th Cir. 2008) ("[CEO] Yancey and [CFO] Doyle were directly responsible for Applied Signal's day-to-day operations… so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.... it would be 'absurd to suggest' that top management was unaware of them.").

Third, all three Officer Defendants made public statements that directly contradicted facts then known or reasonably available to them. As detailed extensively in the Complaint, (¶¶ 165-327), the Officer Defendants repeatedly touted the Company's conservative loan underwriting and high credit quality in 10-Ks, 8-Ks, analyst conference calls, press releases and offering

materials for securities offerings.[24]  In direct conflict with these representations, however, Colonial had simultaneously loosened its underwriting controls and deviated drastically from its own underwriting policies.  For example, CW1 explained that, for the ten years prior to 2006, it was Colonial's practice not to fund loans that failed to meet one or more of Colonial's risk-based lending criteria, and thus posed a high risk of defaulting.  ¶¶ 44-46.  Instead, these loans were flagged in a computer database called OnePoint, and were not cleared for funding unless the borrower's credit defects were first cured.  ¶¶ 44-45.

Additionally, prior to 2006, back office loan operations personnel were responsible for curing credit defects and clearing loans.  ¶ 44.  CW1 and CW2 stated that this compartmentalization of duties provided a check on the loan officers who initiated the loans, and who only received commissions once the loans were cleared and funded.  ¶¶ 45-46.  However, starting in mid-2006, the Company suddenly empowered loan officers to bypass loan operations personnel and unilaterally clear defective loans for funding without first curing the defects.  ¶¶ 45-46.  Predictably, the loan officers, whom the Company incentivized with commissions to push loans through the system, availed themselves of their new authority.  ¶ 45.  The result was a surge of impaired loans that carried a high risk of default.  Compounding this problem, beginning in mid-2007, management instructed loan operations personnel to ignore *all but four* of the 30 risk-based underwriting criteria that Colonial used to evaluate a loan's soundness, including critical measures of loan quality and credit risk such as loan-to-value ratio, debt-coverage ratio and the borrower's credit record.  ¶ 51.

---

[24] For example, all three Officer Defendants signed the Form 10-K for fiscal year 2007, filed with the SEC on February 25, 2008 (the "2007 10-K").  The 2007 10-K touted Colonial's "conservative underwriting and credit product standards," "comprehensive credit and underwriting policies and procedures," and "strong and effective loan approval process."  ¶ 249.

As a result of these and other policy changes, CW1 stated that, by late 2007, Colonial was sacrificing "quality for quantity."  ¶ 51.  CW1's six-person team was instructed by management to push every loan through the system on the same day that that it was received, a virtual impossibility given the influx.  *Id*.  By the fourth quarter of 2007, CW1 recalled that loan volume had soared to an unprecedented extent.  On a daily basis, loan files in the loan operations office were stacked floor to ceiling.  *Id*.  Despite this, Colonial contemporaneously reported "declining loan volumes."  ¶ 217.

Relaxed underwriting practices and higher volumes of loans resulted in higher default rates.  CW6 reported that, by December 2007, loan default rates in Colonial's construction portfolio in Alabama and Florida, which comprised the lion's share of the Company's overall loan portfolio, had skyrocketed to 65-75%, in contrast with a 0-2% default rate in 2005.  ¶¶ 54-55, 331.  Meanwhile, Lowder continued to assure the market that Colonial had "sound credit quality" because "we have strict underwriting standards."  ¶ 219.

Management also repeatedly asserted throughout the Class Period that, as a "conservative" lender, the Company did not originate subprime or other high-risk home mortgage products.  *See, e.g.,* ¶¶ 169, 184, 187, 193, 207, 240, 247.  Flatly contradicting this statement, CW3 and CW4 stated that Colonial *did* originate subprime and other high-risk mortgage loans, including no-doc and stated income loans.  ¶ 47.  Indeed, the industry standard is that loans with FICO scores below 640 are considered subprime, and CW4 stated that Colonial wrote numerous loans with subprime FICO scores, including loans in the 400-500 range.  ¶¶ 48-49.

As shown above, courts have repeatedly drawn the inference that facts critical to a business's core operations or an important transaction generally are so apparent that their

knowledge may be attributed to the Company and its key officers.  *See Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 n.3 (S.D. Fla. 2007) (imputing to CEO knowledge or reckless disregard of GAAP violations in key segment of company).

Further, the Officer Defendants repeatedly represented in financial filings that they "continuously review[ed] [Colonial's] loan portfolio for credit risk," and "closely monitor[ed]" all defaulting loans.  ¶¶ 280, 298, 317, 331.  Lowder went so far as to assert that he and his credit risk management team scrutinized the loan portfolio on a weekly basis, individually discussing every problem loan.  ¶ 328.  The Company also publicly stated it maintained a credit risk and analysis group that reported to the Chief Credit Officer, who in turn reported directly to [Defendant Lowder]."  ¶ 330.  Additionally, Lead Plaintiffs' Confidential Witnesses (the "Confidential Witnesses")[25] corroborated the Officer Defendants' knowledge of – and access to – Colonial's underwriting practices and loan default rates through sophisticated computer programs and reports (¶¶ 44, 55-56, 331), and the Officer Defendants' ability to track non-performing and delinquent loans through a "BancGroup Policy Committee" that Lowder chaired. ¶ 332.

Accordingly, the Officer Defendants are accountable for knowing that the Company's lending business was severely compromised by weak underwriting and credit standards.[26]

---

[25] Individual Confidential Witnesses are referred to by number as "CW__."

[26] The Officer Defendants accuse Plaintiffs of relying on group pleading to raise an inference of scienter.  Br. at 76-78.  Not so.  Albeit group pleading has *not* been rejected in the Eleventh Circuit as to *attribution* of false statements to the defendants who make them, *see supra* discussion p. 45 n.17, Plaintiffs do not invoke group pleading on the separate issue of *knowledge* of falsity.  Rather, Plaintiffs charge the Officer Defendants with knowing, or severe recklessness in not knowing, significant facts that contradicted their own public statements regarding the core business of the Company.  These facts included that, beginning in late 2006, loan sales officers working on commission gained authority to, and repeatedly did, overrule exceptions desk personnel, approving loans that did not meet Colonial's own risk criteria (¶¶ 44-46); that, by mid-2007, the Company had abandoned all but 4 of its 30 underwriting risk criteria (¶ 51); that, by late 2007, loan default rates were skyrocketing (¶ 55); that,

*(continued)*

*Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d at 1156-57 (finding scienter based, in

part, on allegations that the Company used software to track and analyze data regarding

management overrides of underwriters' and appraisers' decisions rejecting loans; that officer

defendants "had access to periodic reports indicating widespread deviation from Company policy

and the adverse effect such practices were beginning to have on [the Company]"; and statements

from former employees that their managers had pressured them to approve loans that did not

comply with the company's policies in order to increase loan volume.); *see also South Ferry LP*

*#2 v. Killinger*, No. C04-1599-JCC, 2009 WL 3153067, at *9-10 (W.D. Wash. Oct. 1, 2009)

(applying core operations doctrine to impute actual knowledge of problems with risk-

management at mortgage lender to CEO based on his public statements indicating knowledge of

the company's risk-management structure).

### B.    <u>Lack of Stock Sales Does Not Negate Scienter</u>

The Officer Defendants claim that they could not have known of the fraud because they

held onto their stock and sustained equity losses.  Br. at 62-63.  This argument is misplaced,

because the PSLRA does not require insider trading allegations in order to show scienter.

*Countrywide*, 554 F. Supp. 2d at 1066 ("The PSLRA neither prohibits nor endorses the pleading

of insider trading as evidence of scienter") (cite and internal quotation marks omitted); *see also*

*Eastwood Enters., LLC v. Farha, et al.*, No. 8:07-cv-1940, 2009 WL 3157668, at *4 (M.D. Fla.

---

*(continued)*

despite incessant assurances to investors, Colonial *did* originate sub-prime and other exotic, high-risk loans, such as
stated income, and no doc (¶¶ 47-48).  Meanwhile, throughout the Class Period, the Officer Defendants assured
investors that they closely tracked the credit risk and quality of Colonial's loan portfolio, scrutinizing every
defaulting and delinquent loan.  ¶¶ 328-32.  The Officer Defendants cannot now escape liability by claiming
ignorance of the underlying facts.

Sept. 28, 2009) ("A complaint need not allege insider trading or pecuniary motive to plead a securities fraud claim successfully.").

Moreover, when plaintiffs do not bring insider trading claims, or even attempt to demonstrate defendants' scienter by means of suspiciously timed stock sales, defendants' trading histories are utterly irrelevant to the scienter analysis. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (finding that defendants' abstention from trading did "not neutralize the motive allegations because they do not directly contradict them... the investors do not rely on allegations of inside transactions"); *see also Fuechtman v. Mastec, Inc.*, 390 F. Supp. 2d 1264 (S.D. Fla. 2005) (denying officer defendants' motion to dismiss, despite absence of any allegation of insider trading).

Rejecting the same argument, one court observed:

Defendants also argue that the [Second Amended Complaint ("SAC")] fails to allege that either Gorman or Kondamoori sold or traded any stocks during the relevant time period.  If Defendants did not sell or trade at the artificially inflated prices, they contend, they could not have received any benefit from overstating revenues.  The fact that they did not profit from selling or trading, they conclude, negates any inference of deliberate misconduct.

Again, the court is not persuaded.  *Plaintiffs have not alleged that Defendants engaged in insider trading during the relevant time period.*  If so, the failure to allege selling or trading could negate the inference of intent.  *A fair reading of this SAC does not suggest claims of insider trading.*  Rather, Plaintiffs' claim is that Defendants knowingly overstated revenues for 1Q97 in an attempt to inflate Nuko's stock prices and secure a deal with Internext.  Plaintiffs relied on Defendants' misstated revenues and purchased Nuko stocks at inflated prices.  *Under these circumstances, the absence of Defendants' selling or trading has little bearing on determining whether Plaintiffs have adequately pleaded scienter.*

*In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344-45 (N.D. Cal. 2000) (emphasis added).

The authority cited by the Officer Defendants is uniformly inapposite.  Br. at 4, 62-63.

Unlike Lead Plaintiffs here, the plaintiffs in those cases either asserted insider trading claims or

alleged that the defendants' stock trades supported an inference of scienter.  *Thornton v. MicroGrafx, Inc.*, 878 F. Supp. 931, 937 (N.D. Tex. 1995) ("The cornerstone of Plaintiffs' case, which they maintain demonstrates the necessary scienter, is the fact that the individual Defendants sold [Company] stock they owned back to the company."); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002) ("investors allege that the defendants' stock sales provide further proof of their fraudulent scheme."); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) ("The Class contends massive insider trading is evidence of the defendants' motive to commit fraud through inflating stock price."); *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (plaintiffs alleged officer defendant's stock sales evidenced his motive to inflate stock price); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994) (plaintiffs brought insider trading claim under § 10(b)); *In re Ceridian Corp. Sec. Litig.*, 504 F. Supp. 2d 617 (D. Minn. 2007) (plaintiffs alleged insider trading in support of scienter); *Tripp v. Indymac Fin. Inc.*, No. CV07-1635, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) ("Plaintiffs theorize that the individual Defendants made the false and misleading statements in an effort to capitalize on the inflated stock price."); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (plaintiffs alleged insider trading against eleven defendants); *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1038 (N.D. Cal. 2000) (alleging inference of scienter arose from defendants' stock sales).

In short, the Officer Defendants have cited no authority to support their contention that absence of insider trading "all but eliminates any suggestion of scienter."  Br. at 63.  The cases they cite stand only for the proposition that abstention from stock trading may undercut scienter where "plaintiffs sought to use stock transactions as evidence of motive."  *Green Tree*, 270 F.3d at 663 (citing *Acito*, 47 F.3d at 54).  However, it is incontrovertible that Lead Plaintiffs have not

pleaded this as an insider trading case, and the Officer Defendants must confront the Complaint's claims and allegations as pled. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 611 n.32 (S.D. Tex. 2003) ("Plaintiff is the master of its complaint and may assert or not assert claims against its defendants as it chooses, as long as the claims against each defendant satisfy the pleading standards of the relevant law and rules. The focus is on the adequacy of what Lead Plaintiff does allege, not on what it does not."); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003) ("Plaintiffs are the master of their complaint and neither this Court nor the defendant have the right to redraft the complaint to include new claims. Defendants must take the Complaints as they are written.") (omitting internal quotation marks).

An equally or more compelling inference arising from the Officer Defendants' retention or purchase of stock is that they believed they could continue the fraudulent scheme. Courts have found that defendants who do not sell their stock may simply think that the fraudulent share inflation and their concomitant inflated equity stakes will persist ad infinitum. *See, e.g., In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007) ("[Defendants] might have believed that the [true financial condition] could be hidden indefinitely.")); *Holmes v. Baker*, 166 F. Supp. 2d 162, 1378 (S.D. Fla. 2001) (finding merit in argument that stock purchases would support scienter when defendant believed that fraud would continue and his shares retain their inflated value); *see also Green Tree*, 270 F.3d at 662 ("The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off."). Accordingly, the Officer Defendants "may have thought that there was a chance that the situation [] would right itself… It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Tellabs Inc.*, 513 F.3d

at 710. In short, that the Officer Defendants owned inflated stock gave them ample motive to continue to mislead the Company's investors. *See In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005) ("With his 6,000,000 shares of S & J, not to mention the 1.2 million he allegedly controlled secretly, [the defendant] clearly had a large stake in keeping S & J's stock price inflated.").

In addition to paper profits earned from share inflation, each Officer Defendant also extracted sizable cash profits from the Company in the form of quarterly dividends. This lends added force to the inference that the Officer Defendants wished to perpetuate the fraud. Until Colonial began to unravel in the fourth quarter of 2008, the Company paid quarterly dividends to shareholders. During the Class Period, the Officer Defendants collectively earned more than $5 million, simply by collecting these dividend distributions.[27] Further, increasing their holdings not only boosted their inflated equity stakes, but also resulted in a concomitant increase in the number of shares on which they received dividends.

Thus, the Officer Defendants had two compelling financial motives to continue misleading investors: (1) preserving their inflated equity stakes, and (2) generating quarterly dividends, which they benefited from commensurate with the number of shares they held. The size of their paper losses when Colonial's share price ultimately plunged merely underscores the Officer Defendants' motive to perpetuate the fraud that had enriched them for years.

---

[27] Lowder earned over $5 million in dividends during the Class Period; Moore earned over $100,000, and Hicks earned nearly $20,000. *See* Br. Ex. 17, Colonial Form 10-K for fiscal year 2007 (signed February 25, 2008) at 13 (showing quarterly dividends paid to shareholders from second to fourth quarter 2007); Br. Ex. 20, Colonial Form 10-Q for first quarter 2008 (signed May 5, 2008), at 5 (showing dividend paid to shareholders for first quarter 2008); Br. Ex. 22, Colonial Form 10-Q for second quarter 2008 (signed August 5, 2008) at 5 (showing dividend paid to shareholders for second quarter 2008); Br. Ex. 51, Collection of Form 4s and 5s for Robert E. Lowder, Sarah H. Moore and T. Brent Hicks (showing number of shares held by the Officer Defendants across the Class Period).

### C.    The TARP Misstatements and Omissions
####      Support a Strong Inference of Scienter

The misstatements and omissions regarding Colonial's eligibility to receive TARP

bailout money further demonstrate the Officer Defendants' pattern of duplicity regarding the

Company's financial health.  On December 2, 2008, Colonial announced that it had been

preliminarily approved for $550 million in TARP funds.  ¶ 324.  In response, Colonial's share

price soared 54%, its largest one day gain in 25 years.  ¶ 8.  However, this announcement omitted

a material fact: the government had conditioned the TARP loan on Colonial first obtaining an

additional *$300 million* in capital funding, representing *94%* of the Company's market

capitalization at the time.  ¶ 8.  When this condition was finally disclosed on January 27, 2009,

Colonial's share price immediately dropped *46%*.

The Officer Defendants indisputably knew about the capital raise condition from the

beginning.  Responding to an analyst's question on a January 27, 2009 earnings call, Defendant

Lowder *admitted* that the condition "was part of the original approval back in December."  ¶ 104.

That alone is strongly probative of his scienter.  "One of the classic fact patterns giving rise to a

strong inference of scienter is that defendants published statements when they knew facts or had

access to information suggesting that their public statements were materially inaccurate."  *Green*

*Tree*, 270 F.3d at 665.

Moreover, it is absurd to suggest that the Officer Defendants would not realize that the

capital funding condition needed to be specifically disclosed at the time of their TARP

announcement.  In light of the severe credit squeeze then affecting the capital markets, which the

Officer Defendants recount at length in their brief, a $300 million quid pro quo was a highly

material condition, especially when that amount represented a staggering 94% of Colonial's

market capitalization, making it impossible for the Company to raise.  ¶ 105.  Indeed, analyst

reaction confirmed that "the most important news of the quarter was the disclosure that previously announced TARP capital from the U.S. Treasury was conditional on the Company raising another $300 million of common equity. This stipulation was never explained to the investment community." ¶ 107. In light of the belated TARP condition disclosure, analysts instructed the market that they could no longer recommend Colonial's stock. *Id.*

At the same time Colonial was proclaiming that TARP relief was virtually assured, it also failed to mention that the Company was subject to Memorandums of Understanding ("MOUs") with the Federal Deposit Insurance Corporation and the Alabama State Banking Department. Colonial entered into these MOUs on December 15, 2008, and January 6, 2009, respectively, but did not disclose them until March 2, 2009. ¶ 111. The MOUs required Colonial to boost its capital ratios and install more robust underwriting controls. ¶¶ 156-57. Upon this post-Class Period revelation, analysts and commentators denounced Colonial's pattern of "fail[ing] to communicate new developments in its quest for capital" and "misguid[ing] investors." ¶¶ 112, 116. They also noted Lowder's disingenuity in responding to analyst questions about regulatory scrutiny of Colonial during Colonial's January 27, 2009 earnings call, and observed that Colonial's pattern of nondisclosure could further jeopardize its chances of finding investors willing to trust it with $300 million. ¶ 113.

The nondisclosure of the $300M capital funding condition and the MOUs offers further evidence that the Officer Defendants made a practice of misleading investors. The Officer Defendants, as sophisticated businesspeople, could hardly have failed to grasp the significance to investors of a $300 million capital raise condition and government regulatory scrutiny of their underwriting practices. The compelling inference is that they simply risked hiding the TARP

condition and the MOUs from the market until Colonial managed to secure a $300 million co-investment.

Moreover, the pattern of deception regarding Colonial's financial health that is spelled out by these misrepresentations and nondisclosures is consistent with Lead Plaintiffs' other allegations. For example, throughout the Class Period, the Officer Defendants touted Colonial's strong capital position and reassured investors that it had contained any problems in its loan portfolio. *See, e.g.,* ¶¶ 37-39, 59-60, 63, 69, 76-77, 81-82. While analysts noted the Company's lack of transparency, they repeated management's assurances regarding its financial health. ¶¶ 74-82. As late as October 22, 2008, the same day that Colonial shocked investors with a third quarter loss 12 times larger than what analysts had predicted, Defendant Moore stated on an earnings call that Colonial's capital reserves were "very healthy" and that the Company had "cushion in its capital ratios." ¶¶ 92, 95. Analysts noted that "[w]e were surprised by the level of [non-performing asset] growth and magnitude of losses," ¶ 93, showing the extent to which the Officer Defendants deliberately misled the markets.

### D.    Lead Plaintiffs' Confidential Witnesses are Competent and Their Statements Support a Strong Inference of Scienter

The Complaint contains information provided by seven former Colonial employees regarding the Company's deviation from its own underwriting policies, disregard for credit risk, spiraling loan defaults and writing of subprime and other high-risk loan products. The Confidential Witnesses held positions at the Company which gave them firsthand knowledge of the subject matter of their statements. Their statements are specific, consistent and corroborate one another, as well as other allegations in the Complaint.

In the Eleventh Circuit, "confidentiality… should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's

knowledge, including the position(s) held, the proximity to the offending conduct, and the

relevant time frame." *Mizzaro*, 544 F.3d at 1240.  Plaintiffs here supply ample foundational

information for the Confidential Witnesses:

| CW | Description | Basis for Knowledge |
|---|---|---|
| 1 [¶ 43] | Loan Document Review Specialist based in Colonial's Montgomery, Alabama headquarters from 1996-May 2008 | Would have known about Colonial's internal underwriting standards, loan origination procedures, and the volume of loans originated;  CW1 and the six-person team CW1 led reviewed every loan made by Colonial throughout all of its regional offices |
| 2 [¶ 46] | Audit-Document Review Specialist in the Loan Operations department based in Colonial's Montgomery, Alabama headquarters from 2000 to August 2008 | As someone who worked with CW1, CW2 was in a position to corroborate CW1's account regarding loan origination and loan officers' motivation to clear exceptions |
| 3 [¶ 47] | Mortgage Loan Officer from 2003 to 2007, covered a territory including Florida and Alabama | Would have known about the types of high-risk mortgage loans Colonial originated |
| 4 [¶ 48] | Administrative Assistant in the post-closing department at Colonial from March 2007 to July 2008 | As someone who reviewed loans that Colonial originated for secondary market customers, CW4 was in a position to observe FICO scores and other lending information with respect to Colonial-originated loans |
| 5 [¶ 49] | Mortgage Consultant from 2004 to the end of 2007 | Would have known about Colonial's mortgage lending practices |
| 6 [¶ 53] | Construction Loan Coordinator at Colonial from 1999 to October 2008 | Would have known about defaults on construction loans originated by Colonial's Alabama lending branch; Based on meetings with Defendant Lowder, CW6 was in a position to know how closely Defendant Lowder, Moore and Hicks monitored the Company's financial status, including the rate of loan defaults and late payments |
| 7 [¶ 332] | Financial Analyst from April 2003 to April 2007, Policy Director from April 2007 to July 2008[28] | Would have known about Defendant Lowder's participation in the "BancGroup Policy Committee" which reviewed delinquent loans |

---

[28] CW7's position and employment dates were inadvertently omitted from the Complaint, and are set forth here.

As seen in the above chart and Point IV.A., *supra*, the Confidential Witnesses all occupied positions at the Company which would have given them access to the information they provided. In the Eleventh Circuit, the Confidential Witnesses' basis for knowledge and the other foundational details regarding their employment at the Company are all that is required to establish that they are competent. *Mizzaro*, 544 F.3d at 1240; *see also Tellabs Inc.*, 513 F.3d at 712 (the confidential witnesses "from the description of their jobs *were in a position to know at first hand the facts to which they [were] prepared to testify*, such as the returns of the [product], [and] that sales of the [product] were dropping off a cliff while the company pretended that demand was strong….") (emphasis added).

Additionally, the Confidential Witnesses' accounts were detailed, corroborative and time-specific. This also supports the reliability of their statements as evidence of scienter. *See Tellabs II*, 513 F.3d 702, 712 (7th Cir. 2008) (favorably noting corroboration from multiple sources). For example, CW1, who led a six-person team that reviewed every loan originated by the Company throughout all of its regional offices, stated that during the early part of the Class Period, Colonial deviated from its longstanding underwriting and risk control policies to an astonishing extent. Beginning in mid-2007, CW1 and his loan review team were instructed by to ignore *all but 4* of Colonial's 30 loan risk criteria. ¶ 51. These included criteria regarded in the industry as among the most predictive of loan risk, such as loan-to-value ratio, debt-coverage ratio and the borrower's credit record. *Id*.

CW1 also attested that, beginning in mid-2006 and continuing through the end of his tenure at the Company in mid-2008, the Officer Defendants authorized loan sales officers to access OnePoint, the computer database in which he and his team flagged loans with "exceptions," *i.e.*, loans that did not meet one or more of Colonial's risk criteria. ¶ 44. Both

CW1 and CW2 stated that this policy change created a dangerous conflict of interest, as loan officers were financially motivated by commissions to approve the loans that they sold for funding, regardless of their defects.  ¶¶ 44-46.  In CW1's first ten years at the Company, from 1996 to 2006, CW1 said that only back-office loan operations personnel were allowed to clear defective loans for funding, and only after the defect or defects were cured.  ¶¶ 44-45.  Giving loan officers the power to bypass operations personnel eviscerated all semblance of internal controls and lending policy.  Indeed, immediately after this policy change, CW1 and his team began to see a surge in volume of still-defective loans being cleared for funding by loan officers and their assistants.  ¶ 45.  CW1 stated that, by November 2007, loan volume was soaring, and files were stacked "from the floor to the ceiling" in the loan operations office every day.  ¶ 50.  Despite this overload, CW1 and CW1's six-person team were instructed by the Officer Defendants to process every file on the same day it was received.  *Id*.  CW1 complained to the Officer Defendants that CW1's team was being forced to sacrifice "quantity [for] quality."  *Id*.  However, the Officer Defendants ignored CW1's concerns and pressed CW1 to clear loans with only a cursory review.[29]  ¶ 51.

---

[29] The Officer Defendants make a number of evidentiary objections, such as hearsay, and unfounded attacks on the Confidential Witnesses' credibility.  Br. at 66-69.  These objections are improper on motions to dismiss.  *See Tellabs, Inc.*, 551 U.S. at 328 ("provided that the [plaintiffs] have satisfied the congressionally prescribed ... means of making an issue, the case will fall within the jury's authority to assess the credibility of witnesses, resolve any genuine issues of fact, and make the ultimate determination [as to] scienter.") (omitting cite and internal quotation marks); *see also In re NPS Pharms., Inc. Sec. Litig.*, No. 2:06-CV-00570, 2007 WL 1976589, at *5 (D. Utah July 3, 2007) (applying *Tellabs* to hold that court may not weigh evidence or "entertain a challenge to the credibility of confidential witnesses on a motion to dismiss.").  Additionally, the Officer Defendants ignore the substance of the Confidential Witnesses' statements.  For example, the Officer Defendants' hearsay challenge to CW6 ignores CW6's *personal* observation of *65-75%* default rates in Colonial's Alabama and Florida construction portfolios, beginning in late 2008 – in other words, shortly after CW1 stated that Colonial's underwriting controls fell to their nadir.  The Officer Defendants also challenge CW1 on the basis that CW1 does not claim direct contact with them.  Br. at 66.  Notwithstanding that CW1 *personally* observed each underwriting lapse, and ascribed them to the Officer Defendants, (*see* ¶¶ 45, 50-51), the Officer Defendants offer no authority suggesting that confidential witnesses must

*(continued)*

Despite these allegations, the Officer Defendants suggest that there was nothing wrong with these policy changes. They speculate that despite Colonial's "loosened" guidelines, its underwriting might still have qualified as "strong" and "conservative." Br. at 17, 18. That argument is unavailing. The question of whether Colonial's underwriting guidelines and practices remained robust, or were weakened and disregarded, presents an issue of fact not appropriate for resolution at this stage. Second, to the extent that there is any room for debate, the Confidential Witnesses were insiders at the Company and actually responsible for implementing the Company's underwriting policies on a daily basis. As such, they were ideally situated to observe management's interference with longstanding underwriting practice and assess how it compromised Colonial's credit quality and loan portfolio. Accordingly, their detailed accounts regarding Colonial's underwriting and risk management breakdowns deserve greater weight than the Officer Defendants' unsupported surmises.

The Officer Defendants rely heavily on an initial ruling in *Hubbard v. BankAtlantic*, 625 F. Supp. 2d at 1267 ("*BankAtlantic I*") to attack the credibility of Lead Plaintiffs' Confidential Witnesses. Br. at 69-71.[30] However, the Officer Defendants fail to acknowledge that the *BankAtlantic* court subsequently upheld the allegations of the complaint when the plaintiffs provided sufficient foundational details, as Lead Plaintiffs have done here. *Hubbard v. BankAtlantic*, No. 07-61542-CIV, 2009 WL 3261941, at *1 (S.D. Fla. May 12, 2009) ("*BankAtlantic II*"). For this reason, *BankAtlantic I* is easily distinguishable because there, the

---

*(continued)*

have had contact with defendants themselves, let alone have known what defendants knew, to support an inference of scienter.

[30] The Individual Defendants' Motion to Dismiss refers to *BankAtlantic I* using the Westlaw citation, 2008 WL 5250271.

court found that the plaintiffs had not sufficiently described the confidential witnesses' positions at the company, employment duties, whether they were employed by the company during the class period, and the basis for their knowledge. *BankAtlantic I* at 1284.

Moreover, the Officer Defendants confine their discussion of the *BankAtlantic* action to the order and opinion issued in December 2008, which granted defendants' motions to dismiss without prejudice. The *BankAtlantic* plaintiffs subsequently amended their complaint to supply added foundational detail for their confidential witness allegations. Although the defendants again moved to dismiss on the grounds that plaintiffs' confidential witness allegations did not establish scienter, in May 2009, the court sustained the amended complaint.

> [T]he Court's [December 12, 2008] Order held that Plaintiff failed to allege facts giving rise to a strong inference of scienter as to individual defendants Abdo, A. Levan, and J. Levan because certain of the allegations made with regard to these individuals were based on statements from confidential witnesses about whom Plaintiff provided absolutely no information from which the Court could evaluate the bases for their statements. *In contrast, the Amended Complaint contains sufficient information regarding these confidential witnesses, including their employment duties, whether they were employed during the Class Period and how they obtained direct knowledge of the facts they were reporting.*

*See BankAtlantic II*, at *1 (emphasis added) (internal citations omitted).

In sum, *BankAtlantic I* does not undermine the competence of the Confidential Witnesses. To the contrary, it confirms it. Not only did *BankAtlantic I* call for exactly the same details furnished in Plaintiffs' Complaint, when put into context with *BankAtlantic II*, which the Officer Defendants (misleadingly) do not cite, it demonstrates that statements by confidential witnesses, properly described as Lead Plaintiffs do here, may be strongly probative of scienter.[31]

---

[31] The Officer Defendants also seek to discredit the statements of confidential witnesses in general, relying on the Seventh Circuit case *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007). Br. at 64. However, other courts have discounted *Higginbotham*, including the Third Circuit and the Seventh Circuit itself. In *Institutional*

*(continued)*

E.    **Defendants' GAAP Violations Further Support
a Strong Inference of Their Scienter**

Contrary to the Officer Defendants' arguments, the Complaint does not plead mere

GAAP violations.  Br. at 71.  Rather, the Complaint contains particularized allegations of the

Officer Defendants' reckless disregard for their deviations from GAAP,  as well as the Officer

Defendants' gross indifference toward the Company's GAAP violations, all of which are

probative of the Officer Defendants' scienter.

GAAP violations are probative of scienter where a complaint pleads "facts that support

the inference that the defendants recklessly disregarded the deviance from GAAP or acted with

gross indifference to the misrepresentation in its financial statements.  Relevant facts are the

magnitude of the accounting error, whether the defendants had prior notice of the error, whether

the defendants had played any role in calculating and disseminating the financial statement."

*Scientific-Atlanta,* 239 F. Supp. 2d at 1366.[32]   The Officer Defendants' involvement in the

----

*(continued)*

*Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), the Third Circuit carefully reviewed how it, the
Seventh Circuit, and other circuits had moved away from *Higginbotham*:

> Other courts, however, have qualified *Higginbotham's* strong skepticism of confidential
> sources.  The Seventh *Circuit* itself distinguished *Higginbotham* in *Tellabs II* . . . . *Tellabs
> II* apparently circumscribes *Higginbotham's* broad pronouncement that confidential witness
> allegations will "usually" be steeply discounted, clarifying that the weight accorded to
> anonymous sources will depend in large part on the level of detail with which they are
> described.  In *Tellabs II*, then, the Seventh Circuit appears to have reached essentially the
> same conclusion we set forth earlier in *Chubb*.

*Avaya*, 564 F.3d at 262; *see also In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 (S.D.N.Y. 2009)
("The Court declines to follow [*Higginbotham*] absent guidance from the Second Circuit, and will continue to
consider allegations based on information provided by confidential sources without discounting those allegations
due solely to the anonymity of the information's source.") (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.
2000)); *see also City of Brockton Ret. Sys. V. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) ("I
disagree with the Seventh Circuit's suggestion, contained in [*Higginbotham*] that information in securities fraud
pleadings from confidential witnesses should always be discounted.")

[32] *See also Fine v. American Solar King*, 919 F.2d 290, 297 (5th Cir. 1990) (evidence of GAAP and GAAS
violations related to revenue recognition and bad debt reserve raised genuine issues of material fact regarding
scienter); *Roth v. Aon Corp.*, No. 04-C-6835, 2008 WL 656069, at *7 (N.D. Ill. Mar. 7, 2008) ("[a]lthough
allegations of GAAP violations, standing alone, are insufficient to raise a strong inference of scienter, GAAP

*(continued)*

Company's massive GAAP violations are more than sufficient to create a strong inference of scienter.

First, the materiality of the alleged GAAP violations supports a strong inference of the Officer Defendants' scienter. The Company's fourth quarter and fiscal year 2008 results showed staggering $825 million and $880 million in losses, respectively. Of the year-end amount, a massive $575 million constituted goodwill impairment. ¶ 102. Moreover, Colonial's net charge-offs increased by a factor of *292* between the first quarter of 2007 and the fourth quarter of 2008, eventually exceeding Colonial's reserves altogether. ¶ 153. The sheer magnitude of the alleged GAAP violations evidences the Officer Defendants' scienter. *See In re Daou*, 411 F.3d at 1022 ("significant violations of GAAP standards can provide evidence of scienter"); *Scientific-Atlanta*, 239 F. Supp. 2d at 1366; *see also In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) (overstatement of restructuring charge by $90 million supported inference of scienter); *Carley Capital Group v. Deloitte & Touche*, *L.L.P.*, 27 F. Supp. 2d 1324 (N.D. Ga. 1998) (understatement of quarterly expenses by $4 million and overstatement of revenue by $12.5 million supported scienter inference); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997) (finding scienter properly alleged where accounting violations led to a drastic overstatement of company's yearly earnings and defendants were responsible for releasing financial information).

Second, the Officer Defendants played a significant role in the financial reporting of the business segments involved in the GAAP violations, and business practices that Defendants

---

*(continued)*

violations may support the inference when coupled with additional circumstances, such as the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information." ).

monitored closely, reported on often, and answered questions about routinely.[33]  The

performance of the Company's loans was a critical factor toward whether the Company's

financial statements complied with GAAP, as the volume of non-performing assets ("NPAs") –

loans originated or purchased  by the Company – bore directly on the issue of whether the

Company's reserves ("ALL") were adequate to cover NPAs, and also whether a goodwill

impairment charge was required.  *See* FAS 142 (¶¶ 130-134); FAS 5, FAS 144 (¶¶ 144-145).

The Company's controls for loan origination and loan performance monitoring similarly bear

directly on whether the Company maintained adequate internal controls under Section 404 of

Sarbanes-Oxley.  ¶¶ 156-164.

     The Officer Defendants were closely involved in these issues.  They themselves stressed

to analysts that "we go over every loan" and "talk about every loan."  ¶ 328.  Lead Plaintiffs

allege through the personal knowledge of CW6, that the Officer Defendants "closely monitored

the Company's financial status, specifically the rate of loan defaults and late payments."  ¶ 56

The Officer Defendants used a "Bankstar" database *every day* to closely monitor how the rate of

loan defaults and late payments impacted the Company's financials.  ¶ 56.   The Officer

Defendants also were actively involved in the review and approval of allowances for loan losses

in the Company's financial statements.  The Company's Form 10-Ks emphasized that the Officer

Defendants reviewed the "methodology, calculations and results" to ensure "that the calculations

are appropriate and that all material risk elements have been assessed in order to determine the

appropriate level …."  ¶ 337.

---

[33] Indeed, the Officer Defendants appear to concede that they were responsible for whether "loan loss provisions and reserves taken throughout the proposed Class Period should have been recognized earlier or, perhaps should have been higher."  Br. at 71.

Indeed, it is inconceivable that the CEO, CFO and CAO would not have unfettered access to the financial reporting implicated by the alleged GAAP violations. *See* ¶¶ 21, 22, 23. These allegations further strengthen the inference of scienter. *See In re Countrywide*, 554 F. Supp. 2d at 1066 ("[T]he executive Defendants were privy to the company's risk management systems on an ongoing basis.... [T]hey also had access to the data contained in the Exception Processing System."); *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d at 1156 (scienter pleaded where "Accredited implemented a system specifically to monitor management overrides of underwriters' rejections of loans for failing to comply with the company's underwriting criteria" and defendants "had access to periodic reports ... regarding widespread deviations from company policy and the adverse affect such practices were beginning to have on Accredited").

Third, the Officer Defendants were aware of – or at the very least grossly indifferent toward – the GAAP violations. The Officer Defendants knew that Colonial's net charge-offs had increased by a factor of *292* between the first quarter of 2007 and the fourth quarter of 2008 (¶ 152), yet they failed to increase the Company's loan loss reserves. ¶¶ 151-52 ("[w]hile NPAs increased 27-fold "from year-end 2006 to year-end 2008, Colonial did not even double its ALL"). To the contrary, the Officer Defendants actively concealed the true NPAs, and reported figures that were markedly lower than the default rate observed first hand by loan officers at the time. *See, e.g.*, ¶¶ 73, 312. Such allegations "suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000).

And despite the Officer Defendants' knowledge that NPAs and NCOs were ballooning in relation to their ALL, they continued to mislead the market throughout the Class Period. For instance, the Officer Defendants misrepresented that "Colonial's credit risk management area

performs detailed verification and testing to ensure appropriate identification of impaired loans and that proper reserves are held against these loans." ¶ 178. The Officer Defendants also declared that they "feel very comfortable about where we are in our reserves," ¶ 197; and that "the coverage represented by our excess capital reserves [over NPAs] are very healthy." ¶ 311. Many courts have found an inference of scienter where, as here, the allegations showed "statements telling the public one thing when [the company] was doing something quite different—the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching." *In re New Century*, 588 F. Supp. 2d at 1230, 1232; s*ee also Netbank*, 2009 WL 2432359, at *4 (dismissal inappropriate where plaintiffs alleged that defendants touted adequacy of reserves even though NetBank's "own analysis indicated that its reserves were severely deficient."); *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005-06 (D. Minn. 1998) (plaintiffs pleaded sufficient facts to support a strong inference of scienter where defendants allegedly engaged in improper revenue recognition practices in violation of GAAP and represented in SEC filings that financial results were prepared in accordance with GAAP).

Finally, the Officer Defendants' failure to maintain adequate internal controls directly contradicts the SOX certifications they signed during the Class Period – in which they personally vouched for the adequacy of the Company's internal and disclosure controls – and also supports an inference of scienter. ¶ 163; *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). The allegations regarding the lack of underwriting documentation, adequate collateral, or other pre-funding requirements demonstrates that the Officer Defendants were severely reckless in attesting to the accuracy of the Company's disclosure controls and financial

statements in the SOX certifications.  *See, e.g.*, ¶¶ 49-60, 42-49, 50-52; *see also Garfield*, 466 F.3d at 1266.

Contrary to the Officer Defendants' contention, Br. at 75-76, courts have held that where, as here, other indicia of scienter are pleaded, SOX certifications will support an inference that the CFO knew or recklessly disregarded that the financial statements were false and misleading. *See, e.g., In re Proquest Sec. Litig*., 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) "The SOX certifications give rise to an inference of [the signer's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."); *In re Lattice Semiconductor Corp. Sec. Litig*., No. CV 04-1255 AA, 2006 WL 538756, at *18-19 (D. Or. Jan. 3, 2006) ("The Sarbanes-Oxley certifications, in combination with plaintiffs' allegations of regular finance meetings, extensive access to databases, periodic reports and special reports, and the allegations that they were micromanagers, are sufficient to create a strong inference of actual knowledge or of deliberate recklessness.").

### F.    Defendants Present No Competing Nonculpable Inference

*Tellabs* instructed courts to weigh allegations of culpability against opposing innocent inferences.  *Tellabs*, 551 U.S. at 324.  Here, the Officer Defendants have presented no competing inference whatsoever to explain Plaintiffs' allegations against them.  *See* Br. 61-79. Accordingly, Lead Plaintiffs' already strong allegations should be regarded as even more supportive of the Officer Defendants' scienter.  "The absence of any suggested counter inference strengthens the contention that there can be but one conclusion drawn from the facts, as pled...

[a]s no opposing inference is evident, the inference of scienter is cogent, indeed." *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007) (citing *Tellabs*).[34]

## V.    THE COMPLAINT ESTABLISHES LOSS CAUSATION

"[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293-94 (M.D. Fla. 2008) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). The liberal notice pleading standard applies to allegations of loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (with regard to pleading loss causation, "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)).

Courts have also recognized that "a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud" as long as the "disclosure [reveals] to the market some part of the truth regarding the alleged fraud." *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008). Moreover, "[b]ecause market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, 'the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; 'he need only show that it was

---

[34] The Officer Defendants failed to supply a competing inference as to their scienter in their initial brief, and thus have forfeited the right to do so on reply. *See In Re Terry Mfg. Co., Inc.*, No. 2:07-CV-0620, 2007 WL 4287366, at *3 (M.D. Ala. Dec. 5, 2007) ("It is improper to raise a new argument in a reply brief because doing so denies the non-movant the opportunity to respond. Therefore, the court declines to consider the merits of this argument.") (internal citations omitted); *Barnette v. City of Phenix City* No. 3:05-cv-00473-WKW, 2007 WL 3307213, at *13 (M.D. Ala. Nov. 6, 2007) (same).

'substantial,' *i.e.*, a significant contributing cause.'" *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997); *see also Hubbard,* 625 F. Supp. 2d at 1291-92 (finding loss causation adequately pled where defendants had withheld revealing bank's true exposure in its commercial real estate lending portfolio in the midst of a crash in the Florida real estate market).

Here, the Complaint describes how the Officer Defendants' fraudulent concealment of their deteriorating underwriting standards, ballooning NPAs and NCOs, and Colonial's true liquidity and capitalization resulted in a shocking *56%* plunge in Colonial's stock price on October 2008 – the biggest drop in almost a *quarter century* – when the market first learned the partial truth regarding the Company's financial condition.  ¶¶ 92-93.  As if losing more than half its value in a single day were not enough, the Officer Defendants' second revelation on January 27, 2009 that: (1) they had omitted a critical condition of the TARP funding (on which Colonial's survival depended); and (2) the Company was taking a massive and sudden writedown of goodwill, sent the stock price diving down another 46% in one day.  ¶¶ 102-103. In contrast, the Officer Defendants' misleading statement that Colonial had been approved for TARP funding in December 2008 had sent the stock price soaring an incredible 54% in one day, the highest one day gain in 25 years.  ¶¶ 100-101.  This fact, on its own, supports the proposition that the misleading TARP statement was a "significant contributing cause" of the subsequent loss on January 27, 2009.  *Robbins*, 116 F.3d at 1447 (finding loss causation established where complaint alleged misstatements and omissions to be significant contributing cause of injury).

Nevertheless, the Officer Defendants brazenly argue that their fraud is not the cause of the drastic drops in Colonial's stock price on October 22, 2008 and January 27, 2009, instead blaming (conveniently) "significant market deterioration – deterioration which had no parallel in modern history."  Br. at 96.  This argument does not withstand scrutiny.

First, Colonial's October 23, 2008 stock price decline of 55.98% was statistically significant.  Indeed, there is near-absolute statistical certainty that Colonial's stock price decline, after accounting for the effects of broad market and industry stock price movements, was caused by the Company's October 22, 2008 disclosure.  For example, while Colonial's stock price fell by *55.98%* on October 23, 2008, the Standard & Poor's ("S&P") 500 Index rose by 1.26%, the S&P Financials Index fell by only 0.86% and the S&P Regional Banks Index fell by only 3.93%.[35]

Colonial's January 28, 2009 stock price decline of 46.20% was also statistically significant.  Again, there is near-absolute statistical certainty that Colonial's stock price decline, after accounting for the effects of broad market and industry stock price movements, was caused by the Company's January 27, 2009 announcements.  While Colonial's stock price *fell* by *46.20%* on January 28, 2009, the S&P 500 Index rose by 3.36%, the S&P Financials Index rose by 12.97% and the S&P Regional Banks Index rose by 14.33%.

In any event, Lead Plaintiffs need not show that the Officer Defendants' misstatements and omissions regarding their deteriorating underwriting and credit standards, and their misstatements regarding the then-current state of Colonial's financial health, were the *only* cause for the stock drop.  *See BankAtlantic,* 625 F. Supp. 2d at 1291-92 (Plaintiffs "need not show that the [Defendants' acts were] the sole and exclusive cause of the injury" suffered, but need only

---

[35] The S&P 500 Index is designed to measure performance of the broad U.S. domestic economy through changes in the market value of 500 stocks representing all major industries.  The S&P Financials Index provides a narrower measure of Colonial's industry and was comprised, as of October 23, 2008, of 85 of the S&P 500 Index stocks - including firms such as banks, insurance companies, investment houses and realty trusts.  The S&P Regional Banks Index provides an even finer measure of Colonial's industry and was comprised, as of October 23, 2008, of 12 of the 85 firms included in the S&P Financials Index.  The regional banks included as of that date were BB&T Corp., Fifth Third Bancorp, First Horizon National Corp., Huntington Bancshares Inc./OH, KeyCorp, M&T Bank Corp., Marshall & Ilsley Corp., National City Corp., PNC Financial Services Group Inc., Regions Financial Corp., SunTrust Banks Inc., and Zions Bancorporation.

show that "the misrepresentation *touches upon* the reasons for the investments decline in value.")
(emphasis added, internal citation omitted).

In *BankAtlantic*, the court found loss causation adequately pled in a case very similar to
this one. The *BankAtlantic* plaintiffs alleged that the defendant company "did not fully reveal its
exposure in its [commercial real estate] portfolio until October 26, 2007, and that up until that
time it had falsely reassured its investors of its conservative lending practices." 625 F. Supp. 2d
at 1292. Just as Colonial did here:

> [BankAtlantic] sought to capitalize on the Florida real estate boom through
> expansion of its commercial real estate ("CRE") loan portfolio. The Company cut
> corners in order to fuel rapid growth and secure customers for its CRE portfolio,
> including ignoring the Company's internal lending guidelines. At the same time,
> the Company failed to adequately reserve for losses associated with its risky CRE
> loans, resulting in material misstatements in the Company's financials. When the
> Florida real estate market entered a free fall in 2007, borrowers began defaulting
> on these CRE loans. Ultimately, in October 2007, Defendants were forced to
> reveal the true extent of the Company's exposure in its CRE portfolio--over $530
> million--and this disclosure caused the Company's stock prices to drop.

*Id*. at 1273 (internal citations omitted).

Even though BankAtlantic's disclosure occurred *after* the Florida real estate market had
started to crash, the court held that plaintiffs had established loss causation because "the
[c]omplaint adequately alleges how Defendants' misrepresentations and omissions regarding its
purportedly conservative lending practices 'touched upon' the reason for the stocks' decline in
value." *Id*. at 1292. Similarly, here, Colonial and the Officer Defendants falsely reassured the
market of Colonial's conservative underwriting standards, and misled the market regarding the
amount of reserves needed to contain Colonial's ballooning NPAs. *See supra* pp. 17-28. The
Officer Defendants admit that the January 27, 2009 announcement (as with the earlier October
22, 2008 announcement) "did disclose a dramatic collapse in the Company's portfolio,"

signaling to the market that the Officer Defendants' previous statements about Colonial's conservative practices, and its loan loss reserves, were untrue.  *See*, *e.g.*, ¶¶ 92-93.

The Officer Defendants also misleadingly assert that "for a disclosure to be 'corrective' and cause a loss, it must reveal information that was…only known by the Officer Defendants." Br. at 97.  However, "a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud" as long as the "disclosure [reveals] to the market some part of the truth regarding the alleged fraud." *In re Take-Two*, 551 F. Supp. 2d at 285.  Therefore, it is sufficient that the disclosures here revealed the true state of Colonial's loan portfolio, and did not explicitly state that "Colonial's financial statements issued during the proposed Class Period were materially inaccurate…or in any way tainted by misconduct."  Br. at 96.  Although the Officer Defendants try to paint the disclosures as "mundane" disclosures "of bad news regarding…the Company's actual or expected performance," Br. at 97, the financial disclosures were a direct indication to the market that, given the financial state of Colonial's loan portfolio, the Officer Defendants' prior reassurances about underwriting standards, reserves, and liquidity *had* to be false.  *See* ¶¶ 92-93 ("[t]his was one of the most disappointing quarters with some of the *worst loan deterioration* we have seen among any bank we follow.")

Thus, Lead Plaintiffs have "more then simply allege[d] that stock was purchased at an artificially inflated price; Plaintiff[s] [have] alleged a causal relationship between certain statements and omissions" and their pecuniary loss. *BankAtlantic*, 625 F. Supp. 2d at 1292 (citing *Dura*, 544 U.S. at 346-47).  Accordingly, the Complaint "provides Defendants with notice of what the relevant economic loss *might be*, or of what the causal connection *might be* between that loss and the misrepresentation concerning the Company's exposure to risk" in its loan portfolio – that the Officer Defendants' misstatements about the vital metrics of Colonial's

business, including credit quality and liquidity – might be a "significant contributing cause" of Plaintiffs' losses, which is all that is required at this stage of the litigation. *BankAtlantic*, 625 F. Supp. 2d at 1292 (emphasis added); *Robbins*, 116 F.3d at 1447.

Indeed, the Officer Defendants demonstrate their awareness of this causal link, stating that "Plaintiffs' tale of fraud is inextricably linked to the alleged deterioration of Colonial's underwriting guidelines and its origination of subprime loans." Br. at 100. Under the applicable standard, Plaintiffs do *not* have to "explain why…it was these two disclosures that moved the stock prices throughout the Class Period, as opposed to all the myriad information about the decline in the Florida real estate market, Colonial's concentration there and the surrounding collapse of the economy in general." Br. at 100. It is enough that the Officer Defendants are aware of the causal link described in the Complaint.

That the overall market was deteriorating is, therefore, of no import to the loss causation analysis, and not surprisingly, other courts have also found loss causation established in similar circumstances. In *In re Countrywide*, 588 F. Supp. 2d at 1132, the defendants argued that plaintiffs' losses resulted from the downturn in the mortgage and credit markets. The *Countrywide* court disagreed, finding the complaint's "basic theory [to be] simple: Countrywide's operations so diverged from soundness that Countrywide's repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false. This triggered a sharp decline in the value of Countrywide-related securities as the truth emerged." *Id*. at 1174; *see also In re Moneygram Int'l Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 984 (D. Minn. 2009) (rejecting defendants' assertion on motion to dismiss that plaintiffs' losses resulted from economic downturn and finding loss causation established where, *inter alia*, company's stock price dropped upon disclosure of comprehensive recapitalization of company,

revealing to market that defendants had overstated company's financial condition by overvaluing mortgage-backed assets and understating risk exposure).

Similarly, the Complaint alleges how the belated revelation of a critical condition for Colonial's TARP funding – on which Colonial's viability as a business depended – related to the drop in stock price on January 27, 2009. *See*, *e.g.*, ¶¶ 105-109. Lead Plaintiffs are not required to rule out other possible explanations for the stock drop, but need only allege that the TARP misrepresentation "touched upon" the reason for the decline in value, not that the misrepresentation was the "per se," Br. at 99, cause of the stock drop. *BankAtlantic*, 625 F. Supp. 2d at 1292, *see also Lentell*, 396 F.3d at 174 ("if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation ... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"); *In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005) ("Defendants' contentions that intervening causes ... were to blame for the collapse of PNL's share price must await the trial.").

Indeed, for all their repeated assertions regarding the dire state of the markets, the Officer Defendants fail to explain why the October 22, 2008 announcement caused an unprecedented *56%* decline in Colonial stock in one trading day, the biggest drop suffered by Colonial (*not* the market as a whole) in almost *25* years, ¶ 92, or why the stock again lost half its value with the TARP disclosure on January 27, 2009. ¶ 108. This only underscores that the general state of the markets is irrelevant to whether the Complaint has established loss causation. Because the Complaint "provides Defendants with notice… of what the causal connection *might be* between [the Plaintiffs'] loss" and the misrepresentations described, Plaintiffs have established loss causation under the applicable standard. *BankAtlantic*, 625 F. Supp. 2d at 1292 (emphasis added).

87

## VI.  PLAINTIFFS' SECURITIES ACT CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE PLEADED WITH THE REQUISITE PARTICULARITY

The Individual Defendants argue that Lead Plaintiffs' Securities Act claims against them should be dismissed for failing to meet the heightened pleading standards of Rule 9(b).  Br. at 101-02.  In response, Lead Plaintiffs incorporate by reference Point III of Lead Plaintiffs' Memorandum of Law in Opposition to the Underwriter Defendants' and Outside Director Defendants' Motions to Dismiss, filed concurrently herewith (the "Omnibus Opposition").[36]

The Individual Defendants also assert that Lead Plaintiffs' Securities Act claims do not allege actionable misstatements because (1) the allegations contain information provided by confidential witnesses, and (2) the Individual Defendants' misstatements were "forward looking" and thus fell into the PSLRA's "safe harbor."  Br. at 102-03.  These arguments are unfounded for the reasons set forth *infra* at Points II.A. and IV.D.

## VII.  THE COMPLAINT ADEQUATELY STATES CONTROL PERSON LIABILITY CLAIMS AGAINST LOWDER, MOORE AND HICKS

The Complaint asserts claims under Section 20(a) of the Exchange Act against the Officer Defendants Lowder, Moore and Hicks as control persons of Colonial.  *See* Count II (¶¶ 355-362).  Section 20(a) "imposes liability on not only the person who actually commits a securities law violation, but also on an entity or individual that controls the violator."  *Laperrier v. Vesta Ins. Group, Inc*., 526 F.3d 715, 721 (11th Cir. 2008).  "Under section 20(a), a

---

[36]  The Underwriter Defendants and the Director Defendants attempt this same argument in their Motions to Dismiss.  In the Omnibus Opposition, Point IV, Lead Plaintiffs explain that their Securities Act claims are based solely on the strict liability provisions of Section 11 of the Securities Act, 15 U.S.C. §§ 77k ("Section 11"), which are subject only to Rule 8 notice pleading standards.  *See Wagner*, 464 F.3d at 1277.  Accordingly, the Individual Defendants, like the Underwriter Defendants and the Outside Director Defendants, cannot shelter behind Rule 9(b).  Moreover, even were Lead Plaintiffs' Section 11 claims subject to Rule 9(b) pleading standards, which they are not, they still meet the heightened standard for pleading fraud claims.  *See* Omnibus Opposition, Point IV.

controlling person is liable to the plaintiff jointly and severally with and to the same extent as a controlled person for the controlled person's acts, unless the controlling person can establish the affirmative defense of good faith and non-inducement." *Id*.

None of the Officer Defendants deny that they were control persons in moving to dismiss the complaint. Nor could they. The scienter allegations discussed above in Point IV make clear that Lowder, Moore and Hicks exercised power or control over Colonial's core businesses, and had direct involvement in Colonial's day-to-day operations including (at a minimum) its financial reporting and accounting functions, and their signatures on and participation in the Company's public filings. In any event, "[w]hether a defendant is a control person is a fact question rarely appropriate for motion practice," because the issue of control is "an intensely factual question." *In re Countrywide*, 588 F. Supp. 2d at 1201 (quoting *Employer-Teamster Joint Council Pension Trust Fund v. Am. West*, 320 F.3d 920, 945 (9th Cir. 2003).

Because Lowder, Moore and Hicks do not contest that they were controlling persons of Colonial at the relevant time, and the Complaint states claims against Colonial for primary violations, the Court should uphold the associated controlling person liability claims. *See Stumpf v. Garvey,* No. 03-CV-1352 PB, 2005 WL 2127674, at *13 n.16 (D.N.H. Sept. 2, 2005) (Section 20(a) claim upheld where challenged solely on ground, rejected by court, that no Section 10(b) claim was stated); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065-66 (9th Cir. 2000) (reversing dismissal of section 20(a) claim asserting that CEO was jointly and severally liable with his company, which was the primary violator); *In re Juniper Networks, Inc. Sec. Litig*., 542 F. Supp. 2d 1037, 1053-54 (N.D. Cal. 2008) (upholding Section 20(a) claims against several officers and directors including CEO and CFO).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that this Court deny the

Individual Defendants' Motion to Dismiss in its entirety.

Dated: January 29, 2010                               Respectfully submitted,

By:  ___s/Tyrone C. Means_____
Tyrone C. Means (MEA003)
H. Lewis Gillis (GIL011)
Gerald C. Brooks (BRO212)
**THOMAS, MEANS, GILLIS & SEAY, P.C.**
3121 Zelda Court
Montgomery, Alabama 36106
Telephone: (334) 270-1033
Facsimile: (334) 260-9396

*Liaison Counsel*

Thomas A. Dubbs (NY 2318863)
James W. Johnson (NY 2108686)
Angelina Nguyen (NY 4233581)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for Lead Plaintiffs Arkansas Teacher*
*Retirement System, State-Boston Retirement*
*System, Norfolk County Retirement System*
*and City of Brockton Retirement System*

**COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
Paul J. Geller
Jack Reise
Douglas S. Wilens
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

**CHIMICLES & TIKELLIS LLP**
Steven A. Schwartz
Kimberly A. Sanders
Timothy N. Mathews
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

*Additional Counsel for Lead Plaintiffs
and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on  January 29, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Enrique Jose Gimenez**  Lightfoot Franklin & White LLC
  hgimenez@lightfootlaw.com

- **James Fletcher Hughey, III**  Lightfoot Franklin & White LLC
  jhughey@lightfootlaw.com

- **Samuel Holley Franklin**  Lightfoot Franklin & White LLC
  sfranklin@lightfootlaw.com

- **Robert David Segall**  Copeland Franco Screws & Gill
  segall@copelandfranco.com

- **Edward Hamilton Wilson, Jr.**  Ball Ball Matthews & Novak PA
  hwilson@Ball-Ball.com

- **Tabor Robert Novak, Jr.**  Ball Ball Matthews & Novak PA
  tnovak@ball-ball.com

- **Alan Frederick Enslen**  Maynard, Cooper & Gale, P.C
  aenslen@maynardcooper.com

- **Armistead Inge Selden, III**  Maynard, Cooper & Gale, P.C
  iselden@maynardcooper.com

- **Carl Stanley Burkhalter**  Maynard, Cooper & Gale, P.C.
  cburkhalter@maynardcooper.com

- **Steven L. McPheeters**  Maynard, Cooper & Gale, P.C.
  smcpheeters@maynardcooper.com

- **Larry Brittain Childs**  Waller Lansden Dortch & Davis LLP
  larry.childs@wallerlaw.com

- **Elizabeth V. Tanis**  King & Spalding LLP
  etanis@kslaw.com

- **Dan S. McDevitt**  King & Spalding LLP
  dmcdevitt@kslaw.com

- **George Patrick Montgomery**  King & Spalding LLP
  pmontgomery@kslaw.com

- **Shelby S. Guilbert**  King & Spalding LLP
  sguilbert@kslaw.com

- **Walter Edgar McGowan** Gray Langford Sapp McGowan Gray, Gray & Nathanson PC
  wem@glsmgn.com

- **Gerald Clark Brooks , Jr.**   Thomas, Means, Gillis & Seay, P.C.
  gcbrooks@tmgslaw.com

- **Henry Lewis Gillis**   Thomas Means Gillis & Seay PC
  hlgillis@tmgslaw.com

- **Ira M Levee**   Lowenstein Sandler PC
  ilevee@lowenstein.com

- **Kimberly A. Sanders**   Chimicles & Tikellis LLP
  kas@chimicles.com

- **Michael Stephen Dampier**  Vickers, Riis, Murray and Curran, LLC
  stevedampier@bellsouth.net

- **Michael S Etkin**   Lowenstein Sandler PC
  metkin@lowenstein.com

- **Steven A. Schwartz**   Chimicles & Tikellis LLP
  sas@chimicles.com

- **Timothy N Mathews**   Chimicles & Tikellis LLP
  TNM@chimicles.com

- **Geoffrey Michael Ezgar**   King & Spalding, LLP
  gezgar@kslaw.com

  s/Tyrone C. Means