# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| In re | ) | CIVIL ACTION NO. |
| COLONIAL BANCGROUP, INC. | ) | 2:09-CV-104-RDP-WC |
| SECURITIES LITIGATION | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

BALL, BALL, MATTHEWS & NOVAK, P.A.
Tabor R. Novak, Jr. (NOV001)
200 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109
Telephone: (334) 387-7680
Facsimile: (334) 387-3222
tnovak@ball-ball.com

JOHNSTON BARTON PROCTOR & ROSE LLP
Thomas E. Walker, Esq. (WAL017)
Colonial Brookwood Center
569 Brookwood Village
Suite 901
Birmingham, Alabama 35209
Telephone:  (205) 458-9400
Facsimile:   (205) 458-9500
twalker@johnstonbarton.com

KING & SPALDING LLP
Elizabeth V. Tanis (GA Bar No. 697415), admitted *pro hac vice*
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5140
etanis@kslaw.com

Geoffrey M. Ezgar (CA Bar No. 184243), admitted *pro hac vice*
101 Second Street
Suite 2300
San Francisco, CA 94015
Telephone: (415) 318-1324
Facsimile: (415) 318-1300
gezgar@kslaw.com

*Counsel for Defendant PricewaterhouseCoopers LLP*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ................................................................................3

    A.    PwC And Its Role As Independent Auditor ..........................................4

    B.    Colonial's Fraud On PwC, The Regulators, And The Market..............5

    C.    Colonial's Demise ................................................................................8

ARGUMENT ......................................................................................................10

I.    PLAINTIFFS HAVE NOT STATED A SECTION 10(B) CLAIM
    AGAINST PWC. ......................................................................................10

    A.    Exacting Pleading Standards Apply To Plaintiffs' Section 10(b)
        Claims..................................................................................................10

    B.    The Complaint Does Not Raise A Plausible Inference Of PwC's
        Scienter, Much Less The Required Strong Inference. ......................11

        1.    The Complaint demonstrates that PwC was a victim, not
            a perpetrator, of the alleged fraud..............................................14

        2.    The Complaint also demonstrates that no one, not even
            the regulators, predicted the marketwide collapse in the
            financial industry......................................................................16

        3.    Allegations that PwC violated GAAS do not support a
            strong inference that PwC acted with scienter.........................17

        4.    The alleged "red flags" do not establish PwC's scienter.........19

        5.    The Complaint does not allege that PwC had a motive to
            commit fraud.............................................................................23

    C.    Plaintiffs Have Not Alleged With Particularity A PwC
        Misstatement. .....................................................................................23

    D.    Plaintiffs Have Not Adequately Pleaded Loss Causation...................28

1.      The "corrective" disclosures alleged in the Complaint were not corrective at all. ........................................................ 30

        a.      Colonial's October 22, 2008 and January 27, 2009 Form 8-Ks did not "correct" any alleged PwC misstatement. ................................................... 30

        b.      The remaining three alleged "corrective" disclosures came after Plaintiffs sold all their Colonial stock. ............................................................... 33

2.      Plaintiffs' theory of causation does not even attempt to account for the marketwide crisis in the financial industry ................................................................................. 34

**II.    PLAINTIFFS HAVE NOT STATED A SECTION 11 CLAIM AGAINST PWC.** ...................................................................................... 35

A.      The Complaint Does Not Allege Particularized Facts Showing That PwC's Audit Opinion Was Subjectively False. .......................... 37

B.      The Complaint Does Not Allege Particularized Facts Showing That Colonial's 2007 Financial Statements Were False. .................... 41

C.      The Lead Plaintiffs Lack Standing To Sue Under Section 11. ........... 42

D.      The Face Of The Complaint Shows That The Negative-Causation Defense Bars The City Of Worcester Retirement System's Section 11 Claim. ............................................................... 44

CONCLUSION .................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................16

*Amoroso v. Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010) .........................................29, 32

*APA Excelsior III L.P. v. Premier Tech., Inc.*,
  476 F.3d 1261 (11th Cir. 2007) .........................................................43

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ................................................................11, 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................11

*Belmont Holdings Corp. v. Sun Trust Banks, Inc.*,
  2010 WL 3545389 (N.D. Ga. Sept. 10, 2010) ...........16, 38, 39, 41, 42

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) .............................................................45

*Central Bank of Denver v. First Interstate Bank*,
  511 U.S. 164 (1994) ...........................................................................24

*Chiarenza v. IBSG Int'l, Inc.*,
  2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) .....................................14

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Public,
  Ltd.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009) ................................................26

*Decker v. Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982) ..............................................................12

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
  454 F.3d 1168 (10th Cir. 2006) .............................................36, 39, 40

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .......................................................................23, 27

*Dronsejko v. Grant Thornton*,
  632 F.3d 658 (10th Cir. 2011) ...............................................................................22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................... *passim*

*Durham v. Whitney Info. Network, Inc.*,
  2009 WL 3783375 (M.D. Fla. Nov. 10, 2009)..................................................14

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
  594 F.3d 783 (11th Cir. 2010) .......................................................................12, 13

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
  595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir.
  2010) .........................................................................................................13, 14

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).........................................................................................12

*Fait v. Regions Financial Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y. 2010) ...............................................38, 39, 41, 42

*Ferris, Baker Watts, Inc. v. Ernst & Young LLP*,
  395 F.3d 851 (8th Cir. 2005) .......................................................................17, 18

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ................................................................ *passim*

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).........................................................................................3, 35

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................................32

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ...............................................13, 15, 18

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) .............................................................19

*In re CIT Group, Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004) ...............................................27, 40, 41, 42

*In re Compuware Sec. Litig.*,
   386 F. Supp. 2d 913 (E.D. Mich. 2005) ..........................................................32

*In re Crocs, Inc. Sec. Litig.*,
   2011 WL 782485 (D. Colo. Feb. 28, 2011)......................................................21

*In re Dell*, *Inc. Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) ............................................................19

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) .........................................................24, 28

*In re Faro Tech. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007)............................................................14

*In re Imergent Sec. Litig.*,
   2009 WL 3731965 (D. Utah Nov. 2, 2009)......................................................20

*In re Impax Labs., Inc. Sec. Litig.*,
   2008 WL 1766943 (N.D. Cal. Apr. 17, 2008)......................................33, 44, 45

*In re IPO Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ..............................................................31

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................32, 34, 44, 45

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   568 F. Supp. 2d 349 (S.D.N.Y. 2008) .........................................................34, 35

*In re Pegasus Wireless Corp. Sec. Litig.*,
   2009 WL 3055210 (S.D. Fla. Sept. 21, 2009) ..................................................14

*In re Salomon Analyst Level 3 Litig.*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..............................................................42

*In re Serologicals Sec. Litig.*,
   2003 WL 24033694 (N.D. Ga. Feb. 20, 2003)..................................................27

*In re Spear & Jackson Sec. Litig.*,
   399 F. Supp. 2d 1350 (S.D. Fla. 2005) ...............................................................18

*In re Witness Sys., Inc. Sec. Litig.*,
   No. 1:06-cv-1894-CC, slip op. (N.D. Ga. Mar. 31, 2008) ...................................14

*Iron Workers Local No. 25 Pension Fund v. OshKosh Corp.*,
   2010 WL 1287058 (E.D. Wis. Mar. 30, 2010)...............................................26, 27

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011)..........................................................................................24

*Kadel v. Flood*,
   2011 WL 2015379 (11th Cir. May 24, 2011)...............................................16, 17

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ...............................................................29, 31, 32

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005) .......................................................................42, 43

*La. Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*,
   622 F.3d 471 (6th Cir. 2010) .......................................................................12, 22

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................29, 30, 31, 34

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .............................................................................31

*Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010).....................................................................31

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................25

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial
   Bank of Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................17

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...............................................................................13

*Pub. Employees' Ret. Assoc. of Colo. v. Deloitte & Touche LLP*,
    551 F.3d 305 (4th Cir. 2009) .......................................................................15, 18

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................................40

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008).............................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................. *passim*

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) ............................................................................28

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ...............................................................40

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)....................................................................................37, 38

*W. Va. Inv. Mgmt. Bd. v. Doral Financial Corp.*,
    2009 WL 2779119 (2d Cir. Sept. 2, 2009) ........................................................15

*Wagner v. First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ..........................................................................35

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ..........................................................................14

S<small>TATUTES AND</small> R<small>ULES</small>

15 U.S.C. § 77k ................................................................................................35

15 U.S.C. § 77k(a) ............................................................................................43

15 U.S.C. § 77k(a)(4) ....................................................................................3, 35

15 U.S.C. § 77k(e) ......................................................................................32, 44

15 U.S.C. § 77m ...............................................................................................45

15 U.S.C. § 78r(a) ............................................................................................39

15 U.S.C. § 78u-4(b)(1)(B) ..............................................................................23

15 U.S.C. § 78u-4(b)(1) ...................................................................................11

15 U.S.C. § 78u-4(b)(2) ..............................................................................11, 12

15 U.S.C. § 78u-4(b)(4) ...................................................................................28

Private Securities Litigation Reform Act of 1995 ("PSLRA") ...................... *passim*

17 C.F.R. § 240.10b-5 ................................................................................ *passim*

Federal Rule of Civil Procedure 8(a)(2) .................................................11

Federal Rule of Civil Procedure 9(b) ..................................................11, 23, 28, 35

Federal Rule of Civil Procedure 12(b)(6) ................................................6

O<small>THER</small> M<small>ATERIALS</small>

*Former Fed Chief "Shocked" by Crisis,* L<small>OS</small> A<small>NGELES</small> T<small>IMES</small>, October 23, 2008.............................................................................................................2

http://www.fdic.gov/bank/individual/failed/banklist.html. .......................................9

## AUDITING AND ACCOUNTING STANDARDS

Statement on Auditing Standards, AU § 110.02 ..................................................................4

Statement on Auditing Standards, AU § 110.03 ..............................................................4, 36

Statement on Auditing Standards, AU § 230.10 ..................................................................5

Statement on Auditing Standards, AU § 230.11 ..................................................................9

Statement on Auditing Standards, AU § 230.13 ................................................................36

Statement on Auditing Standards, AU § 316.09 ..................................................................5

Statement on Auditing Standards, AU § 316.10 ..................................................................5

Statement on Auditing Standards, AU § 316.12 ..................................................................5

Statement on Auditing Standards, AU § 328.05 ................................................................17

Statement of Financial Accounting Standards, SFAS 5 ¶ 8 ..................................................22

## <u>INTRODUCTION</u>

Plaintiffs' case against PricewaterhouseCoopers LLP ("PwC") boils down to a claim that PwC should have detected a fraud of which it was a victim and should have predicted a global financial crisis that no one saw coming.  Much more is required for Plaintiffs to plead securities fraud against PwC.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes stringent pleading requirements on securities fraud plaintiffs.  As courts have recognized, those requirements are at their most demanding in cases where the plaintiffs sue an independent auditor, like PwC here, which audited the 2007 and 2008 year-end financial statements of Colonial BancGroup, Inc. ("Colonial"). That is because an independent auditor differs from the typical securities fraud defendants—the issuer and its management—in at least three ways.

First, an independent auditor necessarily knows less about the financial information underlying its client's financial statements than does its client, which prepares its own financial statements and has first-hand knowledge of the transactions and events reflected in them.  Second, the report issued by an independent auditor expresses the auditor's professional *opinion*, an opinion based on audit testing of *samples* of information (not every transaction) and on the exercise of considerable judgment.  That opinion is not a guarantee of the accuracy of the client's financial statements.  Third, an independent auditor has no economic incentive to commit fraud.  Unlike the officers and directors of the companies whose financial statements it audits, an independent auditor does not (and cannot) own stock in its audit client or receive compensation based on its client's

performance. Thus, an independent auditor stands to gain nothing by propping up its client's stock price through fraud. On the contrary, an auditor's success depends on maintaining its reputation for honesty.

For these reasons, courts assiduously apply the PSLRA's pleading requirements to claims against independent auditors: Plaintiffs here must plead particularized facts raising a strong inference that PwC committed fraud by making material misrepresentations in its audit reports on Colonial's 2007 and 2008 financial statements.

The Complaint, however, creates exactly the opposite inference. It shows that the fraudsters at Colonial and at the bank's biggest client took great pains to *hide* their fraud from PwC precisely because they knew that PwC would not tolerate, much less commit, a fraud. The charge of fraud against PwC also defies common sense: Why would PwC risk its professional reputation and open itself up to potential civil liability to participate in a fraud from which it stood to gain nothing?

Plaintiffs also acknowledge that PwC's audit reports on Colonial's 2007 and 2008 financial statements coincided with an unprecedented, global financial crisis—a period that former Federal Reserve Chairman Alan Greenspan has described as a "once-in-a-century credit tsunami" that turned out to be "much broader than anything [he] could have imagined." *Former Fed Chief "Shocked" by Crisis,* LOS ANGELES TIMES, October 23, 2008 at Part A, pg. 1. Broader indeed: Over 360 other banks failed along with Colonial during the crisis. When the brush is cleared away from the Complaint, the supposed "evidence" of PwC's fraud turns

out to be nothing more than relics of that crisis, and Plaintiffs' allegations that PwC ignored "red flags" nothing more than an impermissible assertion of fraud by hindsight.

Plaintiffs' claims against PwC under Section 11 of the Securities Act fare no better. Section 11 limits an accountant's liability to only those portions of a registration statement that "purport to have been prepared or certified by [the accountant]." 15 U.S.C. § 77k(a)(4); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 n.11 (1983) (accountants can be held liable "only for those matters which purport to have been prepared or certified by them"). With respect to the Section 11 claims, the only statement that PwC "prepared or certified" was its audit opinion regarding Colonial's 2007 financial statements, but the Complaint alleges no facts sufficient to show that PwC's opinion was objectively false, much less that PwC did not truly hold the opinion when issued. The claims against PwC must be dismissed.

## FACTUAL BACKGROUND

An old proverb says that "hindsight wisdom is of no use." The same can be said of hindsight allegations of fraud.

The Complaint against PwC is a classic exercise in hindsight pleading: Plaintiffs seek to hold PwC liable for failing to detect a fraud that took the Government's forensic experts 10,000 hours to unravel (even with help from the fraudsters) and for failing to predict the severity of an economic meltdown that continues to batter the American and international markets today. But PwC is neither police officer nor prophet—it served a limited function with respect to

3

Colonial's financial statements.  Viewed in light of that circumscribed function, Plaintiffs' allegations of a PwC fraud ring hollow.

### A.    PwC And Its Role As Independent Auditor

PwC, an accounting firm, served as the independent auditor of Colonial's 2007 and 2008 year-end financial statements.  Compl. ¶ 28.[1]   In contrast to Colonial's management, which was responsible for running Colonial's business and for preparing Colonial's financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") (*see* AU § 110.03), PwC's role as independent auditor was to audit those financial statements and to form an *opinion* about whether, taken as a whole, they were fairly stated in all material respects in accordance with GAAP.[2]  PwC's audit reports on Colonial's financial statements stated expressly that Colonial's management, not PwC, was responsible for the company's financial statements.  *See* Compl. ¶¶ 585, 623, 975.

Plaintiffs also acknowledge that PwC was required to conduct its audit in accordance with Generally Accepted Auditing Standards ("GAAS").  GAAS limit PwC's responsibilities in important ways.  Compl. ¶ 703.  Under GAAS, an auditor must plan and perform an audit to obtain *reasonable*—not absolute—assurance that the financial statements are not materially misstated.  AU § 110.02; AU § 230.10 ("[a]bsolute assurance is not attainable because of the nature of audit

---

[1] "Compl." refers to Plaintiffs' First Amended Consolidated Class Action Complaint.

[2] "AU" sections refer to Statements on Auditing Standards, which interpret Generally Accepted Auditing Standards ("GAAS").  The Public Company Accounting Oversight Board has adopted GAAS.  Plaintiffs cite "AU" sections throughout their Complaint.  *See, e.g.*, Compl. ¶¶ 703, 707, 791.

evidence and the characteristics of fraud"). This standard recognizes that an auditor's opinion is not based on a complete picture of a company's financial condition, but rather on a limited universe of financial information (much of which is provided by the company), the testing of some (but by no means all) of the company's transactions, and the auditor's professional judgment.

Because of these inherent limitations, even "a properly planned and performed audit may not detect a material misstatement resulting from fraud." AU § 316.12. This is particularly true when, as here, the audit client colludes with a third party or when the client or a third party provides the auditor with falsified documents. *Id.* § 316.10 ("Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false."); *id.* ("As another example, the auditor may receive a false confirmation from a third party. . . ."); *id.* § 316.09 (auditors are not trained to authenticate financial documents).

### B.   Colonial's Fraud On PwC, The Regulators, And The Market

Colonial, a holding company, derived substantially all of its income from its subsidiary, Colonial Bank. Compl. ¶ 2. Colonial Bank had a general commercial banking business and a mortgage lending business. *Id.* The bank's loan portfolio consisted primarily of commercial real estate, construction, and residential loans, concentrated largely in Florida. *Id.* Colonial Bank also provided short-term secured lines of credit to mortgage originators through its mortgage warehouse lending department ("MWLD"). *Id.*

In August 2009, Colonial Bank succumbed to the financial crisis that has rocked the banking and mortgage industries.  Even before then, however, problems were afoot in the bank's mortgage warehouse lending arm.  Starting in 2002 and continuing until Colonial's demise, certain employees in Colonial Bank's MWLD colluded with the department's largest customer, Taylor Bean & Whitaker ("TBW"), to commit a fraud that went undetected for nearly seven years.  Compl. ¶ 106.

The conspiracy principally involved Catherine Kissick, the head of Colonial Bank's MWLD; Teresa Kelly, the MWLD operations supervisor; Lee Farkas, TBW's Chairman of the Board; and Desiree Brown, TBW's Treasurer.  Compl. ¶¶ 6, 11, 98, 101, 103.  This group and many other TBW employees have either pleaded guilty to or been found guilty of bank fraud, securities fraud, or wire fraud relating to MWLD loans that Colonial Bank made to TBW.  *Id.* ¶¶ 6, 174.

The conspirators designed their fraud to evade detection by PwC.  *See* Compl. Section  IV.B.  At first, Kissick and Kelly moved funds daily from one TBW account to another to keep TBW's overdrafts off Colonial Bank's overdraft reports (Compl. ¶¶ 103-08) and thus out of sight.  Farkas Trial Tr. at 766 (attached as Ex. A).[3]  When the conspirators became concerned that the fraud was becoming

---

[3] "Farkas Trial Tr." refers to the transcript of Lee Farkas's criminal trial.

Under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), this Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.* at 322 (citation omitted).  Here, that includes, among other things, the Farkas trial transcript (*see, e.g.*, Compl. ¶ 11), the Securities and Exchange Commission's Complaint against Kissick (*see id.* ¶

too large to conceal through those efforts, Kissick and Kelly began moving TBW's overdrafts to various loan and purchase facilities and fabricating documentation of fictitious loans to support the increased balances.  Compl. ¶¶ 108-12.  The duo also would "refresh" the fictitious collateral periodically by replacing it with additional false or impaired collateral (accompanied by new false documentation).  *Id.* ¶¶ 112, 115.

The fraudsters' concealment efforts didn't stop there.  Kissick also provided PwC with incorrect TBW account balance numbers, which Farkas corroborated in audit confirmations that he sent to PwC.  Kissick SEC Compl. ¶ 50 (attached as Ex. B).  The documents on which Plaintiffs rely so heavily in their Complaint show that, at every turn, Kissick, Kelly, Farkas and others undertook elaborate efforts to conceal their fraud from PwC.  *See* Kissick Statement of Facts ("SOF") at ¶ 7 (attached as Ex. C) (conspirators designed fraud "[t]o avoid scrutiny from regulators, auditors, and Colonial Bank management"); *id.* ¶ 8 (fraudsters' actions made "detection of the scheme by regulators, auditors, Colonial Bank management and others less likely"); *id.* ¶ 13 ("[Kissick], Farkas and other co-conspirators engaged in these sham sales to deceive others, including regulators, auditors, and certain Colonial bank management"); *id.* ¶ 15 (same); *id.* ¶ 16 (same).  In the face of these facts, Plaintiffs' allegation that PwC helped "engineer" the fraudulent scheme (Compl. ¶ 6) cannot be taken seriously.

---

101), the Kissick Statement of Facts (*see id.*), and Colonial's public filings with the SEC (*see, e.g., id.* ¶¶ 183, 903).

The conspirators' efforts to hide their fraud from PwC and the regulators were so varied, intricate, and successful that it took a government team of ten forensic experts working over 10,000 hours and reviewing "[m]illions and millions of . . . records" over the course of six months to fully unravel the fraud *after* it already had been discovered. Farkas Trial Tr. at 1984-89 (Ex. A). And that was with the help of the conspirators, who were looking to cooperate to avoid jail time.

### C.    Colonial's Demise

The fraud at Colonial would have been bad enough if it had occurred in a vacuum. But it did not. In later years, the MWLD fraud coincided with one of the worst economic crises in American history.

Colonial was not immune from that crisis, nor did it pretend to be. In its 2008 Form 10-K, Colonial disclosed an $880.5 million net loss (including a $575 million impairment charge to goodwill), disclosed that it had entered into a Memorandum of Understanding with the Federal Deposit Insurance Corporation ("FDIC") and the Alabama State Banking Department stemming from regulatory concerns over the bank's financial stability, reaffirmed that its receipt of TARP funds was contingent on its raising $300 million in private capital, and warned that its business and earnings "could be further harmed in the event of a continuation or deepening of the current U.S. recession or further market deterioration or disruption." Colonial's 2008 Form 10-K at 2, 4, 10 (attached as Ex. D).

Things did not get better. On August 14, 2009, the FDIC placed Colonial Bank into receivership. Shortly thereafter, Colonial filed for bankruptcy. Compl. ¶ 13. Plaintiffs variously describe the cause of Colonial's demise as the "mortgage

market meltdown," the "serious mortgage lending crisis," the "credit crisis," and the "Florida Real Estate Crisis."  Compl. ¶¶ 192, 244, 245, 246, 822 & Section IV.A.6.  Whatever words are used to describe the financial crisis, there is no question that it pummeled Colonial Bank.

As it pummeled many other banks during the period.  From 2008 through April 29, 2011 (the date of the Complaint), the FDIC listed 360 banks on its failed bank list.[4]  In the preceding five years (2003 to 2007), by contrast, the FDIC listed only ten bank failures.  *Id.*  The crisis extended to every corner of the banking and mortgage industries.  Lehman Brothers and Washington Mutual declared bankruptcy.  Merrill Lynch and Wachovia escaped bankruptcy through last-minute acquisitions.  The Government placed Fannie Mae and Freddie Mac into conservatorship.  Congress enacted a $700 billion bailout of the financial services industry.  The period quickly earned a name—the Great Recession.

And yet Plaintiffs' claims against PwC are based largely on the far-fetched notion that PwC should have predicted the severity of this once-in-a-lifetime recession.  But even Plaintiffs acknowledge that most of the alleged errors in Colonial's financial statements—including Colonial's allowance for loan losses and its valuation of goodwill and of its mortgage-backed securities—were matters of judgment, requiring estimates that were inherently uncertain.  *See, e.g.*, Compl. ¶ 805 (acknowledging that allowance for loan losses, fair value measurements, and goodwill impairment "involve subjective judgments or uncertainties that are difficult to corroborate"); *see also* AU § 230.11 (because "accounting presentations

---

[4] http://www.fdic.gov/bank/individual/failed/banklist.html.

contain accounting estimates, the measurement of which is inherently uncertain and depends on the outcome of future events[,] [t]he auditor exercises professional judgment in evaluating the reasonableness of accounting estimates"). Plaintiffs cannot manufacture a claim for securities fraud against PwC by second-guessing those judgments, particularly in the wake of the financial crisis.

## **ARGUMENT**

## I.   **PLAINTIFFS HAVE NOT STATED A SECTION 10(B) CLAIM AGAINST PWC.**

Plaintiffs are nothing if not audacious. Ignoring this Court's December 17, 2010 Order requiring the parties to meet and confer about any amendments to the Complaint, Plaintiffs assert Section 10(b) claims against PwC despite having told PwC during the court-ordered conference that they would not do so. If Plaintiffs had conferred with PwC about the claims, PwC would have explained the many reasons why asserting them would prove a waste of Plaintiffs', PwC's, and this Court's time. The Section 10(b) claims must be dismissed.

### A.   **Exacting Pleading Standards Apply To Plaintiffs' Section 10(b) Claims.**

To state a claim against PwC under Section 10(b) and SEC Rule 10b-5, Plaintiffs must allege that PwC (1) made a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, and (3) acted with scienter; that (4) Plaintiffs relied on that misrepresentation; and that (5) PwC's misrepresentation caused Plaintiffs economic loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Plaintiffs bear a heavy burden in pleading these elements.  Federal Rule of Civil Procedure 9(b) requires Plaintiffs to plead each element of their claims with particularity.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  On top of Rule 9(b), the PSLRA imposes even more demanding pleading requirements.  Not only must a complaint state facts "with particularity"—"specifying each statement alleged to have been misleading" and "the reasons why the statement is misleading" (15 U.S.C. § 78u-4(b)(1), (b)(2))—but those particularized facts also must "giv[e] rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA."); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008).[5]

Here, the Complaint fails to satisfy these pleading standards in three distinct ways:  It fails to allege particularized facts (1) raising a "strong inference" of PwC's scienter, (2) showing any misstatement on PwC's part, or (3) demonstrating that any alleged PwC misstatement caused Plaintiffs' alleged losses.

### B. The Complaint Does Not Raise A Plausible Inference Of PwC's Scienter, Much Less The Required Strong Inference.

Plaintiffs' Section 10(b) claims against PwC fail at the threshold because the Complaint does not "state with particularity facts giving rise to a strong inference

---

[5] Of course, even under the ordinary pleading standards set out in Federal Rule of Civil Procedure 8(a)(2), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

that" PwC "acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2). Indeed, the Complaint does not support even a *plausible* inference that PwC committed fraud.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Section 10(b) imposes liability only for those materially false statements made with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)).  In the Eleventh Circuit, this standard means, *at a minimum*, "severe recklessness," a mental state encompassing "those highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either *known* to the defendant or is *so obvious the defendant must have been aware of it.*"  *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 790-91 (11th Cir. 2010) (emphasis added).[6]

As demanding as this standard is in the normal course, it is especially stringent when, as here, the Section 10(b) defendant is an independent auditor. Severe recklessness on the part of an independent auditor requires "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated." *La. Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010) (internal quotation marks omitted); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) (same).  When the standard of

---

[6] The Supreme Court has not decided whether recklessness satisfies Section 10(b)'s scienter requirement.  *See Tellabs*, 551 U.S. at 319 n.3.

recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: "'[T]o allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor *must have been aware of the corporation's fraud*.'"  *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 732 (W.D. Tex. 2010) (emphasis added) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 694 (6th Cir. 2004)); *see also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc*., 595 F. Supp. 2d 1253, 1283 (M.D. Fla. 2009) (plaintiff "must offer specific factual allegations that are sufficient to support the strong inference that the audit was so deficient that it amounted to *no audit at all*") (emphasis added, internal quotation marks omitted), *aff'd*, 594 F.3d 783 (11th Cir. 2010).

The standard is tougher still.  Because the "strength of an inference cannot be decided in a vacuum," a complaint alleges a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling *as any opposing inference one could draw from the facts alleged*." *Tellabs*, 551 U.S. at 323-24 (emphasis added).  A court therefore must consider "plausible nonculpable explanations for the defendant's conduct."  *Id.* at 324.

Given these stringent pleading standards, it is not surprising that courts in this Circuit routinely dismiss Section 10(b) claims against auditors for failure to

plead a strong inference of scienter.  *See, e.g.*, *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006).[7]

So it should be here.  Plaintiffs' Complaint alleges no facts raising even a plausible inference—let alone the required strong inference—that PwC must have been aware of Colonial's fraud.  The Complaint does not allege that PwC actually knew of any fraud, or even that PwC had a motive to engage in fraud.  Wholly to the contrary, the Complaint demonstrates that the fraudsters went to great lengths to hide their fraud from PwC.  It also demonstrates that no one, not even the regulators, foresaw the once-in-a-century financial crisis that leveled Colonial and hundreds of other financial institutions.  Those opposing inferences of innocent conduct outstrip any suggestion that PwC committed fraud.  *See Tellabs*, 551 U.S. at 326 ("would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

### 1.    The Complaint demonstrates that PwC was a victim, not a perpetrator, of the alleged fraud.

The Complaint tells a story, not of a PwC fraud, but of Colonial's and TBW's sustained, elaborate efforts to hide their fraud from PwC.  The conspirators transferred funds among various TBW accounts as part of a shell game designed to conceal overdrafts (Compl. ¶ 104); forged bogus or "dummy" loan documentation

---

[7] *See also, e.g.*, *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) (affirming dismissal of securities fraud claim against auditor); *Chiarenza  v. IBSG Int'l, Inc.*, 2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) (same); *Durham v. Whitney Info. Network, Inc.*, 2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) (same); *In re Pegasus Wireless Corp. Sec. Litig.*, 2009 WL 3055210 (S.D. Fla. Sept. 21, 2009) (same); *Jabil Circuit*, 595 F. Supp. 2d at 1287 (same); *In re Witness Sys., Inc. Sec. Litig.*, No. 1:06-cv-1894-CC, slip op. (N.D. Ga. Mar. 31, 2008) [DKT # 109]; *In re Faro Tech. Sec. Litig.*, 534 F. Supp. 2d 1248 (M.D. Fla. 2007) (same).

to "recycle" already pledged loans and to dress up loans that lacked adequate collateral (*id.*); resold loans that were already pledged to other financial institutions (*id.*); and provided PwC with false audit confirmations.  Kissick SEC Compl. ¶¶ 49-50 (Ex. B).[8]  And nowhere in the 300-page Complaint do Plaintiffs ever allege that, despite Colonial's concealment efforts, PwC actually knew about Colonial's illegal scheme.  *See Garfield*, 466 F.3d at 1269 (affirming dismissal where plaintiff failed to allege that auditor knew of the fraud).

All of this is impossible to square with the notion that PwC engaged in any fraud.  *See Pub. Employees' Ret. Assoc. of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 316 (4th Cir. 2009) ("plaintiffs cannot escape the fact that [the companies] went to considerable lengths to conceal the fraud from the accountants"); *see also, e.g.*, *W. Va. Inv. Mgmt. Bd. v. Doral Financial Corp.*, 2009 WL 2779119, at *2 (2d Cir. Sept. 2, 2009); *ArthroCare*, 726 F. Supp. 2d at 737. Indeed, it is consistent *only* with the idea that PwC, like Plaintiffs and the regulators, was a victim of the fraud.  *See Pub. Employees' Ret.*, 551 F.3d at 316 ("the stronger and more plausible inference is that the [auditors] were, like the plaintiffs, victims of [the] fraud rather than its enablers").[9]

---

[8] Although the Complaint cites excerpts from the transcript of TBW Chairman Lee Farkas's two-week-long criminal trial, it conveniently omits those portions of the transcript demonstrating that Colonial and TBW intentionally hid their fraud from PwC.  *See, e.g.*, Farkas Trial Tr. at 766 (Ex. A) (Kissick testifying that the bank hid overdrafts and fraudulent banking practices from PwC); *id.* at 862-64 (Kissick testifying that a TBW confirmation sent to PwC for year end 2007 contained false numbers); *id.* at 500-01 (Teresa Kelly testifying that she kept a database of loans that were ineligible for, but nonetheless, included in, TBW's product line and that she did not share with Colonial management, auditors, or regulators).

[9] In light of the Complaint's allegations demonstrating that Colonial actively hid its mortgage-warehouse fraud from PwC, Plaintiffs' allegations that PwC ignored various "red flags" relating

### 2. The Complaint also demonstrates that no one, not even the regulators, predicted the marketwide collapse in the financial industry.

The Complaint also shows that, at bottom, Plaintiffs' fraud claims amount to an attempt to impose liability on PwC for failing to predict an unprecedented collapse in the financial industry. As courts have held in assessing similar claims, however, a lack of clairvoyance about the market does not amount to fraud. *See, e.g.*, *Kadel v. Flood*, 2011 WL 2015379, at *3 (11th Cir. May 24, 2011) (rejecting scienter allegations because "the stronger inference is that appellees simply failed to predict the eventual collapse of the housing and subprime mortgage market"); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("lack of clairvoyance simply does not constitute securities fraud"); *Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) (same).

Although the Complaint largely ignores the broader context in which Colonial operated and ultimately failed, even Plaintiffs acknowledge that 2007 and 2008 witnessed a collapse in the financial and mortgage industries the likes of which has not been seen since the Great Depression. No corner of the country was immune, and certain states, including Florida, were particularly hard hit. *See* Compl. ¶¶ 244, 822 (banks in Florida were "devastated" by the economic downturn); *id.* ¶ 246 (describing the "mortgage market meltdown").

---

to Colonial's mortgage-warehouse practices (*see* Compl. Section IX.D.3 ("'Red Flags' Raised by the Significant Concentration of Credit Risk with TBW"); *id.* Section IX.D.4 ("'Red Flags' Raised by Aged Loans as AOT Facility Collateral")) hardly deserve a response. The only inference that the Complaint raises with respect to MWLD is that the fraudsters went out of their way to hide their fraud from PwC; it does not also suggest that PwC committed fraud by failing to detect what was hidden from it.

And yet, distilled to its core, the Complaint alleges that PwC committed fraud by failing to foresee what the regulators, analysts, and commentators all failed to foresee and what everyone now agrees was a seismic event in the global economy.  That claim, frankly, is absurd.  Colonial did not hire PwC to run its business or to predict trends in the marketplace, but rather to issue an opinion, based on reasonable assurance and professional judgment, about whether Colonial's historical financial statements were fairly stated in accordance with GAAP as of a certain date.  *See, e.g.*, AU § 328.05 ("The auditor is not responsible for predicting future conditions, transactions or events that, had they been known at the time of the audit, may have had a significant effect on management's actions or management's assumptions underlying the fair value measurements and disclosures.").  The most logical inference is that whirlwind-like market forces flattened Colonial and hundreds of other banks.  It is not, as Plaintiffs suggest, that PwC committed fraud.  *See, e.g.*, *Kadel*, 2011 WL 2015379, at *3.[10]

### 3.    Allegations that PwC violated GAAS do not support a strong inference that PwC acted with scienter.

Most of Plaintiffs' scienter allegations can be brushed aside under the well-established rule that allegations of violations of GAAP and GAAS alone do not establish a strong inference of scienter.  *See, e.g.*, *Garfield*, 466 F.3d at 1270 (allegation that auditor violated GAAS was "merely an allegation of negligence," not fraud); *Ferris, Baker Watts, Inc. v. Ernst & Young LLP*, 395 F.3d 851, 855 (8th

---

[10] Even if PwC were aware of the *general* negative trend in the financial industry, "[k]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

Cir. 2005) ("Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter.  Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.").

Those kinds of allegations lie at the heart of Plaintiffs' claims.  The Complaint contains paragraph after paragraph of quotations of auditing standards followed by threadbare assertions that PwC "would have" detected various alleged problems in Colonial's financial statements had it conducted a GAAS audit.  *See, e.g.*, Compl. ¶¶ 703-15, ¶¶ 820-24 ("Had PwC conducted the Colonial audits in accordance with GAAS, it would have been alerted to [goodwill] impairment indicators in early 2007.").  That, of course, is a far cry from particularized allegations showing that PwC issued false audit opinions intentionally or with severe recklessness.  *See In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1363 (S.D. Fla. 2005) (plaintiff cannot allege strong inference of scienter "by merely alleging that later disclosed information would have been discovered earlier if the auditor had not violated GAAS") (internal quotation marks omitted); *see also Pub. Employees' Ret.*, 551 F.3d at 314 ("In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more."); *ArthroCare*, 726 F. Supp. at 735 (dismissing Section 10(b) claim because plaintiff did not plead any specific details indicating "how or when PwC became aware of the misstatements in ArthroCare's earlier disclosures, what PwC's audit entailed, what the basis is for the assumption PwC did not perform appropriate testing . . ., how the supposedly missed tests would have

revealed the fraud in question, or why there is any reason to believe the alleged deficiencies were purposeful or reckless").

The same goes for Plaintiffs' allegations that PwC ignored weaknesses in Colonial's internal controls and various fraud risk factors.  *See, e.g.*, Compl. ¶¶ 716, 806.  Courts agree that an accountant's failure to identify problems in a company's internal controls and accounting practices does not establish the accountant's scienter.  *See, e.g.*, *In re Dell*, *Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 902 (W.D. Tex. 2008) ("[C]ourts have recognized an auditor's failure to detect weaknesses in a company's internal controls alone is insufficient to determine the auditor acted with scienter, even when a restatement later acknowledges deficiencies."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 450 (S.D.N.Y. 2005) (allegation that PwC "ignored" "weaknesses in accounting controls" did not establish scienter).  Likewise, the fraud "risk" factors that PwC allegedly ignored—such as deteriorating economic conditions and declining real estate values—were present at almost every bank attempting to weather the financial crisis.  Thus, even if PwC had ignored those risk factors—and it did not—that would not bespeak a PwC fraud.  *See Dell*, 591 F. Supp. 2d at 904-05.

### 4.    The alleged "red flags" do not establish PwC's scienter.

Nor do the alleged "red flags" raise an inference of scienter.

Many of the supposed "red flags" are just repackaged versions of Plaintiffs' allegations that PwC violated GAAS (*see, e.g.*, Compl. ¶¶ 723, 764, 774, 777) and thus add nothing to the scienter analysis.  *See Garfield*, 466 F.3d at 1268 ("the purported red flags cannot simply re-hash the alleged GAAP violations" (internal

quotation marks omitted)); *In re Imergent Sec. Litig.*, 2009 WL 3731965, at *10 (D. Utah Nov. 2, 2009) ("GAAP violations masquerading as red flags are insufficient to raise a strong inference of scienter.").

Many other of the alleged "red flags" are plucked from regulatory reports released *after* PwC issued its 2007 and 2008 audit opinions.  For instance, Plaintiffs rely heavily on a Material Loss Review that the FDIC's Office of Inspector General issued in April 2010 ("OIG Report").  The OIG Report is an *after-the-fact* assessment of Colonial's demise, issued at a time when its drafters could view the financial crisis in hindsight, a benefit that PwC did not enjoy when it issued its opinions in 2007 and 2008 Colonial year-end financial statements.  The Report does not assess the quality of PwC's 2007 and 2008 audit opinions, let alone conclude that PwC committed fraud.  *See generally* OIG Report (attached as Ex. E).

Likewise, Plaintiffs rely on a June 2008 Report of Examination that the FDIC issued in *May 2009*, well after PwC had issued its 2007 and 2008 audit opinions.[11]  *See* OIG Report at 4-5 (Ex. E); Compl. ¶¶ 723, 724, 727, 734(a), 738, 749.  And Plaintiffs point to a proposed interim ratings change and cease-and-desist order that the OCC contemplated in 2008 but that Plaintiffs admit never was imposed and do not allege even came to PwC's attention.  *Id.* ¶¶ 725; *see also* OIG

---

[11] Plaintiffs rely heavily on the list of various "weaknesses" related to loan underwriting, credit administration, and risk analysis and recognition practices mentioned on pages 9 and 10 of the April 2010 OIG Report (Ex. E).  *See, e.g.*, Compl. ¶ 734.  Looking at the April 2010 OIG Report as a whole, however, it appears that those "weaknesses" were not identified until the June 2008 Report of Examination.  That report did not issue until May 2009, after PwC opined on Colonial's 2007 and 2008 financial statements.

Report at 13 (Ex. E) ("OCC had also drafted, but *did not impose*, a C&D") (emphasis added); *Garfield*, 466 F.3d at 1268 ("red flags" must "come to the attention of an auditor" and place auditor on notice of wrongdoing).

Moreover, even the regulatory reports that arguably came before PwC issued one or both of its audit opinions would not have alerted PwC to any fraud. Indeed, those reports do not even suggest that *the regulators* suspected fraud:

- **The OCC's March 2008 Supervisory Letter (Compl. ¶ 734).** In a March 2008 letter, the OCC cited certain "concerns" relating to Colonial's MWLD (*see*, *e.g.*, Compl. ¶¶ 734, 743, 753) but, according to the OIG Report, the FDIC followed up on the OCC's concerns in a July 2008 review and "concluded that Colonial's risk management practices were acceptable and improvements were largely being made." OIG Report at 20 (Ex. E); *see also In re Crocs, Inc. Sec. Litig.*, 2011 WL 782485, at *24 (D. Colo. Feb. 28, 2011) (management efforts to remedy various problems inconsistent with strong inference of scienter).

- **Colonial Ratings Downgrades (Compl. ¶ 728).** Although Plaintiffs point to various ratings downgrades of Colonial's stock, Colonial Bank's UFIRS ratings went relatively unchanged until September 2008, when the FDIC raised the bank's composite rating to a "3" (a rating that is still in the middle of a scale of 1 to 5, with 5 denoting the highest level of regulatory concern). OIG Report at 15 (Ex. E). That occurred after PwC issued its 2007 audit opinion and, in any event, did not suggest the existence of fraud. The next wave of ratings changes did not occur until 2009, after PwC issued its 2008 audit opinion.

- **Colonial's December 2008 Memorandum of Understanding ("MOU") with the FDIC (Compl. ¶ 729).** An MOU is "[a]n informal corrective administrative action for institutions considered to be of supervisory concern, but which have not deteriorated to the point where they warrant formal administrative action." OIG Report at 29 (Ex. E). Thus, as of December 2008, the bank had not deteriorated to the point where regulators were taking formal action. In any event, Colonial *disclosed* the MOU in its 2008 Form 10-K at 3 (Ex. D), undercutting any inference of PwC's scienter. *See*

*Dronsejko v. Grant Thornton*, 632 F.3d 658, 669 (10th Cir. 2011) (disclosure of accounting issue undercut inference of auditor's scienter).

- **Colonial's June 2008 Charter Change (Compl. ¶¶ 759-63).**   A charter change is not inherently suspicious.  To the extent that Plaintiffs allege that the timing of the change was suspicious in light of the OCC's proposed cease-and-desist order in 2008, Plaintiffs do not even allege that the proposed cease-and-desist order came to PwC's attention.  Moreover, the charter change did not significantly affect the regulators' supervision of the bank.  OIG Report at 14-15 (Ex. E); Compl. ¶ 725.

Plaintiffs get no further with their final set of alleged "red flags"—those relating to Colonial's allowance for loan losses.[12] *See, e.g.*, Compl. ¶ 197.  The Complaint does not allege that Colonial failed to reserve for loan losses—on the contrary, it alleges that Colonial's allowance for loan losses increased in the fourth quarter of 2007, and continued to increase throughout 2008.  *Id.* ¶ 192.  Plaintiffs claim instead that Colonial's increase in net charge offs in 2008 proves that the bank's allowance was inadequate at the end of 2007.  *Id.* ¶ 197.  Again, the PSLRA rejects this type of hindsight pleading.  *See La. School Employees' Ret. Sys.*, 622 F.3d at 484 (dismissing Section 10(b) claims as "classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly").

---

[12] GAAP impose restrictions on when a bank can record an allowance for loan losses.  Under GAAP, an allowance for loan losses is permissible *only* when (1) it is *probable* (not merely possible) that the bank will experience a loss on the loan, *and* (2) the amount of loss can be *reasonably estimated*.  Statement of Financial Accounting Standards No. 5 ¶ 8.  On top of that, these two GAAP criteria must exist *as of the balance sheet date*, rather than as of some future date.  Thus, GAAP does not permit a bank to record an allowance for loan losses based on mere possibilities as to what the economy might do in the future.

### 5. The Complaint does not allege that PwC had a motive to commit fraud.

Finally, Plaintiffs do not even try to ascribe a fraudulent motive to PwC. *See Tellabs*, 551 U.S. at 325 (noting that courts can consider as part of the scienter analysis the lack of allegations of a fraudulent motive). And for good reason: It defies common sense that a large, well-respected accounting firm such as PwC would risk its professional reputation and invite potential legal liability of millions of dollars by deliberately engaging in fraud with one of its clients to obtain a comparatively modest audit fee. As the Seventh Circuit has explained, "[a]n accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [an auditor] would suffer from a perception that it would muffle a client's fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990).

### C. Plaintiffs Have Not Alleged With Particularity A PwC Misstatement.

Not only does the Complaint fail to raise a strong inference that PwC made a material misstatement with scienter, but it also fails to allege particularized facts that, if proven, would show that PwC made a material misstatement at all. *See* 15 U.S.C. § 78u-4(b)(1)(B) (plaintiff must "specify each statement alleged to have been misleading" and "the reasons why the statement is misleading"); Fed. R. Civ. P. 9(b); *Garfield*, 466 F.3d at 1262 (Rule 9(b) requires plaintiffs to plead "the who, what, when, where and how: the first paragraph of any newspaper story").

Out of the dozens of alleged misstatements identified in the Complaint, Plaintiffs seek to hold PwC liable under Section 10(b) only for its opinions that

Colonial's 2007 and 2008 year-end financial statements were fairly stated in accordance with GAAP.  Compl. ¶¶ 585, 623.  In limiting their Complaint in this fashion, Plaintiffs correctly recognize that PwC cannot be liable for statements that it did not make, such as those in unaudited financial statements, Form 8-Ks or 10-Qs filed with the SEC, press releases, or earnings calls.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301-04 (2011); *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 180 (1994).  The question, then, is whether Plaintiffs have alleged particularized facts sufficient to show that either of PwC's audit opinions was false when issued.  The answer is no.

Almost all the alleged GAAP violations in Colonial's financial statements relate, not to matters of simple arithmetic, but to accounting *estimates*.  Plaintiffs spill much ink about the purported errors in Colonial's allowance for loan losses and its valuations of goodwill and mortgage-backed securities, but as Colonial pointed out in its 2007 and 2008 Form 10-Ks and as Plaintiffs concede, each of those items "require[s] management to make particularly subjective and/or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions."  2008 Form 10-K at 15 (Ex. D); *see also* 2007 Form 10-K at 11 (attached as Ex. F) (similar language regarding allowance for loan losses and goodwill); Compl. ¶¶ 805, 806.  Actual results, of course, can and often do turn out to be different from the original estimates, but that does not mean that the estimates were false when made.  *See, e.g.*, *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010)

("[a]ccounting or business judgments, even negligent ones, are not actionable" under the securities laws) (citations omitted).

Nevertheless, Plaintiffs point to events *after* PwC issued its audit opinions as support for their claim that the original accounting estimates—estimates about future (and hence unknowable) events—were incorrect.  In the wake of a financial crisis that leveled the American economy, Plaintiffs' claim that Colonial and PwC should have predicted the future is particularly ill-founded.  Even in circumstances not involving an historic recession, courts routinely have rejected this type of fraud-by-hindsight pleading.  *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").  Hindsight allegations simply don't suggest fraud.

Plaintiffs' allegations relating to goodwill typify the Complaint's fraud-by-hindsight approach.  GAAP sets forth a fact-intensive two-part test for determining whether goodwill has been impaired (*i.e.*, worth less than the amount recorded).  This test requires a company to make highly subjective estimates, including about future cash flows and the value of assets and liabilities.  *See* Compl. ¶ 241; Colonial's 2007 Form 10-K at 21-22 (Ex. F).  Colonial tested its goodwill for impairment in the third quarter of 2007, at the end of 2007, and throughout 2008, each time determining that it did not need to reduce the recorded value of the asset.[13]   Compl. ¶ 494.  In the fourth quarter of 2008, as the economic crisis

---

[13] Plaintiffs' assertion that Colonial did not test for goodwill impairment between the third quarters of 2007 and 2008 (Compl. ¶ 251) is flat wrong.  Colonial's public filings show that the

reached a crescendo, the bank recorded a $575 million reduction to goodwill.  *Id.* ¶ 10.

Rather than alleging particularized facts showing that the GAAP criteria for goodwill impairment required Colonial to reduce goodwill in its year-end 2007 financial statements, Plaintiffs allege merely that Colonial should have reduced its goodwill earlier because it took a large impairment charge at the end of 2008. Compl. ¶ 254.  Those sorts of allegations could be lobbed at almost any company following the credit crisis, however.  As one court explained in dismissing similar allegations:

> Instead of explaining why optimism [about goodwill] was unwarranted at each step of the way . . ., the amended complaint simply cites disappointing figures from the future as though these are evidence of fraud in the past.  If that were true, of course, we would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their predictions would have been knocked down by the dramatic recession . . . . It should go without saying that one could be mistaken in a prediction about the future without committing fraud.

*Iron Workers Local No. 25 Pension Fund v. OshKosh Corp.*, 2010 WL 1287058, at *17 (E.D. Wis. Mar. 30, 2010); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Public, Ltd.*, 655 F. Supp. 2d 262, 272 (S.D.N.Y. 2009) ("That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent.").  Furthermore, that Colonial tested goodwill throughout 2008 to

---

Company tested for goodwill impairment during that period.  *See* Colonial's Second-Quarter 2008 Form 10-Q (attached as Ex. G); Compl. ¶ 494 (quoting Colonial's SEC filings).

determine whether an impairment existed belies any notion of fraud.  *See OshKosh*, 2010 WL 1287058, at \*14-17.

The Complaint follows the same formula with respect to Colonial's allowance for loan losses and its valuation of its mortgage-backed securities. Plaintiffs engage in post hoc speculation about the adequacy of the bank's loss reserves, apparently equating later substantial increases in Colonial's loan losses with a material misstatement in the original estimates.  But as numerous courts have held, a later increase in reserves does not signal that an earlier estimate was false.  *See, e.g.*, *DiLeo*, 901 F.2d at 627 ("No matter when a bank [writes off a loan], someone may say that it should have acted sooner.  If all that is involved is a dispute about the timing of the write-off, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence."); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) (allegations of inadequate loss reserves are not actionable "under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of loan loss reserves").

Likewise, Plaintiffs' claim that Colonial's *2007* financial statements improperly valued the bank's mortgage-backed securities hinges principally on hindsight allegations that the bank recognized a "jump" in the securities' impairment in the *first quarter of 2008* and recognized a "massive impairment" to the securities *at the end of 2008*.  Compl. ¶ 236; *cf. In re Serologicals Sec. Litig.*, 2003 WL 24033694, at \*10 (N.D. Ga. Feb. 20, 2003) ("allegations that statements in one report should have been made in earlier reports do not make out a claim of

27

securities fraud"). And Plaintiffs' allegations that Colonial's $507 million impairment charge to its mortgage-backed securities in 2008 was insufficient are premised on the bank's suffering a $760 million loss on its *post-failure* sale of its loan portfolio. Compl. ¶ 237. These allegations shed no light on whether Colonial's 2007 financial statements were misstated when they were issued. *See, e.g.*, *In re Fannie Mae*, 742 F. Supp. 2d at 411 (post-conservatorship write-down of securities did not support allegations that impairment existed at the time the financial statements were issued). All they show is that, through opportunistic rummaging of the rubble of the financial crisis, anyone can try to plead fraud by hindsight. The PSLRA and Rule 9(b) demand much more.

### D.   Plaintiffs Have Not Adequately Pleaded Loss Causation.

The Section 10(b) claims against PwC also must be dismissed because Plaintiffs have not plausibly (much less particularly) alleged loss causation.[14]   The PSLRA provides that a Section 10(b) plaintiff must "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This requires Plaintiffs to demonstrate not only that they purchased Colonial stock in reliance on an actionable misrepresentation, but also that the misrepresentation "proximately caused the relevant economic loss." *Dura*, 544 U.S. at 346.

In *Dura*, the Supreme Court made clear that a plaintiff cannot plead loss causation simply by alleging "price inflation," *i.e.*, that the purchase price of the

---

[14] Like all other elements of a fraud claim, Plaintiffs must plead loss causation with particularity. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 689 (11th Cir. 2010).

security was inflated as a result of the defendant's misrepresentation.  The plaintiff also must allege that the misrepresentation concealed something from the market that, when disclosed, caused the security to lose value.  *Id.* at 342-43; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  These allegations are necessary, the Court reasoned, because any number of factors other than fraud can affect a security's price, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."  *Dura*, 544 U.S. at 342-43; *see also Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (corrective disclosure "must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains").

As important, when an auditor is the target of a Section 10(b) claim, "the plaintiff must plead that the market reacted negatively to some disclosure correcting the falsity in the . . . auditor's statements (and not simply the underlying fraud)."  *Amoroso v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 363 (S.D.N.Y. 2010).  In other words, it is not enough for a plaintiff to allege that the market somehow learned that the auditor's client committed fraud—the disclosure must reveal that the auditor's opinion was false.  *Id.*

The Complaint here comes nowhere close to alleging a causal connection between Plaintiffs' alleged losses and PwC's purported misrepresentations.  Not only do Plaintiffs fail to plead a PwC misstatement in the first place, but the series of purportedly corrective disclosures also did not even inferentially suggest to the market that PwC's opinions were false.  They did not relate to PwC's audit

29

opinions at all.   Those purportedly "corrective" disclosures show instead that Colonial's stock price declined, not as PwC's alleged fraud was revealed, but as Colonial reported the effects of the financial crisis on its business.   *See Dura*, 544 U.S. at 342-43; *Lentell*, 396 F.3d at 174 ("when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases").

### 1. The "corrective" disclosures alleged in the Complaint were not corrective at all.

Plaintiffs' allegations of loss causation consist of a handful of paragraphs that point to five purportedly corrective disclosures that Plaintiffs claim revealed to the market the "truth" about PwC's alleged misrepresentations.   *See* Compl. ¶¶ 840-45.   They did no such thing.   The first two disclosures "revealed" that Colonial was losing money—they said nothing about PwC's audit opinions, let alone suggested that they were false.    The remaining three disclosures came after Plaintiffs sold all their Colonial stock and thus have no bearing on Plaintiffs' alleged losses.   Moreover, the Complaint never once attempts to differentiate the effects of PwC's alleged fraud on Colonial's stock price from the effects of the financial crisis on that stock price.

### a. Colonial's October 22, 2008 and January 27, 2009 Form 8-Ks did not "correct" any alleged PwC misstatement.

Plaintiffs allege that "investors began to learn the truth" about PwC's fraud on October 22, 2008, the day that Colonial reported its third-quarter 2008 earnings. Compl. ¶ 840.   One searches the earnings report in vain for any language

suggesting that PwC's opinion on Colonial's 2007 financial statements was materially false. Instead, one finds, unsurprisingly, a report on Colonial's third-quarter earnings. That report certainly was negative—it disclosed a third quarter loss of $.35 per share stemming from increases in net charge offs and non-performing assets (*see* Colonial's October 22, 2008 Form 8-K, Ex. 99.2 at 3 (attached as Ex. H))—but as numerous courts have held, *negative* does not equal *corrective*. *See, e.g.*, *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect") (emphasis in original).[15]   The report was not a euphemism for fraud.[16]

The second alleged "corrective" disclosure—Colonial's January 27, 2009 Form 8-K—was no more corrective than the first. In its January 27 report, Colonial disclosed its earnings for the fourth quarter and year-end 2008. To be sure, the news was bad, as it was for many banks at the time: Colonial reported a net loss of $825 million for the fourth quarter of 2008 and a net loss of $880 million for the year, $575 million of which was attributed to impairment of goodwill. *See* Colonial's January 27, 2009 Form 8-K, Ex. 99.1 at 1 (attached as Ex. I). But again, negative financial news is just that, not a window into fraud, and

---

[15] *See also, e.g.*, *Lentell*, 396 F.3d at 175 n.4; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008); *Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010).

[16] Although Colonial's October 22, 2008 earnings report was not "corrective" in any sense, Plaintiffs' allegation that the report marked the "beginning" of the revelation of the alleged fraud does establish that no alleged PwC misstatement caused any drop in Colonial's stock price prior to October 22, 2008. *See Dura*, 544 U.S. at 342-43.

31

the news of Colonial's losses and impairment charge, however large, did not reveal that PwC's 2007 audit opinion was false.  *See, e.g.*, *Katyle*, 637 F.3d at 475 (dismissing complaint because purported "corrective" disclosures "did not even inferentially suggest that the [company's] prior press releases were fraudulent"); *Amoroso*, 682 F. Supp. 2d at 363 (same).  Indeed, the January 27 disclosure attributed Colonial's large losses, not to any earlier accounting errors, but to a period of unrest in the banking industry that has "no parallel in modern history." Jan. 27, 2009 Form 8-K at 1 (Ex. I); *see also In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005) (applying *Dura* and rejecting plaintiff's argument that defendant's press release "announcing that the company would take a goodwill impairment" adequately alleged loss causation).[17]

Plaintiffs also allege that Colonial's January 27, 2009 Form 8-K revealed fraud because Colonial disclosed, for the first time publicly, that its receipt of TARP funds was contingent on its raising $300 million of private capital.  *See* Compl. ¶ 841.  Colonial's disclosure regarding TARP funds could not have

---

[17] Likewise, Plaintiffs cannot recover under Section 11 for Colonial stock price drops following the October 22, 2008 and January 27, 2009 disclosures.  A Section 11 defendant can avoid liability if he or she proves, as an affirmative defense, "negative causation"—that is, that the defendant's alleged misrepresentation did not cause the plaintiff's losses.  *See* 15 U.S.C. § 77k(e).  As with any affirmative defense, negative causation may serve as the basis for a motion to dismiss if the defense appears on the face of the complaint.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).  Here, the face of the Complaint shows that PwC's alleged misrepresentations did not cause the stock price declines following the October 22, 2008 and January 27, 2009 disclosures—negative financial news did.  *See, e.g.*, *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 865-66 (N.D. Tex. 2005) (dismissing Section 11 claim because the face of the complaint showed that "any loss experienced by Plaintiffs could not be attributable to an alleged misrepresentation").

corrected any PwC "misstatement," however, because PwC never made a statement about TARP.

> **b.    The remaining three alleged "corrective" disclosures came after Plaintiffs sold all their Colonial stock.**

If this Court agrees that Colonial's October 22, 2008 and January 27, 2009 disclosures do not establish a causal connection between PwC's purportedly misleading statements and Plaintiffs' claimed losses, then it must dismiss Plaintiffs' Section 10(b) claims against PwC.  That is because Plaintiffs sold all their Colonial stock before the final three alleged "corrective" disclosures made it to the market.

In *Dura*, the Supreme Court explained that a plaintiff who sells a security before the first disclosure of truthful information will not have suffered any loss as a result of the alleged misrepresentation.  *See Dura*, 544 U.S. at 342 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss"); *see also, e.g.*, *In re Impax Labs., Inc. Sec. Litig.*, 2008 WL 1766943, at *7 (N.D. Cal. Apr. 17, 2008) (applying *Dura* and dismissing lead plaintiff's Section 10(b) claim for lack of Article III standing because plaintiff sold his stock before the first corrective disclosure).  Here, Plaintiffs allege that the three final "corrective" disclosures occurred on June 9, 2009 (Compl. ¶ 842), July 31, 2009 (*id.* ¶ 843), and August 7, 2009 (*id.* ¶ 844).  Before June 9, 2009, however, all the Section 10(b) Plaintiffs had sold their Colonial stock.  *See* Apr. 27, 2011 Certification of Arkansas Teacher Retirement System (attached as Ex. J) (last share sold on 3/4/09); Apr. 26, 2011 Certification

of State-Boston Retirement Board (attached as Ex. K) (last share sold on 1/9/09); Apr. 26, 2011 Certification of Norfolk County Retirement System (attached as Ex. L) (last share sold on 1/9/09); June 19, 2009 Certification of City of Brockton Retirement System (attached as Ex. M) (last share sold on 10/23/08).[18]   Because Plaintiffs sold their stock before the remaining three "corrective" disclosures, those disclosures cannot establish any link between PwC's alleged misstatements and Plaintiffs' claimed losses.[19]   *See In re Merrill Lynch*, 272 F. Supp. 2d at 255 ("It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class.").

> **2.    Plaintiffs' theory of causation does not even attempt to account for the marketwide crisis in the financial industry.**

As noted, the *Dura* Court recognized that a decline in a security's price may reflect "changed economic circumstances," and not the correction of a misrepresentation.  *Dura*, 544 U.S. at 342-43.  Because Plaintiffs' alleged losses "coincide[] with a marketwide phenomenon" (*Lentell*, 396 F.3d at 174), they must plead facts distilling the impact of PwC's alleged fraud from the impact of the marketwide collapse (and other factors not attributable to PwC).  *See, e.g.*, *In re*

---

[18]  PwC cites to the City of Brockton Retirement System's original June 19, 2009 Certification instead of the City's new April 26, 2011 Certification because the new Certification does not specify the dates of the City's purchases and sales of Colonial stock.

[19]  Indeed, three of the four Lead Plaintiffs sold their last share of Colonial stock before the disclosure on January 27, 2009, and before PwC issued its audit opinion on Colonial's 2008 financial statements.

*Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008).

The Complaint fails resoundingly on this score. Plaintiffs do not plead any facts differentiating the effects of PwC's alleged fraud on Colonial's share price from those flowing from the financial crisis. *See generally* Compl. ¶¶ 836-45. That also requires dismissal. *See, e.g., Merrill Lynch*, 568 F. Supp. 2d at 364 (dismissing Section 10(b) claim because complaint did "not attempt to explain how the decline of the stock price . . . was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted [the defendant] during the Internet sector's collapse").

## II.   PLAINTIFFS HAVE NOT STATED A SECTION 11 CLAIM AGAINST PWC.

The Complaint also fails to allege particularized facts that, if proven, would support a claim against PwC under Section 11 of the Securities Act.[20]

Section 11 permits purchasers of registered securities to sue certain parties, including accountants, for material misstatements or omissions in registration statements filed with the SEC. 15 U.S.C. § 77k. Unlike other potential Section 11 defendants, however, an accountant can be liable under Section 11 "only for those

---

[20] Rule 9(b) applies to Plaintiffs' Section 11 claims. It is well-established that Rule 9(b) applies to Section 11 claims "when the misrepresentation justifying the relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006). That is the case here: The only PwC statement identified by Plaintiffs that could possibly support a Section 11 claim against PwC—PwC's audit opinion on Colonial's 2007 financial statements (Compl. ¶ 975)— also forms the basis for Plaintiffs' Section 10(b) claims against PwC. *Id.* ¶ 585.

matters which purport to have been certified or prepared by him." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 n.11 (1983); 15 U.S.C. § 77k(a)(4).

Here, Plaintiffs seek to hold PwC liable under Section 11 for four different sets of misstatements:  (1) Colonial management's statements regarding internal controls in Colonial's 2007 Form 10-K (Compl. ¶¶ 1008-09); (2) management's certifications of Colonial's year-end 2007 financial statements (*id.* ¶¶ 1010-11); (3) Colonial's year-end 2007 financial statements (*id.* ¶¶ 976-1007); and (4) PwC's audit opinion relating to Colonial's 2007 financial statements (*id.* ¶ 975).  But PwC did not "prepare or certify" Colonial's 2007 financial statements, management's certifications of those financial statements, or management's statements regarding Colonial's internal controls.  *See, e.g.*, *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1174 (10th Cir. 2006) ("[A]uditors do not 'certify' a company's financial statements in the sense that they 'guarantee' or 'insure' them.  Nor do they, by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein.") (citations omitted).[21]  Indeed, PwC's audit report stated that "the Company's management is responsible for these financial statements and for maintaining effective internal controls over financial reporting."  Compl. ¶ 975.  PwC therefore cannot be liable for any alleged misstatements in Colonial's 2007 financial statements themselves (or in other parts of Colonial's 2007 Form 10-K) because PwC did not prepare or

---

[21] *See also* AU § 230.13 ("the auditor is not an insurer and his or her report does not constitute a guarantee"); AU § 110.3 ("The financial statements are management's responsibility . . . . [T]he auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.").

certify those materials. It can only possibly be liable under Section 11 for the contents of its audit report on Colonial's 2007 financial statements.

Plaintiffs' Section 11 allegations fail even as to that audit report, however. In Section I.B, PwC showed that Plaintiffs have not alleged particularized facts demonstrating that PwC's audit report on Colonial's 2007 financial statements contained a material misstatement. Even if they had, the Complaint still would fail because it does not plausibly allege that PwC did not actually believe its opinion.

### A. The Complaint Does Not Allege Particularized Facts Showing That PwC's Audit Opinion Was Subjectively False.

As described above, the alleged GAAP violations identified in the Complaint principally involve accounting estimates relating to loan loss reserves, the valuation of assets, and goodwill. *See, e.g.*, Compl. ¶¶ 936, 954, 993. Each of those items required Colonial management to make subjective judgments regarding future events. In its 2007 audit report, PwC provided an opinion about the financial statements containing those estimates, stating, "[i]n our opinion, the consolidated financial statements . . . present fairly, in all material respects, the financial position of The Colonial BancGroup, and its subsidiaries at December 31, 2007." *Id.* ¶ 975. Plaintiffs have not alleged any facts suggesting that PwC did not truly hold that opinion. The Section 11 claims fail as a result.

In *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), the Supreme Court held that a statement of opinion is actionable under Section 14 of the Exchange Act only if the opinion was both objectively *and* subjectively false when issued. *Id.* at 1095-96. In other words, when a statement of opinion is the focus of

a claim, a plaintiff must plead not only that the opinion was objectively false, but also that the speaker did not actually hold the opinion at the time it was issued. *Id.*

Recently, two district courts have applied this standard to dismiss Section 11 claims against banks and their auditors, claims similar to those pressed here. In *Fait v. Regions Financial Corp.*, 712 F. Supp. 2d 117 (S.D.N.Y. 2010), a putative class asserted claims under Sections 11, 12, and 15 of the Securities Act against a bank, several of the bank's directors, and the bank's independent auditor. There, as here, the plaintiffs alleged that the bank's offering materials were materially misstated because they incorporated financial statements that misstated goodwill and loan loss reserves. The court dismissed the claims against all defendants. Reasoning that the goodwill and loan loss reserves reported in the bank's financial statements represented opinions and estimates, the court held that the plaintiffs had failed to allege adequately the subjective falsity of those opinions. When a Section 11 claim is based on a statement of opinion, the court explained, the question "is whether the representation was false—not because the value [was] wrong in some empirical sense, but because the financial statement in the 10-K did not reflect [the maker's] honest opinion." *Id.* at 122 (internal quotations omitted).

Similarly, in *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 2010 WL 3545389, at *1 (N.D. Ga. Sept. 10, 2010), the plaintiffs sued a bank and its auditor under Sections 11, 12, and 15 of the Securities Act, contending that the bank's registration statement was materially misleading because it incorporated financial statements that understated the bank's allowance for loan loss reserves. *Id.* Citing *Fait*, the court rejected the plaintiffs' Section 11 claims, reasoning that a

38

company's allowance for loan losses "is not a matter of objective fact," but rather a statement of "opinion" regarding what portion of the company's loan portfolio will prove uncollectable. *Id.* at \*6. As a result, the court explained, the plaintiffs could state a claim under Section 11 only if they could allege subjective falsity—*i.e.*, that the bank "did not actually hold the opinion it expressed in the financial statements at the time they became effective." *Id.* Because the plaintiffs did not allege subjective falsity—and indeed "specifically disavow[ed]" any allegations of subjective falsity—the court dismissed the Section 11 claims against the bank and its independent auditor. *Id.*

Other courts have reached similar conclusions. In *Deephaven v. Grant Thornton*, for instance, investors sued an independent auditor under Section 18 of the Exchange Act, alleging, as Plaintiffs do here, that purported errors in a company's financial statements were enough to support recovery against the company's auditor. 454 F.3d at 1171.[22] The plaintiffs alleged that, because the company's financial statements did not conform to GAAP, the auditor was liable for its opinion that the financial statements conformed to GAAP. *Id.*

The Tenth Circuit rejected the investor's claims, holding that a plaintiff seeking recovery against an independent auditor must allege facts showing that statements in the audit opinion, and not merely in the financial statements, were false. *Id.* at 1176. The court explained that this requires allegations that the auditor did not believe its opinion. *Deephaven*, 454 F.3d at 1174. Because the

---

[22] Like Section 11, Section 18 requires proof of a material misrepresentation. *See* 15 U.S.C. § 78r(a).

complaint did not explain why the auditor's opinion was subjectively false when issued, the court affirmed dismissal of the complaint. *Id.*; *see also Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010) ("A subjective opinion is actionable under the Securities Act only if the [] complaint alleges that the speaker did not truly have the opinion at the time it was made public.").[23]

The same result should obtain here.  Plaintiffs have not pleaded any facts suggesting that PwC did not believe its audit opinion—indeed, Plaintiffs specifically disclaim any allegation that PwC knowingly made any false statement. *See* Compl. ¶ 1016.  Instead, Plaintiffs merely point to line items in Colonial's financial statements and allege that those items did not conform to GAAP.  Compl. ¶¶ 975-1016.  As PwC showed in Section I.B, however, Plaintiffs' allegations of GAAP and GAAS violations do not even raise a plausible inference that PwC acted with severe recklessness in conducting its audit, a mental state that approaches, but does not equal, actual knowledge of fraud.  It necessarily follows that the Complaint fails to allege facts showing that PwC did not believe its opinion.  The Section 11 claims against PwC must be dismissed.

---

[23] *See also, e.g.*, *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (dismissing Section 11 claim for failure to adequately allege subjective falsity); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (same).

**B.** **The Complaint Does Not Allege Particularized Facts Showing That Colonial's 2007 Financial Statements Were False.**

Even if PwC could be liable for statements in Colonial's 2007 financial statements, the Section 11 claims would fail because the Complaint does not allege particularized facts showing that those financial statements were materially false.

Plaintiffs' Section 11 claims focus on the same areas of accounting that underlie their Section 10(b) fraud claims—Colonial's allowance for loan loss reserves and its valuations of goodwill and of its mortgage-backed securities. As explained, each of these items required Colonial's management to make highly subjective judgments and estimates, a point that Plaintiffs concede. *See, e.g.*, Compl. ¶¶ 805-06; *see also* 2007 Form 10-K at 11 (Ex. F). As a result, courts have held that, to state a Section 11 claim based on one of these subjective areas of accounting, a plaintiff must allege facts showing subjective falsity. *See, e.g.*, *Belmont*, 2010 WL 3545389, at *6; *Fait*, 712 F. Supp. 2d at 122.

The Complaint is silent on this score. Instead of identifying facts suggesting that Colonial did not believe that its allowance for loan losses as of December 31, 2007, was adequate, for instance, the Complaint attempts to demonstrate the inadequacy of that allowance by pointing to later substantial increases in Colonial's net charge-offs and non-performing assets. Compl. ¶¶ 192-96. But as PwC has shown, allegations of a later increase in loan loss reserves do not even reveal that an earlier estimate was "incorrect," much less that the earlier estimate was subjectively false. *In re CIT Group*, 349 F. Supp. 2d at 689; *Belmont*, 2010 WL 3545389, at *6 ("Absent an allegation that Defendants did not believe the

statements incorporated into the [offering materials], Plaintiff has not stated a claim for misstatements relating to SunTrust's opinion regarding the adequacy of its loan reserves.").

Plaintiffs' allegations regarding Colonial's valuations of its goodwill and of its mortgage-backed securities are similarly deficient, as they, too, rely on hindsight pleading and relate to matters of opinion. *See Fait*, 712 F. Supp. 2d at 122-23; *see also In re Salomon Analyst Level 3 Litig*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) ("[F]inancial valuation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions.").[24]   The Complaint simply does not allege any facts sufficient to show that Colonial did not believe its estimates for goodwill or for the value of its mortgage-backed securities as of December 31, 2007.[25]

### C.   The Lead Plaintiffs Lack Standing To Sue Under Section 11.

Section 11 imposes a strict standing requirement:   Because the Securities Act is "concerned with the initial distribution of securities" (*Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005)), Section 11's "standing provisions limit putative plaintiffs to the narrow class of persons . . . who purchase securities that are the direct subject of the prospectus and registration statement." *Id.* (internal

---

[24] As Plaintiffs acknowledge, estimating the value of mortgage-backed securities was all the more difficult during the financial crisis because there was less trading in those securities and thus fewer data points from which to gauge a particular security's value.  Compl. ¶ 234.

[25] This is particularly unsurprising with respect to Colonial's mortgage-backed securities given that, at the end of 2007, credit ratings agencies gave all those securities an AAA-rating.  2007 Form 10-K at 35, 82 (Ex. F).

quotation marks omitted); 15 U.S.C. § 77k(a).  Thus, Plaintiffs here must plead that the Colonial shares they purchased are "traceable" to Colonial's April 23, 2008 stock offering.  *See APA Excelsior III L.P. v. Premier Tech., Inc.*, 476 F.3d 1261, 1276 (11th Cir. 2007) ("In order to have standing and prevail on a claim under Section 11, [an after-market purchaser] must be able to trace his stock to the defective registration statement.").

Plaintiffs have not even attempted to do so.  Although the four Lead Plaintiffs allege that they purchased Colonial common stock (Compl. ¶¶ 19-22), none alleges in even conclusory terms that the stock is traceable to the April 23, 2008 offering.  Moreover, as Plaintiffs' Amended Certifications show, each of the Lead Plaintiffs purchased its shares in the aftermarket, when the shares issued in the April 23, 2008 offering had already become commingled with (and thus indistinguishable from) other outstanding Colonial shares in the market.  *See* Exs. J through M (reflecting that no Lead Plaintiff purchased stock at the time of the April 23 offering); Compl. ¶¶ 69, 831 (Colonial had more than 152 million shares of common stock that traded on the NYSE during the Class Period, only 43.7 million of which were issued in the April 23 Offering).  As a result, the four Lead Plaintiffs lack standing under Section 11.  *See APA Excelsior*, 476 F.3d at 1276; *Krim*, 402 F.3d at 495.[26]

---

[26] As the Underwriters explain in their Motion to Dismiss Plaintiffs' Section 11 claims (Br. at 17), the Complaint shows that the remaining Section 11 Plaintiff, The Moyer Trust, also lacks statutory standing under Section 11 because it cannot trace any of its notes to the March 3, 2008 note offering.  PwC incorporates by reference that argument.

Plaintiffs essentially concede as much.   Although PwC made this same tracing argument in the previous round of motion-to-dismiss briefing, Plaintiffs have not even attempted in their Complaint to plead tracing on behalf of the four Lead Plaintiffs.   Instead, in an obvious attempt to cure this standing defect, Plaintiffs have added a new Named Plaintiff to the Complaint—the City of Worcester Retirement System.  Compl. ¶ 872.  But that ploy does not work:  The City of Worcester Retirement System's Section 11 claim must be dismissed because the face of the Complaint shows that no purported PwC misrepresentation could have caused any of Worcester's claimed losses.

### D.   The Face Of The Complaint Shows That The Negative-Causation Defense Bars The City Of Worcester Retirement System's Section 11 Claim.

As PwC has explained (at footnote 17), a Section 11 defendant can avoid liability if he or she proves, as an affirmative defense, that the defendant's alleged misrepresentation did not cause the plaintiff's losses.  *See* 15 U.S.C. § 77k(e).  As with any affirmative defense, negative causation may serve as the basis for a motion to dismiss if the defense appears on the face of the complaint.  *See, e.g.*, *In re Merrill Lynch & Co.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).

Here, the face of the Complaint shows that the City of Worcester Retirement System sold all its shares of Colonial stock allegedly traceable to the April 23, 2008 offering *before* the first allegedly corrective disclosure on October 22, 2008.[27]  *See* Apr. 26, 2011 Certification of City of Worcester Retirement System

---

[27] Courts also have held that a plaintiff who sells his or her shares before any corrective disclosure lacks Article III standing because he or she has not suffered a cognizable injury-in-fact that is traceable to the defendant's conduct.  *See, e.g.*, *In re Impax Labs., Inc. Sec. Litig.*,

(attached as Ex. N) (last share allegedly traceable to the April 23, 2008 offering sold by June 17, 2008).  Section 11's negative-causation defense therefore bars the City of Worcester's claim.  *See In re Merrill Lynch*, 272 F. Supp. 2d at 253-54.[28]

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss Plaintiffs' claims against PwC with prejudice.

Respectfully submitted this 1st day of August, 2011.

BALL, BALL, MATTHEWS &
NOVAK, P.A.
Tabor R. Novak, Jr. (NOV001)
200 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109
Telephone: (334) 387-7680
Facsimile: (334) 387-3222
tnovak@ball-ball.com

JOHNSTON BARTON PROCTOR &
ROSE LLP
Thomas E. Walker, Esq. (WAL017)
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, Alabama 35209

KING & SPALDING LLP

By:   <u>/s/ Elizabeth V. Tanis</u>
        Elizabeth V. Tanis
Admitted *pro hac vice*
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5140
etanis@kslaw.com

Geoffrey M. Ezgar (CA Bar No.
184243), admitted *pro hac vice*
101 Second Street, Suite 2300
San Francisco, CA 94015
Telephone: (415) 318-1324

---

2008 WL 1766943, at *7 (N.D. Cal. Apr. 17, 2008) (dismissing named plaintiff's Section 10(b) claim for lack of constitutional standing because the plaintiff sold all its shares before the first purported corrective disclosure); *see also Brown v. Medtronic, Inc.*, 628 F.3d 451, 458-59 (8th Cir. 2010) (applying *Dura* and holding that an ERISA plaintiff who sold all his shares before a corrective disclosure had suffered no constitutional injury).

[28] The City of Worcester Retirement System's Section 11 claim also is time-barred.  Section 11 claims are subject to a one-year statute of limitations framed by a three-year statute of repose.  *See* 15 U.S.C. § 77m.  Here, the City of Worcester Retirement System did not sue PwC until April 29, 2011 (the date of the operative Complaint), which is over three years after the April 23, 2008 offering.  Its Section 11 claim therefore is barred both by the one-year statute of limitations and by the three-year statute of repose.

Telephone:  (205) 458-9400
Facsimile:   (205) 458-9500
twalker@johnstonbarton.com

*Co-Counsel for Defendant*
 *PricewaterhouseCoopers LLP*

Facsimile: (415) 318-1300
gezgar@kslaw.com

*Counsel for Defendant*
*PricewaterhouseCoopers LLP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2011, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT for Leave to Exceed Page Limit with the Clerk of the Court using the CM/ECF electronic filing system, which will send notification of such filing to the following:

Thomas A. Dubbs (NY TD 9868), tdubbs@labaton.com
James W. Johnson (NY JJ 0123), jjohnson@labaton.com
Angelina Nguyen (NY AN 8929), anguyen@labaton.com
Alan I. Ellman, aellman@labaton.com
Christopher J. Keller, ckeller@labaton.com
Stefanie J. Sundel, ssundel@labaton.com
Thomas G. Hoffman, Jr., thoffman@labaton.com
Matthew C. Moehlman, mmoehlman@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005

Ira M. Levee, ilevee@lowenstein.com
Michael S. Etkin, metkin@lowenstein.com
LOWENSTEIN SANDLER PC
65 Livingston Ave.
Roseland, NJ 70680

Douglas Scott Wilens, dwilens@rgrdlaw.com
Jack Reise, jreise@rgrdlaw.com
ROBBINS GELLER RUDMAN DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432

*Attorneys for Lead Plaintiffs Arkansas Teacher Retirement System, The State-Boston Retirement System, The Norfolk County Retirement System and City of Brockton Retirement System and*
*Lead Counsel for the Class*

Tyrone C. Means (MEA003), tcmeans@tmgslaw.com
H. Lewis Gillis (GIL011), hlgillis@tmgslaw.com
Gerald C. Brooks (BRO212), gcbrooks@tmgslaw.com
THOMAS, MEANS, GILLIS & SEAY, PC
3121 Zelda Court
Montgomery, Alabama  36106
*Liaison Counsel for the Class*

Jeffrey A. Klafter, jak@klafterolsen.com
KLAFTER, OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY  10573
*Counsel for Plaintiff The Horace F. Moyer and Joan M. Moyer Living Trust*

Kimberly A. Sanders, kas@chimicles.com
Steven A. Schwart, sas@chimicles.com
Timothy N. Mathews, tnm@chimicles.com
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA  19041
*Counsel for the Class*

M. Stephen Dampier, stevedampier@bellsouth.net
LAW OFFICE OF M. STEPHEN DAMPIER, P.C.
55 North Section Street
Fairhope, AL  36532
*Counsel for the Class*

Samuel H. Franklin (FRA006), sfranklin@lightfootlaw.com
James F. Hughey III (HUG044), jhughey@lightfootlaw.com
Enrique "Henry" J. Gimenez (GIM001), hgimenez@lightfootlaw.com
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200

Robert David Segall, segall@copelandfranco.com
COPELAND FRANCO SCREWS & GILL
P.O. Box 347
Montgomery, AL  36101-0347

*Attorneys for the Colonial BancGroup Defendants of Robert E. Lowder, Sarah H. Moore, T. Brent Hicks, Sheila P. Moody, and John C.H. Miller, Jr.*

Armstead Inge Selden, III, iselden@maynardcooper.com
Carl S. Burkhalter, cburkhalter@maynardcooper.com
Richard J. Davis, rdavis@maynardcooper.com
Steven L. McPheeters, smcpheeters@maynardcooper.com
Alan F. Enslen, aenslen@maynardcooper.com
Kathryn L. Dietrich, kdietrich@maynardcooper.com
MAYNARD COOPER & GALE PC
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, Alabama  35203
*Attorneys for the Note Underwriter Defendants and the Stock Underwriter Defendants*

Larry B. Childs, larry.childs@wallerlaw.com
William C. Athanas, bill.athanas@wallerlaw.com
WALLER LANSDEN DORTCH & DAVIS LLP
1901 Sixth Avenue North, Suite 1400
Birmingham, Alabama  35203

Walter Edgar McGowan, wem@glsmgn.com
GRAY LANGFORD SAPP McGOWAN GRAY, GRAY & NATHANSON, P.C.
P.O. Box 830239
Tuskegee, AL  36083-0239

Sheila Watters Sawyer, sheila.sawyer@wallerlaw.com
WALLER LANSDEN DORTCH & DAVIS LLP
511 Union Street
Suite 2700
Nashville, TN  37219

*Attorneys for Lewis E. Beville, William Britton, Jerry J. Chesser, Augustus K. Clements, III, Robert S. Craft, Patrick F. Dye, Hubert L. Harris, Jr., Clinton O. Holdbrooks, Deborah L. Linden, John Ed Mathison, Milton E. McGregor, Joseph D. Mussafer, William E. Powell, III, James W. Rane, Simuel Sippial, Jr., and Edward V. Welch*

KING & SPALDING LLP

1180 Peachtree Street, N.E.             /s/ Elizabeth V. Tanis
Atlanta, Georgia 30309-3521             Elizabeth V. Tanis  (Ga. Bar No. 697415)
Telephone:  (404) 572-4600              etanis@kslaw.com; admitted *pro hac vice*
Facsimile: (404) 572-5140

*Counsel for PricewaterhouseCoopers LLP*

50